UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
SUSAN RATTNER,                 .    Civil Action No. 1:17cv136
                               .
        Plaintiff/             .
        Counterclaim Defendant,.
                               .
        vs.                    .    Alexandria, Virginia
                               .    October 12, 2017
CHUBB NATIONAL INSURANCE       .    9:30 a.m.
COMPANY,                       .
                               .
        Defendant/             .    MORNING SESSION
        Counterclaim Plaintiff..
                               .
.  .  .  .  .  .  .  .  .  .    .
```

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

VOLUME 2 - (a.m.)

APPEARANCES:

FOR SUSAN RATTNER:              MARK W. WASSERMAN, ESQ.
                               GRAYSON P. HANES, ESQ.
                               Reed Smith LLP
                               7900 Tysons One Place, Suite 500
                               McLean, VA 22102
                                 and
                               DOMINIC RUPPRECHT, ESQ.
                               Reed Smith LLP
                               Reed Smith Centre
                               225 Fifth Avenue
                               Philadelphia, PA 15222

FOR CHUBB NATIONAL             LAURIN H. MILLS, ESQ.
   INSURANCE COMPANY:          JEFFREY L. O'HARA, ESQ.
                               LeClairRyan
                               2318 Mill Road, Suite 1100
                               Alexandria, VA 22314

(APPEARANCES CONT'D. ON FOLLOWING PAGE)

(Pages 303 - 442)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

304

APPEARANCES:   (Cont'd.)

FOR CHUBB NATIONAL            PHILIP N. FLUHR, ESQ.
    INSURANCE COMPANY:       LeClairRyan
                             111 West Jackson Boulevard
                             Suite 1700
                             Chicago, IL 60604
                                and
                             ERIC D. FREED, ESQ.
                             Cozen O'Connor
                             One Liberty Place
                             1650 Market Street, Suite 2800
                             Philadelphia, PA 19103


ALSO PRESENT:                DAVID R. ANDERSON
                             ERIK BOLTE
                             CARLYLE BRUEMMER
                             GARY CALZARETTA
                             MARK CALZARETTA
                             SHELLY GUISINGER
                             DR. SUSAN RATTNER




OFFICIAL COURT REPORTERS:    ANNELIESE J. THOMSON, RDR, CRR
                             NORMAN B. LINNELL, FCRR, RPR
                             U.S. District Court, Third Floor
                             401 Courthouse Square
                             Alexandria, VA 22314
                             (703)299-8595

I N D E X

|                                          | DIRECT | CROSS | REDIRECT | RECROSS |
|------------------------------------------|--------|-------|----------|---------|
| **WITNESSES ON BEHALF OF THE PLAINTIFF:** |        |       |          |         |
| Susan L. Rattner (Resumed)               |        |       | 307      | 315     |
| Richard Bottomley                        | 351    | 353   |          |         |
| Steven Rattner (video excerpt)           | 355    |       |          |         |
| **WITNESS ON BEHALF OF THE DEFENDANT:**  |        |       |          |         |
| Daniel Jaeger                            | 367    | 436   |          |         |

EXHIBITS

|                 | MARKED | RECEIVED |
|-----------------|--------|----------|
| **PLAINTIFF'S:** |        |          |
| No. 261A        |        | 331      |
| 298A and 298B   |        | 329      |
| 525             |        | 330      |
| **DEFENDANT'S:** |        |          |
| No. 73          |        | 339      |
| 144             |        | 398      |
| 180             |        | 401      |
| 196             |        | 422      |
| 235             |        | 378      |

P R O C E E D I N G S

1

2                    (Jury present.)

3        THE CLERK:  Civil Action 17-136, Susan Rattner v.

4 Chubb National Insurance Company.

5        Would counsel please note their appearances for the

6 record.

7        THE COURT:  Counsel, your appearances.

8        MR. HANES:  Grayson Hanes for Dr. Rattner.

9        MR. WASSERMAN:  Mark Wasserman with Dominic Rupprecht

10 also for Dr. Rattner.

11        THE COURT:  All right.  We always have counsel put

12 their names on the record before each proceeding.

13        MR. MILLS:  Good morning, Your Honor.  Laurin Mills,

14 Jeffrey O'Hara, Eric Freed, and Phil Fluhr on behalf of Chubb

15 National.

16        THE COURT:  Thank you.  Good morning.  And good

17 morning, ladies and gentlemen.  Thank you for being here on

18 time.

19        I always tell my law clerks that we can tell a good

20 jury when they all get here on time.  I know it is tough around

21 here and we do appreciate that.

22        Did any of you bump into any problems last night in

23 terms of family members or friends overly probing you about

24 what you have been doing all day?  No.

25        And you all followed my instructions to stay off the

307

1    Internet in terms of trying to conduct any investigation?

2    Excellent.

3           All right.  Well, we'll begin then with the

4    continuation of the redirect examination of Dr. Rattner.

5           And, again, we are starting at 9:30.  We will still

6    have our lunch break at 1 o'clock.  There will be a mid-morning

7    break around 11:15.  And, obviously, if any of you need a break

8    before then, just let us know, all right.

9           Thank you.  Go ahead, Mr. Hanes.

10          SUSAN L. RATTNER, the plaintiff herein, previously

11   called in her own behalf, having duly affirmed, continues to

12   testify and state as follows:

13       REDIRECT EXAMINATION

14   BY MR. HANES: (Continuing)

15   A.   Dr. Rattner, yesterday we were talking about --

16          THE COURT:  Dr. Rattner -- sorry.  One second.

17   Dr. Rattner, you are still under your affirmation to tell the

18   truth from yesterday.  Do you understand?

19          THE WITNESS:  Yes, I do.

20          THE COURT:  Go ahead, Mr. Hanes.

21   BY MR. HANES:

22   Q.   Dr. Rattner, we were talking about your brother yesterday.

23   His name is --

24   A.   Steven Rattner.

25   Q.   And his office -- there is something called the Rattner

S. L. Rattner - Redirect

308

1    Family Office or something like that?

2    A.    That's what it is.

3    Q.    What is that?

4    A.    The Rattner Family Office handles business for him, does

5    things for any family member, I guess you would say.

6    Q.    Now, at some point your brother became involved in this

7    claim against Chubb?

8    A.    Yes.

9    Q.    Did you ask him to call Evan Greenberg?

10   A.    I'm not sure who even -- no.  I didn't ask him to call

11   anybody.  Sometime, I think it was the summer of 2016, he

12   called and said that he realized he knew someone at ACE, I

13   think it was, and that he was going to call them.

14          THE COURT:  Well, just so the jury understands,

15   what's the relationship, Mr. Hanes, of ACE to our defendant

16   Chubb?

17          MR. HANES:  I didn't hear.

18          THE COURT:  What's the connection of ACE to Chubb?

19          MR. HANES:  Okay.

20          THE COURT:  Counsel, I will let you --

21          MR. HANES:  I don't think that she understands that.

22          THE COURT:  Right.  Would you all -- just put that on

23   so the jury understands what this is all about.

24          MR. O'HARA:  Yes, Your Honor.  I will represent that

25   ACE was a predecessor company that merged with Chubb as of

1  January of 2016, and the company became known as Chubb National

2  or Chubb Group.

3          THE COURT:  All right.  So that's why there would be

4  some connection of ACE, A-C-E, correct, with this defendant?

5          MR. O'HARA:  Yes, Your Honor.

6          THE COURT:  All right.  Thank you.

7          THE WITNESS:  Sorry.  That's what he told me.

8  BY MR. HANES:

9  Q.   Another line of questioning.  Let me go back to the car

10  that you rented before you went to the beach the weekend of the

11  fire.

12  A.   Yes.

13  Q.   That was at Enterprise at Tysons Corner?

14  A.   Yes.  I didn't even remember about it because of

15  everything that happened after the fire.  But I rented it that

16  Friday or Saturday, I'm not even sure when it was, because I

17  was going to take this road trip with my 90-year-old aunt and

18  wanted to take the boxes down to North Carolina.  And, in fact,

19  had asked, I honestly don't remember who, Sylwia, Jose,

20  somebody, to bring the boxes back from storage that were marked

21  North Carolina.

22          And I picked -- I left the Lexus.  I picked up the

23  car and drove it to Great Falls.  And as I was sort of thinking

24  about loading it, I realized I didn't really want to drive this

25  big car to Bethany.  So I took it back and left it in the

S. L. Ratther - Redirect

310

1  parking lot at Enterprise in Tysons.

2          After the fire, my daughter, Kate, actually returned

3  the car at some point, but neither she nor I remembered

4  anything about it because of what we were going through.

5  Q.  So you went to the beach on Saturday?

6  A.  Saturday.

7  Q.  And did you go into the storage facility at all that day?

8  A.  No, because I went to the beach.  So I wasn't here.

9  Q.  Do you know who did?

10 A.  I know Jose went into the storage unit that Saturday

11 because he sent me an e-mail saying he was returning the piece

12 of art that he had damaged and finally gotten back from the

13 repair people.

14 Q.  At some point you traded in the Lexus?

15 A.  Yes, I traded -- after the fire, as I said, the car

16 smelled so much of smoke between Kate and I going into the

17 house to try to salvage things.  She had gone into her room,

18 which was totally black and waterlogged, but some of her things

19 were still there and had filled up a laundry bag with some,

20 like, soccer trophies and things that she thought she might

21 want to keep and that could be washed.  She put them in a bag

22 in the car.

23          And before Thanksgiving, we just couldn't take the

24 car smell anymore.  We were -- it was like gagging and choking

25 us and just making us physically ill.

1    So I left the car at my friend Michelle's house in

2 McLean and then ask Ustino from Euro Motorcars to come there,

3 take the car, appraise it.  And eventually he bought that

4 car -- I guess they bought the car for --

5 Q.    When was that?

6 A.    The car officially was -- I believe he appraised it around

7 the 25th or 26th of November, and the title was transferred on

8 the 27th of November.

9 Q.    Counsel showed you several documents yesterday dealing

10 with the financing of a new Mercedes?

11 A.    Correct.

12 Q.    Did you trade the Lexus in for the Mercedes?

13 A.    I traded the Lexus in, and I believe at that time I

14 ordered the new Mercedes.  I can't a hundred percent say

15 what -- when, what came first, but I had ordered a car in

16 September that wasn't going to be in for two years.  So I asked

17 Ustino could he get a car that I could do a two-year lease, and

18 that was the Mercedes.  Exactly -- I just don't remember.  It

19 was such a terrible time in my life, but it all happened around

20 the same time.

21    When I put the deposit down on the Mercedes, he told

22 me it wouldn't be in until the end of December.  So Kate and I

23 first rented a car at Enterprise, again because we just

24 couldn't take driving the Lexus up to New York, it smelled so

25 badly.  And as we were going to Enterprise, we passed in Tysons

1    at the front of the Westpark or Best Western, or whatever it

2    was, hotel, used to be a car rental place.

3            So we went by, and we were like, oh, there's a Range

4    Rover we could rent.  They had nicer cars, I don't know how --

5    and long-term rentals.  And so, I went in and I rented the

6    Range Rover for a month because that's what Ustino had told me

7    it would be for the Mercedes to come in.

8    Q.   Ustino is at Euro Motors?

9    A.   Yes.  Ustino I have dealt with since my son was a little

10   boy at Euro.  He would come and pick the cars up at the house.

11   He would do all the paperwork, and just, sign here, here is

12   your car.

13   Q.   While you were at the beach that weekend, counsel

14   introduced evidence of e-mails?

15   A.   Yes.

16   Q.   And one of them dealt with somebody's in the basement,

17   somebody's here or there.  What does that refer to?

18   A.   So at the beach house, because it's very tall, so to

19   speak, and my room is up on the top, we have a system through

20   the computer that if someone passes the sensors, that it would

21   send me an e-mail so that I would know someone was coming in

22   the front door, someone was in the basement.  Mostly that

23   someone was in the kitchen making coffee and I should come

24   down.

25           I'm a really early riser.  And you can imagine at a

1    beach house we had lots of company, and so I didn't always know

2    when people were up.  So this helped me to know when people

3    were up was why the system was -- it's also -- again, with

4    concern about running around this house having to turn off all

5    the lights and thermostats and things, this way I could do it

6    from my computer or phone up in my bedroom.

7    Q.   So those e-mails have nothing to do with the Great Falls

8    house?

9    A.   Those -- the Great Falls house never sent e-mails.  The

10   only thing you got from the alarm company at the Great Falls

11   house was a phone call.  And the home automation system at the

12   Great Falls house never sent out any -- it just wasn't

13   programmed.  This was a completely different software program.

14   It just ran on a computer, and it interacted with various

15   sensors and lights.

16   Q.   If you had left the house at Bethany, would your system

17   have shown that?

18            MR. O'HARA:  Objection.

19            THE COURT:  The basis?

20            MR. O'HARA:  Calls for speculation, number one.

21   Number two, not covered on cross.

22            THE COURT:  Well, I think we're getting far afield

23   now from cross.  And also, the point of redirect is not to

24   repeat what was said in direct or cross, but to clarify what

25   came out during cross.

1           So I will sustain the objection.

2    BY MR. HANES:

3    Q.   One last question.

4    A.   Yes, sir.

5    Q.   Did you ever intentionally mislead Chubb or any of its

6    agents?

7           MR. O'HARA:   Objection.   That's covered on direct

8    examination.

9           THE COURT:   No, I think the questions on direct

10   examination had to do with the setting of the fire.   I don't

11   recall this specific one.   So I will permit this one question.

12   BY MR. HANES:

13   Q.   You can answer.

14   A.   I never intentionally misled anybody.   I think after --

15   you can imagine after the trauma of what we went through,

16   strange, different thoughts, people telling you different

17   things.   Nothing was intentional because I did nothing wrong.

18   So I had no reason to intentionally -- I tried very hard to

19   protect the people that I thought might come under

20   investigation by Chubb, never realizing that it would be me.

21          MR. HANES:   Thank you, Dr. Rattner.

22          THE WITNESS:   You're welcome.

23          THE COURT:   Any recross?

24          MR. O'HARA:   Yes, Your Honor.   I'm going to cover

25   just a few topics.

S. L. Ratther - Recross

315

1          RECROSS EXAMINATION

2     BY MR. O'HARA:

3     Q.    First, let's talk about the e-mails that were just raised

4     by your counsel.  They show movement or motion activity.  On

5     November 14, 2015, two motion sensors, one at 2:29 p.m. and the

6     other one at 4:07 p.m., correct?

7     A.    I don't have them, but I believe you.

8     Q.    If I represent to you they're in evidence --

9     A.    I said --

10    Q.    -- that the two references to the motion in your Delaware

11    home on November 15 are 2:29 p.m. and 4:07 p.m., would you have

12    any recollection that differs from that?

13    A.    No.  I just don't know the exact times because I don't

14    have any reference.

15    Q.    I will represent to you what they say.

16    A.    Okay.

17    Q.    There are -- on November 15 there are a series of

18    activities:  6:44 a.m., 6:45 a.m., 2:40 p.m., 6:20 p.m., 7:07

19    p.m., 7:09 p.m.

20          If I represented that to you, you would -- your

21    recollection would not differ from that, correct.

22    A.    Correct.

23    Q.    And then after 7:09 p.m. on November 15, 2015, there is no

24    motion activity in your house whatsoever until the next morning

25    at 6:33 a.m., correct?

1    A.    If that's what it says, yes, sir.

2    Q.    I will represent to you, ma'am, that that's what these

3    records say.  Do you have a recollection that differs from

4    that?

5    A.    No.  But I don't have the records, so I can't say the

6    times.

7    Q.    Okay.  Now, you mentioned just now something about an

8    e-mail that Jose Renteria sent you on Saturday, November 15,

9    2015, regarding the return of broken artwork.

10   A.    Correct.

11   Q.    Have you produced that e-mail?

12   A.    I don't know.

13   Q.    Have you seen that e-mail?

14   A.    I've seen the e-mail, I think, from -- somebody produced

15   it.

16   Q.    If I were to represent to you that you did not produce an

17   e-mail relating to the return of artwork by Jose Renteria on

18   November 15, 2015, would your recollection differ from that?

19   A.    I have no way of knowing.

20   Q.    And if I were to represent to you that in this entire

21   record, which consists of thousands of documents, there has

22   been no production of an e-mail on November 15, 2015, by

23   Mr. Renteria regarding the return of broken artwork, would your

24   recollection differ from that?

25   A.    I would have no way of knowing because I turned it over to

1   Hunton & Williams.

2   Q.   And if Hunton & Williams didn't produce it, that would be

3   another one of the items that you understood during the course

4   of the company's investigation related to the fire that somehow

5   some way was not given to Chubb; isn't that a fair statement,

6   ma'am?

7   A.   No.  I have no -- you just said there's a thousand pages.

8   I don't know what was produced and what wasn't produced.

9   Q.   My question, ma'am, was, if it was in fact not produced,

10  that would be another item that you would agree is important

11  relating to activity associated with the fire that would have

12  been the subject of requests during the company's investigation

13  that has not been produced; isn't that a fair statement?

14  A.   I don't know if it was produced or not, sir.

15  Q.   Thank you.  Ma'am, you testified near the end of yesterday

16  about this planned road trip to North Carolina with your

17  90-year-old aunt.

18          Do you recall that line of testimony?

19  A.   Yes, sir.

20  Q.   Ma'am, isn't it a fact that in your sworn statement under

21  oath on June 22, 2016, you spoke about boxes that had been

22  labeled North Carolina that you wanted to have shipped to North

23  Carolina?  Isn't that true?

24  A.   I trust that you have that in your papers, yes.

25  Q.   And if I -- do you have a recollection of testifying to

S. L. Ratcher - Recross

318

1    something different than what I just represented, that as of

2    August 23, 2016, you testified that the boxes that had been

3    marked for North Carolina were for purposes of being shipped to

4    North Carolina?

5         Would you have any recollection that differs from

6    that?

7    A.   No.  Originally, they were --

8    Q.   That's just a yes or no question, ma'am.

9    A.   I have a different recollect -- I mean, I don't have a

10   different recollection of what you're saying I said in June,

11   but I have a different recollection of the sequence of events.

12   Q.   And at no time during the first statement under oath that

13   you gave on June 22, 2016, when you made specific reference to

14   these boxes, did you say anything whatsoever about a planned

15   trip with your 90-year-old aunt for which you were renting a

16   vehicle two days before or one day before this fire to drive to

17   North Carolina; isn't that true?

18   A.   I didn't remember --

19   Q.   It's a yes or no question.

20   A.   -- it until you brought it up.

21   Q.   Ma'am, it's a yes or no question.  Isn't it true that,

22   when you testified under oath on June 22, 2016, and then again

23   on August 23, 2016, specifically about these boxes, you made no

24   reference whatsoever to a plan with a 90-year-old aunt to drive

25   them to North Carolina in an SUV that you rented the day before

1  the fire?  Isn't that true?

2  A.   I didn't say one way or another that I was doing this.  It

3  wasn't something that I was hiding -- can you ask the question

4  again so I know how to answer it?  Thank you.

5  Q.   Sure.  Ma'am, it's a yes or no question.

6  A.   I under -- that's what I am trying to answer yes or no.

7  Q.   Okay.

8  A.   I want to hear the rest.

9  Q.   I would like you to try and answer yes or no.

10  A.   Okay.  Ask it again.  I'll --

11  Q.   Isn't it true that on June 22, 2016, and then again on

12  August 23, 2016, when asked specific questions about the boxes

13  that were being packaged for purposes of shipment to North

14  Carolina, at no point under either of those sworn testimony

15  settings did you make any mention whatsoever about a rental of

16  an SUV the day before the fire for a planned trip with your

17  90-year-old aunt?  Isn't what I just said true, yes or no?

18  A.   Yes.

19  Q.   Thank you.

20  A.   But I didn't say anything to the contrary.

21        MR. O'HARA:  Judge, I would ask that the witness --

22        THE WITNESS:  I'm sorry.

23        THE COURT:  I'm going to strike that.

24        MR. O'HARA:  Thank you, Your Honor.

25        THE COURT:  The jury should disregard the last

1    statement.  A yes or no answer is the appropriate answer.

2    BY MR. O'HARA:

3    Q.   Now, you testified today that Jose Renteria, to your

4    knowledge, went to the storage units on the day of this fire,

5    January 15, 2015, for purposes of putting back a piece of

6    broken artwork, correct?

7    A.   No, I don't think it was the 15th.  I think it was the

8    14th.

9    Q.   And just so we're clear, Jose Renteria, as you've

10   testified to your presentation to this jury, was going to

11   access the Public Storage units that we talked about during my

12   cross-examination, correct?  Yes?

13   A.   I didn't know Jose was accessing them that day.  I knew he

14   could access them.

15   Q.   Ma'am, isn't it a fact that when you gave the recorded

16   statement in this case on December 15, 2015, when you were

17   asked who had codes to access the storage units, you made no

18   mention whatsoever of Jose Renteria approximately 30 days after

19   the fire when Chubb was seeking information; isn't that true?

20   A.   Can you read what I said?

21   Q.   Yes, ma'am, I will.

22            Your Honor, this is Exhibit 150.

23            Question:  Who had those codes?

24            Can you pull it up, Gary?

25            So you can look along, ma'am.

 1            Who had those codes?

 2            I don't even know the garage door code because I

 3    always use my clicker.  On the codes into the house, well, a

 4    lot of people had the code through the mud room, exterminator

 5    John, security guy, the housekeeper, who would have come

 6    through that house that I would just let --

 7            THE COURT:  Counsel, wait a minute.

 8    A.   You're talking about two different things.

 9            THE COURT:  You were talking about the storage units.

10    This has to do with access to the house.

11            MR. O'HARA:  Fair, Your Honor.  I withdraw the line

12    of questioning.

13            THE COURT:  All right.  The jury again should

14    disregard this line of questioning.

15            MR. O'HARA:  My apologies, Your Honor.

16    BY MR. O'HARA:

17    Q.   There was testimony about Mr. Rattner and the funds that

18    he provided to you.  And just drawing you back, you had

19    testified about having access anytime, anyplace, whenever you

20    needed anything, correct?

21    A.   By Mr. Rattner, I'm assuming you mean Steve?

22    Q.   Yes, your brother.

23    A.   Okay.  Yes.

24    Q.   There came a point in time in late 2016 when you

25    understand that Mr. Rattner told you that he was no longer

S. L. Ratcher - Recross

322

1    going to be a piggy bank and provide that funding to you.

2            MR. HANES:  Objection, Your Honor.  Yesterday you

3    raised repetitive questions --

4            THE COURT:  Just a second.  I don't think this is

5    adding anything to the case.  I'm going to sustain the

6    objection.

7            MR. O'HARA:  Yes, Your Honor.

8    BY MR. O'HARA:

9    Q.   I will cover two final points.  On redirect examination,

10   you were asked questions about your trip to the Inca Trail --

11   A.   To Peru?

12   Q.   You hiked up the Inca Trail at Machu Picchu a month before

13   this fire where you had a spiritual experience; isn't that

14   true?

15   A.   I believe I have told you before we never hiked the Inca

16   Trail.

17   Q.   Isn't it a fact that you testified in your statement under

18   oath, as well as your recorded statement as follows:  What you

19   are looking for when you're hiking on the Inca Trail -- and you

20   subsequently testified:  And we got to, up to the top of Sun

21   Gate in Machu Picchu.

22           Isn't that what you testified to, ma'am?

23   A.   The way you can get to --

24   Q.   It's a yes or no.  Isn't that what you testified to?  Yes

25   or no?

1    A.    I don't think that means I hiked the Inca Trail, but no.

2    Q.    I am going to finish with, with respect to the efforts

3    that you undertook after the fire, there was discussion about

4    the moneys that were paid to you by Chubb as well as the moneys

5    that were paid to you when you sold your lot, isn't it a fact

6    that in 2016 you traveled in March to Cuba?

7              MR. HANES:  Objection, Your Honor, as to the

8    relevancy of this.

9              MR. O'HARA:  I will tie it all in at the end.

10             MR. HANES:  I still object to it, Your Honor.

11             THE COURT:  Well, let me -- approach the bench.  And

12   hopefully we won't have too many of these today.

13             NOTE:  A side-bar discussion is had between the Court

14   and counsel out of the hearing of the jury as follows:

15   AT SIDE BAR

16             MR. HANES:  Our objection is to relevancy.  What in

17   the world does it have to do --

18             THE COURT:  Where are you going with that?

19             MR. O'HARA:  There has been testimony that she was --

20   that she was going to suggest that someone told her to live the

21   high life.

22             THE COURT:  I'm sorry, what?

23             MR. O'HARA:  There has been testimony by her that

24   immediately after the fire that she was told by Tim Blake to

25   live the high life.  That is going to be -- the testimony of

1    Tim Blake it is not going to be consistent with that.

2           In fact, we are going to argue that she lived the

3    high life by taking money under false pretenses and during the

4    course of the immediate aftermath of this fire traveling to

5    Cuba, South America, Iceland, Croatia -- excuse me, not South

6    America -- South Africa, Iceland, Croatia, Montenegro, Bosnia,

7    Istanbul, before her brother stopped giving her money.  They

8    put it in issue by the way that they raised the fact that they

9    say Tim Blake told her to live the high life.

10          MR. HANES:  Never said that in the testimony

11   whatsoever.

12          THE COURT:  No, I think I did hear that.  But I think

13   it is so far afield from the issues in this case that it's an

14   unnecessary distraction.  So I'm going to sustain the

15   objection.

16          MR. HANES:  Thank you, Your Honor.

17          MR. O'HARA:  May I cover it at all?

18          THE COURT:  Excuse me?

19          MR. O'HARA:  May I cover it at all with respect to

20   multiple vacations without going into the details?

21          THE COURT:  No, I don't think it's relevant.

22          NOTE:  The side-bar discussion is concluded;

23   whereupon the case continues before the jury as follows:

24   BEFORE THE JURY

25          MR. O'HARA:  No further questions at this time, Your

325

1    Honor.  Thank you.

2              MR. WASSERMAN:  Your Honor, we would call --

3              THE COURT:  Wait, wait.  I just want to make sure.

4    Mr. Linnell, are you ready?

5              MR. HANES:  I have no further questions.

6              THE COURT:  All right.  You may step down,

7    Dr. Rattner.

8              THE WITNESS:  Thank you.

9              NOTE:  The witness stood down.

10             THE COURT:  Yes, Mr. Wasserman.

11             MR. WASSERMAN:  Your Honor, our next witness is

12   Sylwia Nowek.

13             THE COURT:  All right.  Ms. Nowek is outside; is that

14   correct?  She better be.

15             MR. WASSERMAN:  She should be, Your Honor.  May I --

16   I will have someone check.

17             THE COURT:  No, we will get her.  My Court Security

18   Officer will get her, Ms. Nowek.

19             NOTE:  The witness duly affirms.

20             SYLWIA E. NOWEK, called by counsel for the plaintiff,

21   first duly affirming, testifies and states:

22        DIRECT EXAMINATION

23   BY MR. WASSERMAN:

24   Q.   Good morning, ma'am.

25   A.   Good morning.

S. E. Nowek - Direct

326

1    Q.    Would you state your full name.

2    A.    My name is Sylwia Ewa Nowek.

3            THE COURT:  Ma'am, you're going to have to get close

4    to that microphone and speak up.  We cannot hear you.

5    A.    Okay.  My name is Sylwia Ewa Nowek.

6    Q.    Ms. Nowek, do you know Sue Rattner?

7    A.    Yes, I do.

8    Q.    How long have you known Sue Rattner?

9    A.    Since 2012.

10   Q.    Did you work for Sue Rattner?

11   A.    Yes, I did.

12   Q.    What kind of work did you do?

13   A.    I was a housekeeper.  And I was taking care of the house,

14   running errands, whatever was needed to do inside the house,

15   cleaning outside the house.

16   Q.    I am going to direct your attention, ma'am, to the time

17   period of late September 2015.  Did anything unusual happen at

18   Dr. Rattner's house at that time?

19   A.    Yes.

20   Q.    What was that?

21   A.    That was last Sunday of September, I believe 27.  I went

22   there with my kids and my husband.  And when I entered the

23   house, I noticed different smell inside the house.  And because

24   I knew the house, you know, on a, like I would say, daily

25   basis, I was able to notice different smell.  Although my

S. E. Nowek - Direct

327

1   husband didn't.

2           So I went around the house and when I get to the

3   basement, to the storage unit, that's when I started to feel

4   stronger smell of gas.  And I called my husband, you know, if

5   he can confirm that this is the same smell I feel.  And, yes,

6   he did confirm that.

7   Q.   Did you tell anyone about the gas smell that you and your

8   husband noticed?

9   A.   Yes, I did.  I contacted immediately Ms. Rattner.  I don't

10  remember right now if -- because I remember that I was trying

11  to call her, she might not pick up right away.  I probably sent

12  her a text message, and I think I also tried to contact her,

13  her daughter at the same time.  But, yes, at the end we, we

14  spoke.

15  Q.   And what was your conversation that day?

16  A.   Well, I notified her about the smell of gas in the house.

17  And I asked her what actions I should take.  You know, that

18  never happened before and I never been in that kind of

19  situation.  So she told me to get out from the house.

20          And I knew also that day that Mr. Jose Renteria was

21  scheduled to come in the afternoon.  So we get to the agreement

22  that he will call Washington Gas, and he will take care of that

23  from that moment.  And she told me to leave the house.

24  Q.   Did you leave the house that day?

25  A.   Yes, I did.

S. E. Nowek - Direct

328

1   Q.   All right.  Now, do you recall anything else unusual that

2   happened at the house in late September?

3   A.   Well, the next day, that was Monday, I went there and

4   everything was fine in the house.  I noticed the stickers on

5   the -- downstairs in the storage, like labels from Washington

6   Gas.  And -- but I checked the house, everything was fine.

7        But then the following day, that was Tuesday, I went

8   there, it was around -- after 10:00 a.m. in the morning, and I

9   entered the house like every day.  I was there with my son.

10  Ms. Rattner's dog was there inside.  And, you know, I started

11  my day.

12       I went up, you know, to fix the bedroom, things like

13  that.  And then the pond person, Mr. Chris -- I don't remember

14  his last name -- he ring the doorbell and he told me that he

15  noticed the smell of gas outside the house.  If I would be

16  facing the house, it would be on the right side -- I'm sorry --

17  on the right side of the house.  He said he smelled gas

18  outside.

19       So inside the house, you know, when I was like going

20  up and I was on the middle of it, I didn't smell anything.  But

21  then when he told me, I went down to that side of the house,

22  and, yes, I did notice smell of gas.

23  Q.   Are you aware that there was actually a small fire?

24  A.   Well, yes, but that was after.  Because in that time when

25  I smelled the gas, I went actually to that, that area where

1   after it was the small fire, and I didn't notice, you know,

2   anything unusual, I just noticed the smell.

3           And so, I called Ms. Rattner, she was already -- I

4   mean, she was not home physically at this moment, but she was

5   around.  So I called her.  And she told me to get out from the

6   house, to lock the dog out so she cannot enter, and she said

7   that she is coming back home and that she is going to call

8   Washington Gas.

9   Q.   All right.  Do you have a small binder near you?

10          In the binder in front of you, would you turn to 298A

11  and 298B?

12          THE COURT:  Any objection to those exhibits?

13          MR. FLUHR:  Subject to laying a foundation, Your

14  Honor, there is no objection.

15          THE COURT:  All right.

16  BY MR. WASSERMAN:

17  Q.   Ms. Nowek, did you see 298B and 298A at Dr. Rattner's

18  house?

19  A.   Yes, I did.

20          MR. WASSERMAN:  Move them in, Your Honor.

21          THE COURT:  I am going to allow them in.  They are

22  both in.

23          (Plaintiff's Exhibit Nos. 298A and 298B were received

24  in evidence.)

25          MR. WASSERMAN:  Thank you.

S. E. Nowek - Direct

330

1   BY MR. WASSERMAN:

2   Q.   Now, in the same book, would you look, please, at

3   Exhibit 525.

4   A.   Yes.

5           THE COURT:  Any objection to 525?

6           MR. FLUHR:  No objection.

7           THE COURT:  All right, it's in.

8           (Plaintiff's Exhibit No. 525 was received in

9   evidence.)

10  BY MR. WASSERMAN:

11  Q.   All right, directing your attention to the very first

12  sentence, do you see where it says:  We had a small house fire

13  today.

14          Well, let me back up, please.  This is an e-mail from

15  Sue Rattner to Paddy Murphy, yourself, and Mr. Renteria, right?

16  A.   Yes.

17  Q.   And did you receive that e-mail?

18  A.   Yes, I did.

19  Q.   Did you receive that e-mail on or about 29 September,

20  2015?

21  A.   Yes.

22  Q.   All right.  Now, back to the first sentence, please.

23          It says:  We had a small house fire today which

24  started in the utilities room next to the apartment.

25          Is that true?

S. E. Nowek - Direct

331

1    A.    Yes.

2    Q.    Now, did anything else happen that was unusual at all in

3    the late October, early November period at Dr. Rattner's house?

4    A.    Yes.

5    Q.    What happened?

6    A.    Well, that was the last weekend of October, I think it was

7    October 30, it was Saturday.  It was the first open house for

8    the auction, and I went there in the morning to check on

9    things, you know, if the landscapers did their job, blow the

10   leaves, if everything was looking fine.  And also that day I

11   smell gas.

12   Q.    What happened next?

13   A.    Well, I -- that smell of gas was coming from the storage

14   unit, that was the first, like the first time.  And I went

15   there and I turned the valve from the gas off.  And I opened

16   also windows around the house.  But the smell of gas that time,

17   it was not very, not very strong.

18   Q.    In the booklet in front of you --

19   A.    Yes.

20   Q.    -- would you turn to Exhibit 261A, please.

21   A.    Yes.

22            THE COURT:  Any objection to 261A?

23            MR. FLUHR:  No objection, Your Honor.

24            THE COURT:  All right, it's in.

25            (Plaintiff's Exhibit No. 261A was received in

S. E. Nowek - Direct

332

1    evidence.)

2    BY MR. WASSERMAN:

3    Q.   All right.  Now, this is an e-mail from Sue Rattner to you

4    on November the 1st, correct?

5    A.   Yes.

6    Q.   And the very first part of the e-mail says:  Thank you for

7    coming by and turning off the gas.

8         Correct?

9    A.   Yes.

10   Q.   Is that the time that you turned off the gas --

11   A.   Yes.

12   Q.   -- that you just testified about?

13   A.   Yes.

14   Q.   Now, you remember the -- what I will call the big fire

15   that burned Dr. Rattner's home altogether, right?

16   A.   Yes.

17   Q.   That was in mid-November of 2015, correct?

18   A.   Yes.

19   Q.   Did you see Dr. Rattner after the fire?

20   A.   Yes, I did.

21   Q.   How did she look to you?

22   A.   Very bad.  She was crying.  I never seen her in that kind

23   of state, if I can call it like that.

24   Q.   And do you know how long after the fire you first saw her

25   when Dr. Rattner looked the way you described?

S. E. Nowek - Cross

333

1    A.   Well, I went to the -- I can say house, to the property,

2    it was probably around 10:00 a.m., and first when I arrive at

3    the property, I spoke with some fire marshal, fireman, and

4    after that -- so I don't know, it took me, you know, maybe like

5    20 minutes there or more or less like that.  And after that I

6    went to the neighbor house because people told me that

7    Ms. Rattner is there, and so I went to see her over there.  So

8    maybe it was around 10:30, maybe somewhere around -- between

9    10:00 and 11:00 a.m.

10   Q.   And was this the morning after the fire?

11   A.   Yes.

12        MR. WASSERMAN:  Your witness.

13        THE COURT:  All right, cross-examination.

14        MR. FLUHR:  Yes, Your Honor.

15    CROSS-EXAMINATION

16   BY MR. FLUHR:

17   Q.   Ma'am, I just wanted to follow up on one of the questions

18   that Mr. Wasserman asked you related to your arriving at the

19   house on the first day of the auction in late October.  Was

20   that --

21   A.   Yes.

22   Q.   And what time of day did you arrive?

23   A.   I can't remember exactly what time it was.  But it was --

24   I would say it was morning.  You know, on Saturday I always

25   take my son to school in Silver Spring, and I have to be there

S. E. Nowek - Cross

334

1   by 10:00, and then I went there before.  So maybe it was

2   something around 8:00 o'clock.

3   Q.   Okay.  And you had previously made arrangements to meet

4   Dr. Rattner that afternoon; is that correct?

5   A.   You mean on Saturday?

6   Q.   No, no.  On Monday, November 16, 2015, before the fire

7   occurred, you had planned to meet with her that afternoon;

8   isn't that true?

9   A.   Can you repeat again.  Which day?

10  Q.   Monday.

11  A.   Yes.  Monday, you mean the Monday after the fire?

12  Q.   Yes.  Had the fire not occurred --

13  A.   Yes.

14  Q.   -- you had made arrangements to meet with her that

15  afternoon?

16  A.   Yes, yes.  I was supposed to meet her somewhere in

17  Bethesda to pick the dog up from her because she had, I

18  believe, some doctor appointment.

19  Q.   And you testified on direct examination that you began

20  working for Dr. Rattner in or about 2012; is that correct?

21  A.   Yes.

22  Q.   Now, leading up to -- and you frequently, the work that

23  you did for her occurred at her home in Great Falls, Virginia,

24  correct?

25  A.   Yes.

S. E. Nowek - Cross

335

1   Q.   And then with respect to the fire that occurred in the

2   late or early morning hours of November 16, 2015, at that time

3   you were still working for her?

4   A.   Yes.

5   Q.   And you were working for her approximately three days a

6   week; is that true?

7   A.   You know, before I used to work, it was three days a week,

8   but then after I had my child -- you know, at first it was

9   three times a week, seven hours a day.  But because I had my

10  child, you know, sometimes I could not, I would say, last seven

11  hours.  So I would maybe split it between, you know, five days,

12  shorter days.  Sometimes I would go three days.  Depends on

13  my -- on the need.  But it was approximately 21 hours a week

14  together.

15  Q.   And even after the fire at Dr. Rattner's house in November

16  of 2015, you have continued to work for her on occasion; isn't

17  that true?

18  A.   Yes.

19  Q.   And from time to time your husband, Roger Capriles, he's

20  also worked for Dr. Rattner?

21  A.   Yes, few times.

22  Q.   Now, with regard to the home in Great Falls, ma'am, you

23  had an access code to enter that house, correct?

24  A.   Yes.

25  Q.   And with that access code, a key was not required to

336

1   access the home, correct?

2   A.    Correct.

3   Q.    And who is Jose Renteria?

4   A.    Well, he was also working for Ms. Rattner at the house

5   doing, you know, some kind of more heavy stuff around the

6   house.

7   Q.    So he would be --

8   A.    More heavy than what I was doing.

9   Q.    Yes, ma'am.  So he would be described as a handyman; is

10  that correct?

11  A.    Yes.

12  Q.    And Jose Renteria also had a code to access Dr. Rattner's

13  house?

14  A.    Yes.

15  Q.    Now, while you were working for Dr. Rattner, did you meet

16  a woman named Paddy Murphy?

17  A.    Yes, I did.

18  Q.    Paddy Murphy was working as a realtor for Dr. Rattner,

19  correct?

20  A.    Yes.

21  Q.    And isn't it true that in September 2015 Paddy Murphy

22  suggested to Dr. Rattner that some items be moved out from

23  Dr. Rattner's house while it was being marketed for sale,

24  correct?

25  A.    Can you repeat, please?

1   Q.   Yes.  In 2015, in the months leading up to the fire, Paddy

2   Murphy suggested to Dr. Rattner that she should take some items

3   out of the house while it was being --

4   A.   Yes.

5   Q.   Ma'am, if you would just let me finish my question before

6   you answer it, I --

7   A.   I am sorry.  Yes.

8   Q.   -- that will just make it easier for the court reporter.

9   A.   Yes.  Okay.

10  Q.   And for the most part, to your knowledge, the items that

11  were being removed from the house consisted of artwork and

12  furniture, correct?

13  A.   Yes.

14  Q.   And the items were moved to storage units that Dr. Rattner

15  rented, correct?

16  A.   Yes.

17  Q.   With respect to access to those storage units, only

18  Dr. Rattner and Jose Renteria had the access codes for that

19  facility, correct?

20  A.   I believe so, but I cannot be sure.  I know I didn't have

21  the access, but the key to the storage unit was in the kitchen

22  drawer.  So that I know.

23  Q.   The key chain?

24  A.   Kitchen, kitchen drawer, in the kitchen drawer.

25  Q.   But the -- the access code that is needed to actually get

S. E. Nowek - Cross

338

1   onto the grounds of the storage facility, you did not have an

2   access -- you did not have that access code?

3   A.   At this moment I don't remember if I was ever given the

4   access.  It might be somewhere on the paper in the kitchen.

5   But because I never went to the storage, you know, I never

6   actually pay attention that it was even an access code to

7   enter.

8   Q.   But you understood that Jose Renteria did have the access

9   code --

10  A.   Yes, I believe, yes.

11  Q.   Just let me finish, ma'am.

12  A.   I am sorry.

13  Q.   You understood that Jose Renteria did have the access code

14  to the storage facility, correct?

15  A.   Yes.

16  Q.   Now, in direct examination Mr. Wasserman reviewed with you

17  a couple of e-mail communications between Dr. Rattner and you

18  and some other people; is that correct?

19  A.   Yes.

20  Q.   And on occasion you communicated with her through e-mail

21  as well as by text message, correct?

22  A.   Yes.

23  Q.   And on those occasions, you -- you used an e-mail address

24  lillesylvi@yahoo.no?

25  A.   Yes.

S. E. Nowek - Cross

1          MR. FLUHR:  Your Honor, with the assistance of your

2     court reporter, I'd like to show the witness an exhibit that is

3     not yet in evidence from a binder that we have.

4          THE COURT:  All right.  What is the number?

5          MR. FLUHR:  It is Exhibit 73.

6          THE COURT:  Any objection to 73?

7          MR. WASSERMAN:  No objection, Your Honor.

8          THE COURT:  No objection.  All right.  It's in, then.

9          (Defendant's Exhibit No. 73 was received in

10    evidence.)

11         MR. FLUHR:  In that case, may I publish it, Your

12    Honor?

13         THE COURT:  Yes, go ahead.

14         MR. FLUHR:  Thank you.

15    BY MR. FLUHR:

16    Q.   Ma'am, that e-mail is -- it's an e-mail thread between you

17    and Dr. Rattner between October 1 and October 2, 2015, correct?

18    A.   Yes.

19    Q.   And in -- in the originating message -- or in that message

20    thread Dr. Rattner used slr715@gmail.com, correct?

21    A.   Yes.

22    Q.   And that was an e-mail account that Dr. Rattner used

23    frequently to communicate with you, correct?

24    A.   Yes.

25    Q.   In the note at the bottom of the exhibit, Dr. Rattner

1    provides four instructions for Jose.  Does that -- does that

2    Jose refer to Jose Renteria as you understood it?  Correct?

3    A.   Yes.

4    Q.   And so -- and the note above that references your

5    communication back to Dr. Rattner that you had communicated

6    with Jose regarding those instructions, correct?

7    A.   Yes.

8    Q.   Okay.  Ma'am, if I can ask you now to turn to Exhibit 115.

9            Your Honor, I am going to publish 115, which is

10   already in evidence from the trial testimony yesterday.

11           THE COURT:  Ask the question first before you publish

12   anything.

13           MR. FLUHR:  Yes, Your Honor.

14           THE COURT:  Ask a question.  Let me see if it's

15   relevant.

16   BY MR. FLUHR:

17   Q.   Ma'am, if you would please turn to Exhibit 115.

18   A.   Yes.

19   Q.   Is that also a string of communications between

20   Dr. Rattner and you?

21   A.   Yes.

22   Q.   And again, she was using the slr715@gmail.com e-mail

23   address?

24   A.   Yes.

25           MR. FLUHR:  Your Honor, may I publish what has

1    already been admitted as Exhibit 115?

2           THE COURT:  Any objection?

3           MR. WASSERMAN:  No, Your Honor.

4           THE COURT:  All right, go ahead.

5    BY MR. FLUHR:

6    Q.   Ma'am, in that message Dr. Rattner states:  I'm not

7    mentioning anything about the storage units or what has been

8    taken out of the house.  It will just complicate matters, so

9    don't say anything and tell Jose not to.  Remember that dealing

10   with them, the less you say, the better.  The insurance people

11   are nice and all, but they will drag this on and I really can't

12   emotionally or physically.  I would never ask you to lie, but

13   don't offer any information or speculate on anything.  Hope you

14   understand.

15          Ma'am, do you remember receiving that e-mail?

16   A.   Yes.

17   Q.   And you would agree that in that e-mail Dr. Rattner was

18   trying to hide something, correct?

19          MR. WASSERMAN:  Objection.

20          THE COURT:  Sustained.  There is no question.  You

21   don't have to answer that.

22          THE WITNESS:  I don't?

23          THE COURT:  You don't have to answer that question.

24          THE WITNESS:  Okay.

25   BY MR. FLUHR:

S. E. Nowek - Cross

342

1  Q.   Ma'am, you would agree that in that message Dr. Rattner

2  was encouraging you not to be wholly --

3            THE COURT:  The better question is, how did you

4  respond to that e-mail?  What did you understand when you read

5  that?

6            THE WITNESS:  Well, first, I have to read what -- if

7  I responded anything here.  Can I read?

8            THE COURT:  What did you -- how did you react when

9  you saw that?

10            THE WITNESS:  Well, at this moment I don't really

11  remember my reaction to it.  But -- it's really hard to say

12  right now.  You know, it passed already some time, so I don't

13  remember my immediate reaction.

14  BY MR. FLUHR:

15  Q.   Ma'am, do you recall being deposed in this case?

16  A.   Deposed?  What does it mean?  I am sorry.

17  Q.   So you were in a conference room in a law firm not far

18  from this office --

19  A.   Yes.

20  Q.   -- where you were asked a series of questions by attorneys

21  involved in this case.  Do you remember that?

22  A.   Yes, I do.

23  Q.   And it was in about June of this year?

24  A.   Yes, I do remember.

25  Q.   And during that -- during that deposition you were asked

S. E. Nowek - Cross

343

1    about this very e-mail?

2    A.    Yes.

3    Q.    And you said:  It looks like -- you were asked a

4    question --

5              MR. WASSERMAN:  Where are we, please?

6              THE COURT:  Well, you need to give the page so that

7    counsel knows what you are talking about and you need to read

8    the question so the answer is in context.

9    BY MR. FLUHR:

10   Q.    Page 122.  Ma'am, during that deposition you were asked

11   about that very e-mail and you were asked whether it seemed

12   suspicious to you.  And your answer was:  So I'm looking at it

13   now.  It looks like Ms. Rattner was trying to hide something.

14             Do you recall that testimony?

15   A.    Yes, I do.  But as you say, at that moment when I had the

16   deposition, I don't -- to the judge I answered that at the

17   moment when I receive e-mail, I don't -- I just don't remember

18   my reaction in that moment back those almost two years ago.

19             But I remember when I was on the deposition in June,

20   yes, I remember that answer.

21   Q.    When you received the e-mail from Dr. Rattner on or about

22   November 18 of 2015 that we just discussed, you were going to

23   heed her instructions, correct?

24             MR. WASSERMAN:  Objection.

25             THE WITNESS:  Heed?  What do you mean, heed?

1    BY MR. FLUHR:

2    Q.    You were going to listen to her instructions in the way

3    that you dealt with the insurance company, correct?

4    A.    Well, I would take her advice.  But, you know, I also have

5    my common sense and I would not do anything that would, you

6    know, be -- I would say something against the law.

7    Q.    And, ma'am, just to confirm, the Jose that is referenced

8    in the November 18, 2015 message is Jose Renteria, correct?

9    A.    Yes.

10   Q.    Okay.  Ma'am, if we can move on now to -- if you can turn

11   to Exhibit 114.

12           THE COURT:  I'm not sure if that is in.  These are

13   defense exhibits we are talking about, correct?

14           MR. FLUHR:  Yes, Your Honor.  This was admitted as

15   well yesterday, but I will ask a couple of foundational

16   questions before requesting your permission to publish.

17           THE COURT:  Well, if it has been admitted, it can be

18   published.  I just want to make sure it is relevant.  Go ahead.

19   BY MR. FLUHR:

20   Q.    Ma'am, Exhibit 114, which is in evidence, is an exhibit

21   showing an e-mail sent from Dr. Rattner to you and a number of

22   other recipients on November 18, 2015, correct?

23   A.    Yes.

24   Q.    And again, that was just a couple days after the fire at

25   her home, correct?

S. E. Nowek - Cross

1    A.    Yes.

2    Q.    And in that message, Dr. Rattner again used the

3    slr715@gmail.com address, correct?

4    A.    Yes.

5    Q.    And at the end of the second paragraph, Dr. Rattner's

6    message states in reference to the inspectors, investigators,

7    and insurance people that had been at her property that:  They

8    have pretty much determined the house is a total loss.  Now

9    they just need to know it's not because of any negligence.  I

10   know it isn't, but they have to come to their own conclusion,

11   and can only hope they don't try to pin it on any one

12   individual who worked for me.

13          MR. WASSERMAN:  Objection, Your Honor.  This is

14   needlessly cumulative evidence.  We went over this yesterday at

15   some length.

16          MR. FLUHR:  The next question will be --

17          THE COURT:  All right.  We are not going to have a

18   whole lot of cumulative evidence in this case.  I allow with

19   the first witness a broader leeway than I normally do in a

20   case.  There has been a lot of repetition, but we are going to

21   start making this case a little bit more concise.  But I will

22   permit one line of questioning on this.  Go ahead.

23          MR. FLUHR:  Yes, Your Honor.

24   BY MR. FLUHR:

25   Q.    Ma'am, at the time that the e-mail was sent from

S. E. Nowek - Cross

346

1    Dr. Rattner, both you and Jose worked for Dr. Rattner; isn't

2    that correct?

3              THE COURT:  That is completely repetitive.  That's

4    been asked a half dozen times.  This jury knows that.  Move on.

5    BY MR. FLUHR:

6    Q.   Ma'am, if you can now turn to Exhibit 160, which is in

7    evidence.

8              THE COURT:  Again, Defense Exhibit 160?

9              MR. FLUHR:  Yes, Your Honor.

10             THE COURT:  All right.  You need to say which sides,

11   all right, so we are clear.

12   BY MR. FLUHR:

13   Q.   Ma'am, that exhibit is an e-mail sent from Dr. Rattner to

14   you and Jose Renteria on January 8, 2016, correct?

15   A.   Yes.

16   Q.   And in that communication, Dr. Rattner used a different

17   e-mail account, bella29301@gmail.com, correct?

18   A.   Yes.

19             MR. WASSERMAN:  Objection, Your Honor.  Again, we are

20   just repeating this same thing that we went through yesterday

21   at some length.

22             THE COURT:  Well, this one -- it is a repeat, but

23   it's only been the second repeat, unlike the 10th or 12th.  So

24   I am allowing this, but we need to get this moving.

25             MR. FLUHR:  Yes, Your Honor.

1    BY MR. FLUHR:

2    Q.   And, ma'am, in that message Dr. Rattner, which Dr. Rattner

3    wrote at approximately 12:15 on that day, she states:  Sylwia,

4    can you please write down the stuff about the house and explain

5    to Jose what we are telling insurance people so we can -- so we

6    can all same the same thing.  Jose, I will talk to you about it

7    on Tuesday.

8         Ma'am, how did you understand those instructions from

9    Dr. Rattner?

10   A.   Well, those instructions, I remember Ms. Rattner had a

11   hard time remembering, you know, the dates of like first gas

12   leak or when the plumbers came, when the Washington Gas people

13   came.  So I remember she asked me to write down the dates, you

14   know, when -- when was the -- the time when I turned off the

15   gas, things like that.

16   Q.   Wasn't she really asking you to get your story straight,

17   ma'am?

18        MR. WASSERMAN:  It's argument, Your Honor.

19        THE COURT:  That's not a proper question, so the

20   objection is sustained.

21        And, ladies and gentlemen of the jury, I want to make

22   sure you understand that lawyers are not witnesses.  If a

23   lawyer makes a statement, that statement is not a fact unless a

24   witness says, yeah, that's what happened.

25        So be very careful.  There have been a lot of -- a

S. E. Nowek - Cross

348

1   lot of the questions of counsel seem to make a statement, but

2   that's -- that's establishes -- that question establishes

3   nothing unless the witness says, yes, that's what happened.

4          All right.

5          MR. FLUHR:  Again, I am going to refer to 137 in her

6   deposition.

7          Your Honor, I am referring to deposition testimony

8   from this witness.

9   BY MR. FLUHR:

10  Q.  And, again, from your deposition, you were asked

11  specifically about whether Dr. Rattner wanted you and Jose to

12  say the same thing about what she was saying.  Do you remember

13  being asked that?

14  A.  Well --

15         MR. WASSERMAN:  What page are we at?

16         MR. FLUHR:  137.

17         MR. WASSERMAN:  Thank you.

18         THE COURT:  Read the question.  Read it literally.

19  BY MR. FLUHR: (Continuing)

20  Q.  Question:  What do you recall there was about the house

21  that Dr. Rattner wanted you and Jose to say the same thing

22  about as she was saying?

23         Answer:  I'm not 100 percent sure, but I think that

24  may have been exactly that, that the things were taken to

25  storage.

1          Question:  She wanted you to get your story straight

2     about that; is that right?

3          Answer:  It looks like, yes.

4     A.   Okay, I remember that now.

5          MR. FLUHR:  No further questions, Your Honor.

6          THE COURT:  All right.  Any redirect, Mr. Wasserman?

7          MR. WASSERMAN:  Just two questions, Your Honor.

8          THE COURT:  Now, when lawyers tell me just two

9     questions, I like to see whether they can really do that.  At

10    least you didn't say one question, which many times trips

11    people up.

12         Go ahead.  Two questions, Mr. Wasserman.

13         MR. WASSERMAN:  Thank you, Your Honor.

14    REDIRECT EXAMINATION

15    BY MR. WASSERMAN:

16    Q.   Ms. Nowek, did you lie to Chubb National or anybody else

17    in connection with the investigation of the fire?

18    A.   No, I didn't.

19    Q.   Ms. Nowek, did you conceal anything from anyone, including

20    Chubb National or anyone else, with regard to the investigation

21    of the fire?

22    A.   Can you explain word "conceal," please.

23    Q.   Hide.

24    A.   No, I didn't.

25         MR. WASSERMAN:  Thank you.

S. E. Nowek - Redirect

350

```
 1          THE COURT:  Is there any recross?

 2          MR. FLUHR:  No, Your Honor.

 3          THE COURT:  All right.  Does anybody think they might

 4   be calling this witness again in the course of the trial?

 5          MR. WASSERMAN:  I don't think so, Your Honor.

 6          MR. FLUHR:  Chubb National does not anticipate doing

 7   so, Your Honor.

 8          THE COURT:  All right.  Then I am going to excuse the

 9   witness if everybody is sure about that.

10          MR. FLUHR:  Yes, Your Honor.

11          MR. WASSERMAN:  Well, Your Honor, Mr. Hanes points

12   out there is rebuttal, so I would like her subject to recall,

13   but I think she can leave today.

14          THE COURT:  Yeah.  Ma'am, you can leave the

15   courthouse, but you may have to come back to testify.  That

16   means you cannot discuss your testimony with anyone who is

17   going to be a witness in this case.  Do you understand that?

18          THE WITNESS:  Yes, I do.

19          THE COURT:  All right.  And you need to make sure

20   that counsel has contact information so if they need to have

21   you back here sometime in the next couple of days, you can get

22   back here.

23          THE WITNESS:  Okay.

24          THE COURT:  All right.  You are free to go at this

25   time.
```

1        THE WITNESS:  Thank you.

2        NOTE:  The witness stood down.

3        THE COURT:  Your next witness.

4        MR. WASSERMAN:  Mr. Bottomley, Your Honor, Richard

5   Bottomley.

6        THE COURT:  Mr. Hanes, while we are waiting for the

7   witness, how does he spell his last name?

8        MR. HANES:  B-o-t-t-o-m-l-e-y, I believe.

9        THE COURT:  Bottomley.

10       MR. HANES:  Yes, ma'am.

11       NOTE:  The witness is duly affirmed.

12       RICHARD BOTTOMLEY, called by counsel for the

13  plaintiff, first duly affirming, testifies and states:

14       DIRECT EXAMINATION

15  BY MR. HANES:

16  Q.   State your full name and address, please, sir.

17  A.   Richard Bottomley.  148 River Park Lane, Great Falls,

18  Virginia.

19  Q.   How long have you lived there?

20  A.   23 years.

21  Q.   Did you have a neighbor there, Dr. Rattner?

22  A.   Yes.

23  Q.   Did she live there in 2015?

24  A.   Yes.

25  Q.   What occurred on the night of November 15, early morning

R. Bottomley - Direct

352

1    November 16, Saturday into a Sunday?

2    A.   There was a large fire and the house burned down.

3    Q.   Did you observe it?

4    A.   I was awoken several times during the night.  And the

5    final time when I looked out the window, the house was ablaze.

6    Q.   Did you hear anything?

7    A.   I heard --

8            MR. O'HARA:  Objection.

9            THE COURT:  Wait just a second.

10           MR. O'HARA:  Objection.  Can we have a reference in

11   time since he is speaking about the entire night.

12           THE COURT:  I think that is appropriate.

13   BY MR. HANES:

14   Q.   At the time of the fire, did you hear anything?

15           THE COURT:  No, no.  What -- sir, what time did you

16   go to bed that night, if you recall?

17           THE WITNESS:  I think around 11 o'clock.

18           THE COURT:  All right.  And when do you first recall

19   being awakened?

20           THE WITNESS:  So I think my wife and I went to sleep,

21   I think it was around midnight.  Actually, our dog was

22   restless, and we thought that was unusual.  She jumped up on

23   the bed and she's not allowed on the bed when we sleep, and I

24   told her to get off the bed and settle down.  Sometime after

25   that, my wife went back to sleep.  I heard a loud bang or boom,

R. Bottomley - Cross

353

1   and I just kind of -- it awoke me, and I just kind of rolled

2   over.  I didn't think much of it.

3           Sometime after that, I think I was still kind of

4   awake, there were flashing lights outside the house that shine

5   in our bedroom, and I think probably the sound of large trucks.

6   Sometimes happens that snowplows or plowing at night and things

7   like that.

8           So I got up, I looked out the window, and that's when

9   I saw the house, and the blaze was already above the trees.  I

10  mean, it was amazing.  And I shouted at my wife, my God, the

11  house is on fire.  She thought I was talking about our house.

12          And we had a house guest staying with us as well, so

13  we went down and awoken her, got some clothes on, and then

14  walked outside and -- so the fire trucks had arrived.

15          There was no siren when they arrived which I -- all I

16  saw were flashing lights.  So that's -- I mean, the fire was

17  just -- it was scary, actually.  Even from across the street, I

18  was hesitant to kind of stand in our driveway and look at it.

19          THE COURT:  Thank you, sir.  Your witness.

20          MR. O'HARA:  Just very briefly.

21      CROSS-EXAMINATION

22  BY MR. O'HARA:

23  Q.  Mr. Bottomley, from the time that your dog was restless at

24  about midnight until the time that you actually hear the noise

25  that causes you to roll over, can you give any reasonable

R. Bottomley - Cross

354

1  estimate as to the amount of time that elapsed?

2  A.   It's hard because I think I was kind of dozing in or out

3  or trying to go back to sleep.  My guess would be --

4  Q.   We don't want you to guess.

5  A.   Okay.

6  Q.   Can you give a reasonable estimate?

7  A.   A reasonable estimate would be between a half hour and an

8  hour.

9           MR. O'HARA:  Thank you, sir.  That's all I've.

10          THE COURT:  All right.  Does anybody expect to call

11  this witness again?

12          MR. WASSERMAN:  Your Honor, at this time we would

13  like to play the video deposition of Steven Rattner.

14          THE COURT:  All right.  Are you going to call this

15  witness again, Mr. Wasserman?

16          MR. WASSERMAN:  No, sir -- no, ma'am.  I apologize.

17          THE COURT:  How about from the defense?

18          MR. O'HARA:  No, Your Honor.

19          THE COURT:  Now, sir, you're excused as a witness.

20  That means you may stay in the court now and watch the

21  proceedings if you wanted to, but you're not to discuss your

22  testimony or anything you see or hear in the courtroom with any

23  witness who has not yet testified.  All right?

24          THE WITNESS:  Okay.

25          THE COURT:  Thank you.  All right.

1          NOTE:  The witness stood down.

2          THE COURT:  We're now going to play the deposition?

3          MR. WASSERMAN:  Yes, Your Honor.  I'm told the clip,

4    altogether, combining the portions that both sides want in

5    evidence, is more than an hour, Your Honor.

6          THE COURT:  That's all right.  We'll break -- we'll

7    break into it for our morning break.

8          MR. WASSERMAN:  You want to start now?

9          THE COURT:  Oh, yeah.

10          MR. WASSERMAN:  Yes, ma'am.

11          THE COURT:  All right.  I assume it's all teed up and

12    ready to go?

13          And just for the record, my court reporter is not

14    going to take this down.

15          I assume you have a written transcript of what is in

16    this video, correct?

17          MR. WASSERMAN:  Of course, Your Honor.  We will

18    prepare it.  I believe it already exists, actually.

19          THE COURT:  Is there any objection to that being the

20    way in which we record this?

21          MR. WASSERMAN:  No, Your Honor.

22          MR. O'HARA:  None, Your Honor.

23          THE COURT:  That's fine.

24          NOTE:  The video deposition of Steven Rattner is

25    begun to be played into evidence.

Steve Ratther - Video Deposition

356

1          MR. WASSERMAN:  Your Honor, excuse me.

2          THE COURT:  Stop the video.  Stop the video.

3          MR. O'HARA:  May we approach, Your Honor?

4          THE COURT:  Yes.

5          NOTE:  A side-bar discussion is had between the Court

6    and counsel out of the hearing of the jury as follows:

7    AT SIDE BAR:

8          THE COURT:  Yes, Mr. Wasserman?

9          MR. WASSERMAN:  Thank you, Your Honor.  Counsel

10   kicked me.  Juror Number 2 is asleep.  So --

11         THE COURT:  Which one is Number 2?

12         MR. O'HARA:  The African-American gentleman sitting

13   in the second chair in the front row.

14         THE COURT:  I've been watching him.  He tends to look

15   that way and then you notice he really isn't asleep.  He is

16   just one of those people who --

17         MR. O'HARA:  I appreciate that.  We felt it was

18   appropriate, which is why I brought it to the attention of

19   counsel, I watched him nod off two or three times over the

20   course of the last 15 minutes.

21         So because Your Honor mentioned there are times when

22   jurors may need to take a break or to stretch, I did not want

23   to not raise it, because if he stays asleep for any long period

24   of time, he doesn't catch the key pieces of the testimony for

25   both sides.

1          THE COURT:  Again, I don't think that's what's

2     happening.  But the other thing that is happening, in a video

3     deposition like this, you all know this case well because

4     you've been living with it for a while.  But it is, to some

5     degree, not fair to the jury when you have this witness being

6     asked to look at a document, and he says these things upset

7     him, they have no context for that.  You know what he's looking

8     at, but they don't.

9          See, this is hard.  I hope this deposition goes

10    better than this.

11         MR. WASSERMAN:  I don't know that it will, Your

12    Honor.  These are Chubb's designations.

13         THE COURT:  Well, all right.  Anyway --

14         MR. MILLS:  Your Honor, since we're up here, I was

15    about to object.  You overruled their objections to certain

16    parts of this, and it was represented to me that they did not

17    excise our objections.  They did.  The very first objection has

18    been excised, and I think they are not putting -- they did not

19    put all our objections back in.

20         THE COURT:  Oh, I don't want your objections to --

21         MR. MILLS:  No, no, no.  No.  They objected to

22    certain portions --

23         THE COURT:  And I said all that could come in.

24         MR. MILLS:  Yeah, and it's not in.  The very first

25    one is not in.

Steve Ratcher - Video Deposition

358

```
 1              THE COURT:  Well, that was the understanding on this
 2    video.
 3              MR. WASSERMAN:  I agree, Your Honor.  As far as I
 4    know, we did not excise any, that's what I was told.
 5              MR. MILLS:  The very first one is not in.
 6              MR. WASSERMAN:  They've had this for more than
 7    24 hours.  If they had a problem with it, they should have told
 8    us.
 9              THE COURT:  Do you have any other witnesses?
10              MR. WASSERMAN:  No, Your Honor.
11              THE COURT:  This is it?
12              MR. WASSERMAN:  Yes.
13              THE COURT:  All right.  What we're going to do is
14    we're going to stop the deposition at this point.  Okay?  We
15    get it done correctly.  All right?  And we can play it this
16    afternoon or tomorrow.
17              And let's start getting your case, your witnesses on.
18              MR. MILLS:  At this point, it might be a good chance
19    to excuse the jury because we're going to make a Rule 50
20    motion.
21              THE COURT:  No, without the record stuff, you can't
22    do that.
23              MR. MILLS:  Okay.  But at the end of that.
24              THE COURT:  All right.  I am going to let the jury
25    take their break earlier.  Go back to your seats.
```

1          NOTE:  The side-bar discussion is concluded;

2   whereupon the case continues before the jury as follows:

3   BEFORE THE JURY

4          THE COURT:  All right.  Ladies and gentlemen, I'm

5   going to give you a chance to take an earlier morning break.

6   We have some logistical problems with this video.  Not

7   everything that's supposed to be in the video is in the video.

8          So I'll ask you -- I'm going to give you until ten

9   after, so you're getting a 20-minute break this morning.  That

10  should be enough time to get some coffee if any of you need

11  that.  All right?  I will see you back here at ten after.

12         NOTE:  At this point the jury leaves the courtroom;

13  whereupon the case continues as follows:

14  JURY OUT

15         THE COURT:  All right.  Counsel, you had a motion?

16         MR. MILLS:  Your Honor --

17         THE COURT:  At the lectern.

18         MR. MILLS:  Your Honor, Lauren Mills, for the record,

19  on behalf of Chubb National.

20         THE COURT:  Yes, sir.

21         MR. MILLS:  We were going to wait until the end of

22  the Rattner deposition when the plaintiff rested to make the

23  Rule 50 motion.  But since the jury is out, we will make the

24  Rule 50 motion right now.  And if I can ask Mr. van Roekel to

25  hand this up to you.

1              THE COURT:  My clerk will get it.

2              MR. WASSERMAN:  Your Honor, I'd like the record to

3    reflect that counsel just handed me a -- I don't know --

4              THE COURT:  We're both getting -- we're both getting

5    the same document at the same time, Mr. Wasserman.

6              MR. WASSERMAN:  Yes, Your Honor.

7              THE COURT:  Go ahead, Mr. Mills.

8              MR. MILLS:  And we are moving on two grounds.  The

9    first is the issue of waiver.  And there are two essential

10   arguments for -- on the issue of waiver.  A waiver, by

11   definition, is a voluntary and knowing relinquishment of a

12   known right based on all the facts.  And it is very clear that

13   from the beginning, starting 48 hours after this fire, that

14   there was instructions from Dr. Rattner to her employees not to

15   reveal all the facts.

16             For whatever reason, those were the instructions, and

17   there is multiple evidences from Dr. Rattner's own mouth and

18   from her e-mails where she did not give Chubb all the facts.

19   Whether it's the rental of the SUV, whether it's storage units,

20   whether it is instructions to household employees.  And we have

21   listed all the instances of that on pages 5, 6, and 7, going on

22   to page 8 of motion.

23             So on these facts, there can be no knowing waiver

24   because Chubb did not have all the facts regardless.  And there

25   is no evidence of an express waiver.  And there is no evidence

1  of an implied waiver, which has to be clear and convincing and

2  unmistakable evidence under Virginia law.  And there is

3  absolutely no evidence of that based on their case in chief.

4       Lastly, waiver is an equitable doctrine.  And

5  somebody with unclean hands cannot mount a -- assert a waiver

6  defense.  And for the same reasons on pages 5 through 8, there

7  is a mountain of evidence that Dr. Rattner did not have clean

8  hands on this.  She was not forthcoming with Chubb about what

9  happened.  Numerous material and intentional omissions of fact

10  absolutely preclude her as a matter of law from asserting a

11  waiver affirmative defense, and it needs to come out of the

12  case right now.

13       For exactly the same reasons, she has admitted to

14  multiple material omissions of fact from Chubb.  One is enough

15  to void her policy.  This mountain of material omissions is

16  enough.  You recognized that a month ago when we were first in

17  front of you on the summary judgments.  You've now heard it

18  from her mouth, you have seen all the evidence, it's time to

19  end this.  Her policy is void.  The trial should proceed on

20  damages only.

21       Thank you, Your Honor.

22       MR. RUPPRECHT:  Your Honor, Dominic Rupprecht for

23  Dr. Rattner.

24       Initially, again as counsel noted, waiver is an

25  affirmative defense.  It is not something we need to prove in

1    our case in chief.  It is something we will prove in our

2    rebuttal case to the extent they can establish that either of

3    the fraud concealment or the Intentional Acts Exclusion apply.

4           As to the fraud or concealment issue in this case in

5    chief, as Your Honor recognized when you ruled on the summary

6    judgment motions ultimately on September 28 -- again, this is

7    the same standard.  There are still outstanding issues of

8    intent and materiality here that would bar a ruling as a matter

9    of law and requires this issue go to the jury.

10          Questions of intent -- and Dr. Rattner has testified

11   repeatedly that she did not intend to lie, she did not intend

12   to mislead.  That's the end of the ball game on the Intentional

13   Acts Exclusion as it relates to whether it can be moved as a

14   matter of law.

15          I would also note, Your Honor, that both the Supreme

16   Court and the Fourth Circuit have recognized that when we have

17   a jury impaneled, it is the better course to allow the jury to

18   rule rather than issue a Rule 50 order.

19          THE COURT:  I have to tell you all that I am going to

20   let this case go to the jury, but I will alert the plaintiff

21   that at least on the evidence that the Court has heard so far,

22   that this -- if the jury were to not find that this had been an

23   intentional misrepresentation of material facts, I don't think

24   that that jury verdict could be sustained.  I don't see how

25   rational jurors could find in that direction.

1          So that's how I'm going to rule now.  It is a far

2   better use of judicial resources, at this point you've all

3   invested so much time, unless you can resolve this case, let it

4   go to the jury so we have got a jury verdict one way or the

5   other.

6          But the evidence that the Court has seen, if this

7   were being tried to the Bench, I can tell you right now I would

8   be granting judgment in the defendant's favor.

9          MR. MILLS:  Thank you, Your Honor.

10          THE COURT:  All right.  That may or may not assist

11   you in this case.

12          All right, we are on recess then until ten after.

13          (Recess from 10:57 a.m., until 11:10 a.m.)

14                      (Jury present.)

15          THE COURT:  All right, we need to take the visual off

16   the screen unless you've fixed the problems with the video.

17   Has it been fixed?

18          MR. WASSERMAN:  Your Honor?

19          THE COURT:  Yes.

20          MR. WASSERMAN:  I'm told that we now have a complete

21   set that Chubb asked for so that we can backtrack and include

22   everything.

23          THE COURT:  How much backtracking are we going to --

24   you know, the other thing that I have done in cases when it's

25   taking too long to get it done this way, the jury's had a

1    chance to see the witness.  We have transcripts here.  I'll put

2    my law clerk in the box to start reading it, because there are

3    delays as the witness is looking at the document, and making

4    the jury have to sit through that is going to put them to

5    sleep, and it's not a fair use of their time.

6               So you're saying we have to go back?

7               MR. WASSERMAN:  Well, I think we have to -- we at

8    least have to go back to the point where the first omission

9    occurred.

10              THE COURT:  How far back is that?

11              MR. MILLS:  Your Honor, it's not very far.  The time

12   we came to the bench was maybe a minute.

13              THE COURT:  All right, let's go back then to that,

14   and if -- but if it starts to get bogged down, I'm going to

15   switch it over to the faster way of having it read in, all

16   right?

17              MR. WASSERMAN:  Understood, Your Honor.  Thank you.

18              THE COURT:  While that's being done, I don't want

19   anyone asking for the street addresses of anybody again in this

20   case.  That has to be redacted from the transcript because the

21   rules do not permit street addresses to be part of a public

22   record.  So you're all going to have to go through these

23   transcripts for redactions.  It's not a proper question unless

24   it's absolutely relevant to a case.  I don't want people's home

25   addresses anymore.

1              (Excerpt of videotaped deposition of Mr. Steven

2    Rattner was played.)

3              THE COURT:  It's not right yet?

4              MR. MILLS:  No.

5              THE COURT:  All right, that's it.  I'm not taking up

6    the jury's time any further.

7              Do you have properly edited transcripts of this

8    video -- of this deposition, including just the portions of the

9    transcript that plaintiff wants to use and that the defendant

10   is using?

11             MR. MILLS:  Your Honor, I do.

12             THE COURT:  Yours is fully marked with both sets?

13             MR. MILLS:  Yes.

14             THE COURT:  How many copies of that do you have?

15             MR. MILLS:  I just have one for myself.

16             THE COURT:  All right.  You're going to give it to my

17   law clerk.  He's going to run a couple of copies, and what will

18   happen is he will go into the witness box and will read the

19   answers.  You'll read the questions.  Whichever attorney,

20   whichever side was asking the question will ask the question.

21             So who did the direct exam on the deposition?

22             MR. MILLS:  Mr. Freed.

23             THE COURT:  All right.  Mr. Freed, you're on board.

24   You will stand there; you'll read the question.  My law clerk

25   will play the role of Dr. -- Mr. Rattner and will read the

1    answers.  It will go much faster that way.  These pauses are

2    not appropriate.

3             MR. MILLS:  The only problem with copying this, Your

4    Honor, is I did stuff in color so I know what was ours and what

5    was theirs and what was objected to, and I'm just not sure how

6    your copier is going to deal with it.

7             THE COURT:  It won't.  All right, have a seat.  Then

8    what we'll do is over the lunch break, somebody get a fancy

9    copier, and let's get it done correctly.  So we'll have to

10   postpone the rest of the Rattner information at this point.  My

11   understanding is with that having been said, we're going to --

12   we're going to switch to the defendant's case at this point.

13            So let's get this off the screen.  Close it down, all

14   right?

15            Mr. Rattner would have been the plaintiff's last

16   witness, so I'm not technically closing the plaintiff's case.

17   We're leaving it open to finish it, but we are starting the

18   defense case.

19            Do you want to call your next witness, please?

20            MR. O'HARA:  Yes, sir -- Your Honor.  Mr. Freed will

21   handle the next witness, and Chubb National will call

22   Dan Jaeger to the stand.

23            THE COURT:  All right, Mr. Jaeger.  How does he spell

24   his last name?

25            MR. FREED:  How I do spell --

D. Jaeger - Direct

367

```
1              THE COURT:  How does he spell his last name?

2              MR. FREED:  J-a-e-g-e-r, Jaeger.

3              THE COURT:  Thank you.

4         DANIEL JAEGER, DEFENDANT'S WITNESS, AFFIRMED

5              MR. FREED:  Your Honor, we have prepared some

6    exhibits that I would be asking the Court to permit us to use

7    with Mr. Jaeger.  May they be handed to the witness?

8              THE COURT:  Yeah.  Do you have a set for the Court?

9              MR. FREED:  We do.

10             THE COURT:  All right.  Hand those up, please, as

11   well.  Where's my set?

12             MR. MILLS:  We brought them up this morning, Your

13   Honor.

14             MR. O'HARA:  We presented them this morning.

15             THE COURT:  Ah, got them.  Thank you.

16             MR. FREED:  May I inquire?

17             THE COURT:  Go ahead, yes.

18             MR. FREED:  Thank you.

19                       DIRECT EXAMINATION

20   BY MR. FREED:

21   Q.   Good morning, sir.

22   A.   Good morning.

23   Q.   Where do you work?

24   A.   I work for ACE American Insurance Company, which is a

25   member of the Chubb Group Insurance Companies.
```

D. Jaeger - Direct

368

1    Q.    What is your job there?

2    A.    I am the property SIU claim manager for North America.

3    Q.    What's SIU?

4    A.    It's the Special Investigations Unit.

5    Q.    How long have you had this job?

6    A.    The current job that I'm in has been since January of

7    2016.

8    Q.    What was your job in November of 2015?

9    A.    I was the worldwide first-party Special Investigations

10   Unit manager for Chubb & Son, a division of Federal Insurance

11   Company.

12   Q.    Why did your position change?

13   A.    Chubb and ACE merged.

14   Q.    Did your job functions, your responsibilities change in

15   any way as a result of that merger?

16   A.    The only real change in responsibility is prior to the

17   merger, I had responsibility worldwide for the first-party

18   Special Investigations Unit.  After the merger, my

19   responsibility was for North America.

20   Q.    Would you just take a moment to explain what you mean when

21   you use the phrase "first party"?

22   A.    Sure.  At Chubb, we used to divide claims between first

23   party and third party.  So first party would be anyone who had

24   an insurance policy with us.  Third party would be those claims

25   that are made against our insureds.

D. Jaeger - Direct

369

1   Q.   So, for instance, a car accident where someone was suing,

2   your insured would be a third-party claim?

3   A.   That's correct.

4   Q.   And a case such as that which brings us to court today

5   where the insured person's property was damaged or destroyed,

6   that would be first party?

7   A.   That's correct.

8   Q.   How long have you worked in the insurance industry?

9   A.   Twenty-three years.

10  Q.   Do you have a college degree?

11  A.   Yes, I do.

12  Q.   From where?

13  A.   The University of Delaware.

14  Q.   What year did you graduate?

15  A.   In 1994.

16  Q.   And what was your degree?

17  A.   I have a Bachelor of Arts in Criminal Justice.

18  Q.   Do you hold any professional designations?

19  A.   Yes, I do.

20  Q.   Would you tell us what those are?

21  A.   Sure.  I am a chartered property casualty underwriter and

22  an associate in claims.

23  Q.   Would you tell us a little bit about the company you work

24  for, Chubb?

25  A.   Sure.  Chubb is an international property and casualty

1    insurance company that specializes in the United States in

2    high-net worth affluent homeowners' insurance.

3    Q.   Aside from homeowners' insurance, does it write other

4    types of insurance as well?

5    A.   Yes, it does.  It writes valuable articles.  It writes

6    artwork, boats, and other types of property insurance.

7    Q.   In the United States, does Chubb have any particular focus

8    or niche?

9    A.   Yeah, we do have a niche market.  We focus on high-net

10   worth affluent households, so that's primarily what we do.

11   Q.   And what's Chubb's business model for handling claims?

12   A.   The Chubb brand is known throughout the world for its

13   reputation for superior claims service.

14   Q.   How does that translate into real life?

15   A.   It translates into real life that, you know, when we have

16   a claim, we provide, you know, quick response to that claim.

17   We provide insureds with the necessary resources to minimize

18   the impact to them, and we typically generously pay claims.

19   Q.   What is Chubb's approach when it reaches a determination

20   that one of its insureds has attempted to defraud it?

21   A.   We take a very hard-line approach on that, and we do not

22   pay fraud.

23   Q.   Is your compensation, sir, in any way tied to the

24   declination or denial of insurance claims?

25   A.   Absolutely not.

1   Q.   What about the investigators who worked for your

2   department?

3   A.   Absolutely not.

4   Q.   Does the Special Investigation Unit of Chubb get involved

5   in every property claim?

6   A.   No.  Actually, we get involved in a very small percentage

7   of the property claims that are handled by Chubb.

8   Q.   And are you personally familiar with the percentage of

9   such claims that get referred to SIU?

10  A.   Yeah.  It is on an annual basis less than 1.4 percent of

11  the non-marine property claims that we handle per year.

12  Q.   And when you say "non-marine property claims," just

13  explain to us, please, what that means.

14  A.   Sure.  That's any type of property claim except for what

15  would be considered marine or yacht.

16  Q.   Of the 1.4 -- approximately 1.4 percent of claims, the

17  total claims paid on these type of losses that get referred to

18  the Special Investigation Unit, or SIU, are you familiar with

19  how the majority of those are disposed?

20          MR. WASSERMAN:  Objection, Your Honor.  Relevance.

21  We're talking about this claim, not the company's entire

22  claims.

23          THE COURT:  I'll sustain the objection.

24  BY MR. FREED:

25  Q.   Under what circumstances does the SIU, your department,

D. Jaeger - Direct

1   get involved in a particular claim?

2   A.   Usually after the adjustor meets with an insured and

3   acquires some basic information, if there are indicators or red

4   flags, as we call them in the industry, present, that adjustor

5   will typically talk with the Special Investigations Unit, and a

6   decision will be made on whether or not to refer it to SIU,

7   which is the acronym for Special Investigations Unit, and

8   whether or not additional investigation by us is warranted.

9   Q.   What's the purpose for the company's maintaining a Special

10  Investigations Unit?

11  A.   Most -- or I should say several states require it, but the

12  primary purpose is to ensure that we detect and prevent the

13  payment of fraudulent claims.

14  Q.   As of November of 2015, approximately how many field or

15  front line investigators were working in your department?

16  A.   We had approximately ten investigators throughout the

17  United States.

18  Q.   And who hired each of those investigators?

19  A.   Depending on when those investigators were hired would

20  determine who actually hired them, but I was in this position

21  as of January of 2011, so anyone who was hired after that point

22  would be hired by me.

23  Q.   Was there a specific special investigator who worked for

24  you who was assigned to handle the Rattner claim?

25  A.   Yes, there was.

D. Jaeger - Direct

373

1    Q.    Who was that person?

2    A.    Christina Fiscella.

3    Q.    And did you hire Ms. Fiscella?

4    A.    I did hire Ms. Fiscella.

5    Q.    Are you familiar with what her background is?

6    A.    Generally, yes.

7    Q.    Could you tell us, please?

8    A.    Sure.  At the time that the Rattner claim occurred,

9    Ms. Fiscella had been with Chubb for approximately five years.

10   Prior to that, she was a detective in New Jersey for the office

11   of the insurance fraud prosecutor, and prior to that, she had

12   worked for Allstate Insurance in a special investigator role.

13   Q.    Does Ms. Fiscella still work for Chubb?

14   A.    She does not.

15   Q.    Until when did she work for Chubb?

16   A.    She left Chubb in February of 2017.

17   Q.    And do you know where she's working now?

18   A.    Yes.  She now runs the Special Investigations Unit for

19   ProSight Specialty Insurance Company in New Jersey.

20   Q.    Did her departure from Chubb -- was that voluntary?  Did

21   she leave under her own volition, or was she asked to leave?

22   A.    That was a voluntary departure for a promotional

23   opportunity.

24   Q.    Approximately how many investigations per year of

25   property -- suspicious property insurance claims does your

1   department handle?

2   A.   Approximately 600.

3   Q.   And how many investigations have you personally handled of

4   fire claims?

5   A.   Of fire claims, I would say probably approximately 20

6   personally as an investigator.

7   Q.   And of those approximately 20 fire claims that you

8   handled, do you know approximately how many were ultimately

9   denied based on --

10             MR. WASSERMAN:   Objection.

11  BY MR. FREED:

12  Q.   -- a determination that it was arson?

13             MR. WASSERMAN:   Your Honor, again, we're getting far

14  afield from the case.

15             THE COURT:   Well, I think the quality of the

16  investigation and the scope is within the relevance of this

17  case, so I'm going to overrule this objection.

18             THE WITNESS:   If I understood your question

19  correctly, how many claims that I personally investigated were

20  denied for arson?

21  BY MR. FREED:

22  Q.   Of the -- you said that you had personally investigated

23  approximately 20 fire claims?

24  A.   Correct.

25  Q.   And my question was, of those approximately 20, how many

1    were ultimately denied based on a determination that there was

2    an arson by the insured?

3    A.   Of the ones that I personally investigated, three to four.

4    Q.   And you've been doing this for 22 years?

5    A.   Twenty -- 22 years in special investigations and 16 years

6    at Chubb.

7    Q.   Did Ms. Fiscella report directly to you during the course

8    of this claim?

9    A.   No, she did not.

10   Q.   And to whom did she report?

11   A.   She reported to Patrick Cronin, who is an SIU supervisor.

12   Q.   And just in the pecking order of the company, where did

13   Mr. Cronin fall?

14   A.   Mr. Cronin is a direct report to me.

15   Q.   So Christina Fiscella reported to Mr. Cronin, who reported

16   to you; is that fair?

17   A.   That's correct.

18   Q.   Were you personally involved in the evaluation and

19   handling of the Rattner claim?

20   A.   Yes, I was.

21   Q.   How were you personally involved?

22   A.   I received notice of the fire loss shortly after it was

23   received by the company, and at some point a few weeks later, a

24   determination was made that we were going to further

25   investigate it in the Special Investigations Unit, and at that

D. Jaeger - Direct

376

1    point, I started following the case.

2    Q.   And have you followed the case from that point up through

3    and including today?

4    A.   I have.

5    Q.   And are you familiar with the facts that developed during

6    the course of that investigation of the Rattner claim?

7    A.   Yes, I am.

8    Q.   Have you reviewed the claim file that was generated by

9    Chubb in relation to the Rattner claim?

10   A.   Yes, I have.

11   Q.   Is the claim file a business record maintained by Chubb?

12   A.   Yes, it is.

13   Q.   Is it maintained by people who are under a duty to keep it

14   accurately?

15   A.   Yes, it is.

16   Q.   And do personnel at Chubb rely upon the claim file when

17   making decisions about whether or not to pay claims and how to

18   administer claims?

19   A.   Yes, they do.

20   Q.   Were you ultimately involved in the decision to deny the

21   Susan Rattner claim?

22   A.   Yes, I was.

23   Q.   What role did you play in that?

24   A.   I was the manager of the investigation, so I was providing

25   direction and guidance throughout the course of the

1   investigation, and ultimately at the conclusion of the

2   investigation, I reviewed all of the evidence that was

3   obtained, and I made a recommendation to senior management at

4   Chubb.

5   Q.   Who ultimately made the final decision?

6   A.   The ultimate decision was made by consensus of senior

7   management.

8   Q.   When was the decision made to deny Susan Rattner's claim?

9   A.   The decision was made around January 9 of 2017.

10  Q.   So what -- in brief, what happened between November 2015,

11  when this fire occurred, and February of 2017, when the claim

12  was denied?

13  A.   Sure.  During that time, we undertook a comprehensive and

14  thorough investigation of Dr. Rattner's claim.

15  Q.   Were you involved in issuing the letter by which

16  Dr. Rattner was notified that her claim was being denied?

17  A.   Yes, I was.

18          MR. FREED:  Your Honor, I would ask the -- to --

19  permission to publish Exhibit 235.

20  Q.   Mr. Jaeger, would you take a look at Exhibit 235 in the

21  binder before you, please?  Defendant's exhibit, excuse me.

22          THE COURT:  Any objection?

23          MR. WASSERMAN:  No, Your Honor.

24          THE COURT:  All right, Defense 235 is in.  It may be

25  published.

1          (Defendant's Exhibit No. 235 was received in

2    evidence.)

3          MR. FREED:  Thank you very much, Your Honor.

4    Q.   Can you identify what Exhibit 235 is, Mr. Jaeger?

5    A.   Sure.  This is the formal coverage determination letter

6    that was sent to Dr. Rattner's counsel at the time, dated

7    February 3 of 2017.

8    Q.   Who signed it?

9    A.   I signed this letter.

10   Q.   Why did it take 14 months to deny -- or reach a final

11   determination of Dr. Rattner's claim?

12   A.   These investigations by nature are complex.  They take

13   time, and it also really depends on the amount of cooperation

14   that we're receiving from the insured during the course of the

15   investigation.  That has a large impact on how quickly we could

16   complete it.

17   Q.   What were the bases or the reasons that Chubb decided to

18   deny Susan Rattner's claim?

19   A.   There were two bases set forth in the letter.  The first

20   bases was the intentional acts exclusion, which excludes

21   coverage for anyone who intentionally causes damage to their

22   home.

23   Q.   Was that provision, which is now up on the screen,

24   included in the denial letter that was sent to Dr. Rattner?

25   A.   Yes, on page 3.

D. Jaeger - Direct

379

1   Q.   And under what circumstances does Chubb invoke the

2   intentional acts exclusion?

3   A.   We take this decision very seriously, but after a

4   comprehensive investigation, if there is substantial evidence

5   that an insured is involved in intentionally damaging their

6   property, we will invoke this exclusion to coverage.

7   Q.   Were there any other bases for the decision to deny

8   Dr. Rattner's claim?

9   A.   Yes.  The claim was also denied for violation of the

10  concealment or fraud provision of the policy.

11  Q.   And that's up on the screen at this time?

12  A.   Yes, it is.

13  Q.   And would you explain to us, please, what the concealment

14  or fraud provision is designed to accomplish, what's the

15  purpose of that provision?

16  A.   Sure.  The purpose of this provision is to ensure that a

17  insured who's making a claim under the contract of insurance is

18  truthful and honest in their representations to the company in

19  support of their claim.

20  Q.   In denying Dr. Rattner's claim, what did Chubb tell her it

21  had concluded about her violation of the concealment or fraud

22  provision?

23  A.   It had advised Dr. Rattner that based on our comprehensive

24  investigation, that she made multiple material

25  misrepresentations and concealed material facts during the

1   course of the claim investigation.

2   Q.   And what was the underlying reason for informing

3   Dr. Rattner that you were invoking the intentional acts

4   provision?

5   A.   Based on the significant and overwhelming direct evidence

6   of concealment or fraud during the course of the investigation

7   by Dr. Rattner, we believed that there was no other reason for

8   her to have made those material misrepresentations, concealed

9   those material facts, other than to conceal her involvement in

10  the fire that destroyed her house.

11  Q.   Tell us just briefly a little bit about how an SIU

12  investigation unfolds and how it unfolded more particularly in

13  this claim.  Does the SIU investigator, in this case

14  Ms. Fiscella, does she actually do the fire investigation?

15  A.   No, she does not.

16  Q.   Who does that?

17  A.   We hire an independent origin and cause investigator who

18  has specific training in fire science and is licensed or

19  certified by the National Fire Protection Agency.

20  Q.   How do you try to ensure that the people that you hire to

21  do that job for you are qualified?

22  A.   We go through a pretty extensive vetting process.  In this

23  particular case, prior to hiring this origin and cause

24  investigator, we had retained a law firm to vet origin and

25  cause investigators throughout the United States.

D. Jaeger - Direct

381

1              This law firm had specific experience in dealing with

2     origin and cause, and we put each investigator who wanted to do

3     work for Chubb through an extensive background check and

4     checked their qualifications, and also an interview process.

5     Q.   Who was the fire investigator that Chubb hired to

6     investigate the fire at Dr. Rattner's home?

7     A.   We hired Douglas Carpenter of Combustion Science &

8     Engineering.

9     Q.   Is it fair to assume that he passed that background check,

10    etc., that you just described?

11    A.   He wouldn't have been on our preferred list if he did not.

12    Q.   What other consultants or experts did Chubb hire to help

13    investigate the Chubb -- the Rattner fire claim?

14    A.   We hired an engineer to look at the alarm panel data.

15    Q.   And who was that person?

16    A.   That was Rick Merck of Q-DOT Engineering.

17    Q.   And what's his expertise?

18    A.   He is a fire protection engineer who specializes in the --

19    in analyzing and interpreting alarm panel data.

20    Q.   Why were his services believed to be important in this

21    case?

22    A.   Because in this case, Mr. Carpenter looked at the alarm

23    data and provided his analysis of it, but we wanted to make

24    sure we retained someone who had specialized skill in the

25    interpretation of that data to confirm that Mr. Carpenter's

D. Jaeger - Direct

382

1    analysis was correct.

2    Q.   And did Mr. Merck serve in that capacity?

3    A.   Yes, he did.

4    Q.   Were there any other experts or consultants who were hired

5    to help with this investigation?

6    A.   We hired a mechanical engineer, Bob McLauchlan.

7    Q.   To do what?

8    A.   To inspect the mechanical fixtures in the house that were

9    available for inspection.

10   Q.   While those technical expert investigations are ongoing,

11   what did Ms. Fiscella do in the course of the Rattner claim?

12   A.   Ms. Fiscella's role as a special investigator at the

13   company was to do background searches, get some general

14   information about the fire, about Dr. Rattner, schedule an

15   appointment to meet with Dr. Rattner to obtain her recorded

16   statement so we could get information about the loss, and then

17   do any follow-up investigation with witnesses as needed to

18   complete the investigation.

19   Q.   Why was the Rattner fire claim one of the 1.6 percent that

20   got referred to SIU?

21   A.   After we initially inspected the loss, we started to

22   acquire some information.  That information gave us indication

23   of what we described as red flags.

24   Q.   What's a red flag?

25   A.   Sure.  A red flag in the insurance industry is what we

1    call an indicator of suspicion.  So based on the totality of

2    homeowner's fire losses, there are certain indicators that are

3    present in claims that have been deemed to be fraudulent.  So

4    we look for those indicators to determine whether or not we

5    need to conduct further investigation.

6    Q.    Could you provide a couple of examples that you would be

7    looking at in a fire claim?

8    A.    Sure.  If the home was vacant and for sale, if the home

9    had an alarm system that did not function, if the home was --

10   if no one was home at the time of the fire, those types of

11   things.

12   Q.    What were the red flags that you mentioned that existed in

13   Susan Rattner's claim?

14   A.    From early onset, we knew that the home was for sale.  We

15   also knew that the home was set to be sold five days after the

16   fire occurred at a no reserve auction.  We knew that

17   Dr. Rattner was not home and neither was her pet at the time of

18   the fire.

19   Q.    What's the relevance of the pet?

20   A.    Because most people who are involved in arson don't want

21   their pet to die in the fire.

22   Q.    Any other red flags that you can remember at this point?

23   A.    I think the only other one very early on was the fact that

24   when we went out there, there was no clear and obvious cause to

25   the fire.

D. Jaeger - Direct

384

1   Q.   Was part of the, the decision to make the referral related

2   at all to the alarm system?

3   A.   The -- well, yes.  The, the alarm system, we learned

4   through speaking with Dr. Rattner and others, was a pretty

5   sophisticated, expensive alarm system, and it had a fire

6   detection system as well, and for some reason on the evening

7   into the morning of this fire, it did not function properly and

8   never notified the central monitoring company.

9   Q.   At some point shortly after the claim was referred to SIU,

10  did Ms. Fiscella conduct a recorded statement or interview of

11  Dr. Rattner?

12  A.   Yes, she did.

13  Q.   Was there anything unusual about that?

14  A.   No.  That's pretty commonplace in investigations done by

15  the Special Investigations Unit.  We typically will create an

16  investigative plan, which includes an in-person interview of

17  our policyholder.

18  Q.   Is that something that happens pretty much in every claim

19  that's referred to SIU?

20  A.   Yes, it does.

21  Q.   And what's the purpose of that?

22  A.   The purpose is to meet with the insured, get a set of

23  facts, get some information about the loss, and it's really an

24  opportunity for the insured to tell us what happened from their

25  point of view and what information they have.  And based on

D. Jaeger - Direct

385

1  that recorded statement and that information, we then begin to

2  try to conduct our investigation.

3  Q.   At any point in this process, if the question about

4  potential involvement of the insured or anything suspicious

5  gets resolved, what happens?

6  A.   If we are able to resolve any issues of the insured's

7  involvement, we would pay the claim.

8  Q.   If you're not able at the close of that process of taking

9  the recorded statement, for instance, getting the initial

10  expert reports, what happens then?

11  A.   We do additional investigation to try to determine what

12  the cause of the fire was and who was involved.

13  Q.   What -- how does the investigator decide who should be

14  interviewed and when?

15  A.   The investigator makes those decisions based on the

16  information that they're obtaining.  You know, these

17  investigators, as Christina Fiscella was, has a lot of

18  experience, and she would determine what witnesses to interview

19  based on information she's receiving during the course of her

20  investigation.

21  Q.   Did Christina Fiscella take a recorded statement of

22  Dr. Rattner?

23  A.   Yes, she did.

24  Q.   Do you recall approximately when that was taken?

25  A.   I believe it was on December 14 of 2016.

D. Jaeger - Direct

386

1   Q.   Would you take a look at Exhibit 150 that I believe is in

2   your book?  And I think you said 2016?

3   A.   I'm sorry, 2015.

4           MR. FREED:  Your Honor, this document is already in

5   evidence.

6           THE COURT:  All right.

7           MR. FREED:  It's Exhibit 150.  May it be published to

8   the jury at this time?

9           THE COURT:  The whole thing?

10          MR. FREED:  Well, I'm going to ask that it be put up,

11  and I'm going to direct the witness to specific snippets.

12          THE COURT:  All right.  I think it would be -- for

13  purposes of the record, there's a Bates stamp number in the

14  lower right-hand corner.

15          MR. FREED:  Yes.

16          THE COURT:  Use that number so we have a clear record

17  of it.

18          MR. FREED:  Will do.

19          THE COURT:  Yes.

20  BY MR. FREED:

21  Q.   Would you identify 150 for us, please?

22  A.   Yes.  This is a transcript of the recorded statement that

23  Christina Fiscella took from Susan Rattner on December 14 of

24  2015.

25  Q.   I'm going to draw your attention to Bates No. 18021 and

1   18022 in that document.

2   A.   Okay.

3   Q.   And during the course of that interview of Dr. Rattner

4   conducted by Christina Fiscella, did Christina ask Dr. Rattner

5   about the source of the purchase money for her condominium?

6   A.   Yes, she did.

7   Q.   Would you read the Q&A into the record, please?

8   A.   Sure.

9        "Question:  Okay.  Do you draw upon any of your

10  investments at all?

11       "Answer:  Only, now that the kids are, what I call

12  off, off the family payroll, no.

13       "Question:  Okay.  So you leave that alone?

14       "Answer:  I leave that pretty, well, I'm going to

15  draw upon it to buy the condo."

16  Q.   Why was that issue relevant?

17  A.   Because shortly after the loss, Dr. Rattner decided to buy

18  this condo in Virginia, and we were trying to determine where

19  the source of those funds were coming from to buy that condo.

20  Q.   Did the information provided by Dr. Rattner on

21  December 15, 2015, with regard to the source of those funds

22  turn out to be true?

23  A.   No.  That was a false statement.

24  Q.   What did you ultimately ascertain the truth to be?

25  A.   The truth was that the money to buy the condo was loaned

D. Jaeger - Direct

388

1   to her by her brother, with the expectation that it be paid

2   back.

3   Q.   When did you find that out?

4   A.   We didn't find that out until after the second examination

5   under oath, I believe.

6   Q.   There's been a lot of conversation or talk and testimony

7   here about this examination under oath, which is referred to as

8   an EUO.  Can you just explain to the jury what an EUO is and

9   under what circumstances that happens?

10  A.   Sure.  An examination under oath is a policy requirement.

11  It's found under the duties after a loss provision in the

12  insurance contract, and it requires the insured to provide

13  sworn testimony as well as documents that the company requests

14  in an effort to complete the investigation.

15  Q.   How many examination under oath sessions did Dr. Rattner

16  attend?

17  A.   There was two examinations under oath here.

18  Q.   Is there any typical number that an insurance company or

19  that Chubb would require?  How is it determined how many times

20  a -- an insured is questioned?

21  A.   I think a lot of that depends on the level of cooperation

22  from the insured.  I don't believe that there is a typical

23  number.  We always try to complete the EUO process as quickly

24  as possible, but in this particular case, there was two because

25  of missing documentation and information.

1  Q.   How would you characterize Dr. Rattner's level of

2  cooperation with Chubb's requests in this claim --

3           MR. WASSERMAN:  Objection, Your Honor.  He can say

4  what she did or what she didn't do, but characterizing it is

5  improper.

6           THE COURT:  No, I think in this case, it's not

7  improper.  I'm going to overrule the objection.

8           THE WITNESS:  I think that Dr. Rattner from very

9  early on in the investigation had tried to prevent us from

10 obtaining information about her, her finances and the sale of

11 the house and other, other material things, and I think that

12 she put up many roadblocks throughout the course of the

13 investigation.

14 BY MR. FREED:

15 Q.   Did that approach to this claim by Dr. Rattner contribute

16 to the 14 months it took to finish Chubb's evaluation?

17 A.   Yeah, absolutely.  As I testified earlier, the length of

18 the investigation is in many instances really dependent on the

19 level of cooperation that we get from the policyholder.  So if

20 the cooperation is not there, they, they prevent us from

21 getting documents that we need or there's a lot of back and

22 forth about certain documents that we're requesting that they

23 don't want to provide, that usually results in a delay in the

24 investigation.

25 Q.   Would you take a look, going back to the exhibit that's

1    before you, at Bates No. 18099, please?

2    A.    Okay.

3    Q.    Are you good?  Was Dr. Rattner asked during the recorded

4    statement taken by Christina Fiscella where she was on the

5    night of the fire?

6    A.    Yes, she was.

7    Q.    At the risk of being obvious, why is that important?

8    A.    One of the most important things that could be done during

9    the course of an investigation of a fire is to obtain a

10   timeline from the insured about their whereabouts when the fire

11   occurred.

12   Q.    What did Dr. Rattner tell Ms. Fiscella during that

13   recorded statement on December 15, 2015, about her whereabouts

14   on the night of the fire?

15   A.    Dr. Rattner told Ms. Fiscella that she was at Bethany

16   Beach at her beach house, asleep.

17   Q.    Did Chubb ultimately determine whether or not that

18   statement was true?

19   A.    Yes, we did.

20   Q.    And what was your determination?

21   A.    That was not a truthful statement.

22   Q.    What did you ultimately determine about what -- where

23   Dr. Rattner was on the night of the fire?

24   A.    We determined through cell tower analysis that Dr. Rattner

25   left her Bethany Beach house at approximately 8:30 p.m., made a

1   trip to Tysons Corner, Virginia, was in that vicinity at the

2   time the fire was occurring at her house, and then departed

3   that vicinity and went back to Bethany Beach, Virginia,

4   arriving at approximately 3:00 in the morning.

5   Q.   You said Bethany Beach, Virginia.

6   A.   I'm sorry.  Bethany Beach, Delaware.

7   Q.   Who conducted that forensic evaluation?

8   A.   Scott Baxter.

9   Q.   And who is that?

10  A.   Mr. Baxter is an engineer who specializes in cell tower

11  analysis and review of those records.

12  Q.   Was your determination that Dr. Rattner had lied about her

13  whereabouts on the night of the fire significant?

14  A.   It was extremely significant.

15  Q.   Why?

16  A.   Because there would be no reason to lie about your

17  whereabouts on the night of the fire unless you were concealing

18  your involvement in the fire.

19  Q.   Would you take a look at Bates Nos. 18043, -44, and -45,

20  please?

21          MR. WASSERMAN:  I'm sorry?

22          MR. FREED:  18043 through -45.

23  Q.   Was Dr. Rattner asked by Ms. Fiscella during her recorded

24  statement about who had access to the house at the time of the

25  fire?

1   A.   Yes, she was.

2   Q.   What did she say?

3   A.   She provided the names of a few people who had access to

4   the house prior to the fire.

5   Q.   Did she ever mention when Ms. Fiscella was questioning her

6   that Jose Renteria, her handyman, had access to the house?

7   A.   No, she did not.

8   Q.   What significance do you attribute -- did you ultimately

9   attribute to that omission?

10  A.   The significance of that omission is the relationship

11  between Susan Rattner and Jose Renteria and that it continued

12  after the fire -- or leading up to the fire.

13  Q.   What, if any, significance or involvement do you

14  understand that Jose Renteria may have had?

15  A.   Jose Renteria was her handyman.  Jose Renteria had access

16  to her home.  Jose Renteria was moving property out of the home

17  to storage units prior to the fire, and Jose Renteria was

18  working for Dr. Rattner up through October of 2015.

19  Q.   In the course of this lawsuit, are you aware of a

20  deposition that was taken of Paddy Murphy?

21  A.   Yes, I am.

22  Q.   And are you aware of the statement that Paddy Murphy

23  testified that Dr. Rattner made to her with regard to Jose

24  Renteria?

25  A.   I'm aware that Paddy Murphy advised us that Jose Renteria

```
 1   was removing property to storage, and during -- or shortly
 2   before one of the open houses that were going to take place,
 3   Jose Renteria removed several pieces of furniture and artwork,
 4   and that Paddy Murphy was upset about that, and that Paddy
 5   Murphy asked Dr. Rattner to have Jose bring the property back
 6   to the house, and Dr. Rattner was reluctant to bring all of the
 7   property back because she said it was either sold or going to
 8   be sold.
 9   Q.   We've heard testimony in this courtroom today --
10            THE COURT:   That's not appropriate.
11            MR. FREED:   I'm sorry?
12            THE COURT:   You don't refer to what else you heard in
13   court.
14            MR. FREED:   Very well, Your Honor.
15   Q.   During the course of Chubb's investigation, did
16   Dr. Rattner ever inform Chubb that Jose Renteria had gone to
17   the storage spaces that she had rented on the day before the
18   fire?
19   A.   No, she did not.
20   Q.   And what do you recall about Dr. Rattner's testimony about
21   when was the last time Jose Renteria had worked for her?
22   A.   I believe her testimony at her examination under oath was
23   that he last worked for her in May of 2015.
24   Q.   Did that statement turn out to be true?
25   A.   That was a false statement.
```

D. Jaeger - Direct

394

1   Q.    And how did -- what did you ultimately determine to be the

2   truth about when was the last time Mr. Renteria worked for her?

3   A.    We know that Mr. Renteria was working for her through the

4   course of the auction process, and we also through this

5   litigation received checks that Dr. Rattner wrote to Jose

6   Renteria in October of 2015.

7   Q.    During the course of the recorded statement, was

8   Dr. Rattner asked about her efforts to sell her house?

9   A.    Yes, she was.

10  Q.    And what do you recall that she told?  And I would refer

11  you to Bates No. 18055.

12          MR. WASSERMAN:   I'm sorry.   What page?

13          MR. FREED:   18055.

14  BY MR. FREED:

15  Q.    Have you found that, Mr. Jaeger?

16  A.    I have.

17  Q.    What did -- what did Dr. Rattner tell Ms. Fiscella in that

18  first recorded statement about her efforts to sell the house?

19  A.    That the house was on and off the market for a couple of

20  years.

21  Q.    Did that -- in the course of your investigation, did you

22  ultimately determine whether or not that statement was true?

23  A.    That was a false statement.

24  Q.    What did your investigation ultimately determine?

25  A.    The house had been for sale for roughly eight years.

1    Q.   And did you investigate how the asking price for the house

2    had changed, if at all, during that eight-year period?

3    A.   Yes.  From the first time that it was initially listed

4    eight years prior, the asking price dropped somewhat

5    significantly from around $4 million to the last listing of, I

6    think, 3.2.

7    Q.   Was that of any significance to you?

8    A.   That was of significance, because it was showing that

9    there was an effort to sell the home, and it was unsuccessful.

10   Q.   Was there ever any evidence that you were able to uncover

11   of a single offer being made to Dr. Rattner on her house over

12   that entire eight-year period?

13   A.   No.  We interviewed all the realtors that we were aware

14   of, and none of them said that there were any offers on the

15   home.

16   Q.   Did Ms. Fiscella speak to the assigned fire marshal at

17   that time, Captain Alvaro?

18   A.   Yes, she did.

19   Q.   And do you recall what she was informed with regard to the

20   status of the Fairfax County investigation of this fire?

21   A.   Yes.  She was advised that it was an active, ongoing

22   investigation.

23   Q.   What relevance does that have?

24   A.   The relevance of that is --

25            MR. WASSERMAN:  Objection.  Your Honor, we're now

1   getting far afield.  We're in the Fairfax County Fire

2   Department now and interactions between Chubb and it.

3           THE COURT:  But this line of questioning is going to

4   explain how Chubb was approaching the investigation, why it was

5   taking so long.  Some of these issues have been adequately

6   raised in the plaintiff's case or in the opening statement, so

7   I think it's not inappropriate.  I'm overruling the objection.

8   BY MR. FREED:

9   Q.   Go ahead, Mr. Jaeger.

10  A.   Could you repeat the question?

11  Q.   Sure.  I asked you about what relevance, if any, it had to

12  Chubb that the Fairfax County fire investigators were carrying

13  this as an open investigation.

14  A.   Yeah.  It told us that they had questions about the fire

15  and that they were dedicating resources to investigate it.

16  Q.   Are you aware of whether or not there was ever a Virginia

17  state investigation of the fire at Dr. Rattner's home?

18  A.   I'm not aware of the State of Virginia investigating the

19  fire at Dr. Rattner's home.

20  Q.   After the recorded statement was taken by Ms. Fiscella,

21  what did she recommend?

22  A.   She recommended that certain documents be requested from

23  Dr. Rattner in an attempt to confirm the statements -- confirm

24  the statements that were made during the recorded statement.

25  Q.   Were documents subsequently submitted by Dr. Rattner?

1   A.   The chronology is that Dr. Rattner was asked to produce

2   certain documents for Ms. Fiscella, and shortly thereafter, we

3   got a phone call from her first attorney.

4   Q.   Do you remember the name of that lawyer?

5   A.   I think his name was Jamie Bobotek of the Pillsbury firm.

6   Q.   And what happened with regard to the efforts to get the

7   documents?  I assume you then dealt with Mr. Bobotek?

8   A.   Yes.  Mr. Bobotek was requesting that Chubb enter -- well,

9   Mr. Bobotek was questioning the need for many of the documents,

10  but he was also requesting that Chubb enter into a

11  nondisclosure agreement.

12  Q.   Did that negotiation take time?

13  A.   That negotiation took a little bit of time.

14  Q.   And do you recall the type of documents that were

15  requested?

16  A.   I think the documents that were requested at that time

17  were documents relative to the sale of the house, documents

18  relative to her whereabouts and her financial condition.

19  Q.   Did Chubb retain counsel at some point?

20  A.   Yes, we did.

21  Q.   Who was that?

22  A.   We retained Cynthia Bernstiel.

23  Q.   When?

24  A.   We retained Cynthia Bernstiel when we received an Arson

25  Reporting Immunity Act letter from the Fairfax County Fire

1    Marshal's Office.

2    Q.    Would you please take a look at Exhibit 144?  Are you able

3    to identify that for us?

4    A.    Yes.

5    Q.    What is it?

6    A.    This is an Arson Reporting Immunity Act letter sent to

7    Mr. Tim Blake of Chubb, who is the adjustor, requesting

8    information pursuant to the Arson Reporting Immunity Act in

9    Virginia.

10   Q.    Could you explain to us, please, what an Arson Reporting

11   Immunity Act is?

12   A.    Sure.  The Arson Reporting Immunity Act is an act that

13   requires insurance companies to provide information to law

14   enforcement in ongoing investigations of fires.

15        MR. FREED:  Your Honor, I'd ask for the admission of

16   Exhibit 144.

17        THE COURT:  Any objection?

18        MR. WASSERMAN:  No, Your Honor.

19        THE COURT:  All right.  It's in.

20        (Defendant's Exhibit No. 144 was received in

21   evidence.)

22        MR. FREED:  May it be shown to the jury?

23        THE COURT:  Yes.

24   BY MR. FREED:

25   Q.    And would you go to the page with the letterhead, please?

399

1  Is that the copy of the Arson Reporting Act letter that was

2  received by Mr. Blake?

3  A.   Yes, it is.

4  Q.   And just so we're clear, who was Mr. Blake?

5  A.   Mr. Blake was the executive general adjustor assigned to

6  handle Dr. Rattner's claim.

7  Q.   How does his job in this situation differ from that of

8  Ms. Fiscella?  How did it differ?  What was his -- what were

9  his responsibilities?

10  A.   Mr. Blake was responsible for the claim filed but

11  responsible for assessing damages.  He was providing

12  information about the policy and the coverages to Dr. Rattner,

13  and Christina Fiscella was more involved in conducting the

14  investigation of the fire.

15  Q.   Is it accurate to say that they were moving in parallel?

16  A.   Yeah.  We always move in parallel, so we're always trying

17  to move forward with the adjustment as best we can, and also

18  the investigation, so if we come to the end of the

19  investigation and we are deciding to pay the claim, that we're

20  not behind the 8 ball, and we can go ahead and do that quickly.

21  Q.   During this period when the investigation was getting

22  started, did Chubb make advance payments to Susan Rattner?

23  A.   Yes, we did.

24  Q.   Do you know the approximate total amount of those

25  payments?

D. Jaeger - Direct

400

1   A.   Approximately $719,000.

2   Q.   Why were those payments made?

3   A.   We typically on large fire losses, as a customer service

4   benefit, will provide advances to insureds during the course of

5   the investigation.  They are much more common on total loss

6   fires like this.  We want to provide the insured with money so

7   they can have temporary housing, replace contents that were

8   destroyed.  So we will typically advance money prior to a

9   coverage decision being made to minimize the impact of the loss

10  to the insured.

11  Q.   At a certain point, did those payments -- advance payments

12  to Dr. Rattner cease?

13  A.   Yes, they did.

14  Q.   When was that?

15  A.   That was in March of 2016.

16  Q.   Would you take a look at Exhibit 180 in your -- the book

17  before you, please?

18  A.   I'm not sure, Mr. Freed, if I have --

19          THE COURT:  I don't think it's in --

20  BY MR. FREED:

21  Q.   It's in the -- it's in the inner -- if you go to the back

22  of the first binder?

23  A.   Back.  Oh, I see, in the front.

24  Q.   Yeah.

25  A.   Oh, I see it.

D. Jaeger - Direct

401

1  Q.    Can you identify Exhibit 180 for us, please?

2  A.    Yes.  This is an Arson Reporting Immunity Act letter that

3  was sent to my attention by Vicky Houser on behalf of Matthew

4  Varisco of the ATF.

5  Q.    What's the ATF?

6  A.    It is the Bureau of Alcohol, Tobacco, Firearms and

7  Explosives.

8          MR. FREED:  Your Honor, I'd ask permission to have

9  Exhibit 180 admitted and published.

10          THE COURT:  Any objection?

11          MR. WASSERMAN:  No, Your Honor.

12          THE COURT:  It's in.

13          (Defendant's Exhibit No. 180 was received in

14  evidence.)

15  BY MR. FREED:

16  Q.    What was the date that you received an Arson Reporting

17  Immunity Act letter from the ATF?

18  A.    March 3 of 2016.

19  Q.    In response to the Arson Reporting Immunity Act letters

20  from Fairfax County and the second one from the Federal Bureau

21  of ATF, Alcohol, Tobacco, and Firearms, were materials

22  provided?

23  A.    Yes.  We retained Cynthia Bernstiel to assist us in

24  responding to these requests from local and federal law

25  enforcement.

1   Q.   Why did you hire Cynthia Bernstiel as opposed to some

2   other lawyer?

3   A.   Cynthia Bernstiel has specialized skills in dealing with

4   first-party insurance claims.  She also has been working as a

5   partner with Chubb for many years and has significant

6   experience in the investigation of fire losses.

7   Q.   And what was her role in responding -- if any, in

8   responding to the Arson Reporting Immunity Act requests?

9   A.   Her role was to obtain a copy of the claim file

10  information that was requested, including any audio recordings,

11  and she would respond to Fairfax County and the ATF pursuant to

12  the Virginia Code that required us to comply with it.

13  Q.   And just so it's clear, does Chubb have discretion?  Can

14  it say to either Fairfax County or ATF or any other agency:

15  We're not going to give you this?

16  A.   No, we can't.  We have to comply with the requests.

17  Q.   What, if anything else, did you ask Cynthia Bernstiel to

18  do on your behalf?

19  A.   Initially, we retained Cynthia to respond to the Arson

20  Reporting Immunity Act letters, and then after Mr. Bobotek

21  became involved and requested a nondisclosure agreement, we

22  asked her to assist us in negotiating that nondisclosure

23  agreement with Mr. Bobotek.

24  Q.   What else did she do after that?

25  A.   After we became aware that the fire classification was

D. Jaeger - Direct

403

1    arson, we expanded the scope of her retention to conduct the

2    examination under oath of Dr. Rattner and request certain

3    documents from her.

4    Q.    When did you first become aware that the fire was being

5    classified as arson?

6    A.    I would say that we got a verbal report from Mr. Carpenter

7    sometime in mid to late March, and we received his formal

8    report, I believe, in April of 2016.

9    Q.    And in general, what did Mr. Carpenter's report conclude?

10   A.    Mr. Carpenter concluded, based on his evaluation,

11   including the alarm panel data and the tampering of the alarm

12   system, that the fire classification was incendiary, or arson.

13   Q.    You said "the fire classification."  Is there a

14   distinction between that and what's called the fire cause?

15   A.    Yes.  My understanding of NFPA 921 requires that an origin

16   and cause investigator make two determinations.  One is the

17   cause classification, and one is the fire classification.

18   Q.    What is NFPA 921?

19   A.    That's the National Fire Protection, I think it's Agency,

20   it might be Association.  They are the authority in fire

21   investigations, and they issue, I believe it's Chapter 921 or

22   Guide 921 on how to investigate fires.

23   Q.    Was the determination by Mr. Carpenter that the fire that

24   destroyed Susan Rattner's home was caused by arson significant?

25   A.    Yes, that was significant because now we knew that we were

D. Jaeger - Direct

404

1    dealing with an intentionally set fire.

2    Q.   How did that change or focus the investigation, if it did

3    at all?

4    A.   It changed the investigation because we knew now we needed

5    to move forward with the examination under oath, and we needed

6    to request documents to rule Dr. Rattner out as a suspect in,

7    in the arson.

8    Q.   And do you recall approximately when the examination under

9    oath of Dr. Rattner took place?

10   A.   I believe it was June 22 of 2016.

11   Q.   Under what authority does Chubb or any other insurance

12   company have the right to demand that its insured submit to an

13   examination under oath?

14   A.   Yeah.  Under the insurance contract in this policy, which

15   is a masterpiece policy, it's called duties after a loss, and

16   there are certain duties, including an examination under oath,

17   that at the request of the insurance company, the insured must

18   comply with, and that includes providing sworn testimony and

19   providing all documents that we request.

20   Q.   Would you take a look, please, at Exhibit 235A in your

21   binder?

22            THE COURT:  Any objection?

23            MR. WASSERMAN:  It's already in evidence, Your Honor.

24            MR. FREED:  It is already in evidence.

25            MR. WASSERMAN:  It's the policy.

D. Jaeger - Direct

405

```
 1              THE COURT:  All right, it's in.
 2    BY MR. FREED:
 3    Q.    235A is a copy of the insurance policy issued by Chubb
 4    National to Susan Rattner?
 5    A.    That's correct.
 6    Q.    Would you take a look at page 49 of that policy?
 7    A.    I'm sorry, where is the page number?
 8    Q.    That's a good question.
 9    A.    If you're referring to page Y-4, which I believe you are,
10    I'm on that page.
11    Q.    Thank you.
12              Can you tell us what the provisions are that appear
13    on Y-4 that relate to an insured's duties after a loss?
14    A.    Sure.  These are the property conditions contained within
15    the insurance contract.  There is a heading set that is
16    called "Your duties after a loss," and it provides a list of
17    requirements that the insured must comply with in order to
18    perfect a claim.
19    Q.    If you know, are these provisions optional for an
20    insurance company to include or mandatory in a fire insurance
21    policy?
22    A.    My understanding is that they're mandatory.
23    Q.    Excuse me?
24    A.    My understanding is that they are mandatory.
25    Q.    Who typically conducts an examination under oath for
```

D. Jaeger - Direct

406

1   Chubb?

2   A.   At Chubb, we retain counsel to do that.

3   Q.   Why, why do you believe you need lawyers to do that?

4   A.   Because ultimately, the sworn testimony will probably be

5   used in our evaluation of the claim and a legal analysis that

6   would be provided.  So it makes sense for the lawyer, who

7   ultimately will provide that legal analysis, to take the

8   testimony of the insured.

9   Q.   Who was it at Chubb that made the decision to demand an

10  examination under oath from Dr. Rattner?

11  A.   I think it was a decision that was made between the claim

12  team and myself.

13  Q.   Was Dr. Rattner represented by counsel at her examination

14  under oath in June?

15  A.   Yes, she was.

16  Q.   Do you recall who that was?

17  A.   It was Mike Levine and Jen White at Hunton & Williams.

18  Q.   And were they -- at what point did they become involved?

19  A.   Initially, Mr. Bobotek was counsel for Dr. Rattner.  Then

20  it was an individual named Josh Katz became counsel for

21  Dr. Rattner, and then her third lawyer was Hunton & Williams.

22  Q.   So just so we're clear, this is a proceeding that takes

23  place presumably at an office somewhere?

24  A.   It took place at Dr. Rattner's attorneys' offices.

25  Q.   And there's a court reporter there to record what

1  everybody says accurately?

2  A.    Yes, there is.

3  Q.    And the insured person, in this case, Dr. Rattner, was

4  under oath?

5  A.    She was under oath.

6  Q.    At around this time, did Chubb also receive information

7  about the alarm system?

8  A.    We received information about the alarm system in

9  Mr. Carpenter's report, so we were aware of that alarm data and

10 how it factored into his analysis as to the fire

11 classification.

12 Q.    Tell us, tell us what you learned.

13 A.    Generally what we learned is that there was entry into the

14 home at approximately 11:28 p.m. on November 15, and there was

15 exit from the home at approximately 12:02, and then there was

16 fire detected on multiple levels at the home and that the fire

17 spread was rapid and that the system tried to send a signal

18 from the panel to the central monitoring station, but it was

19 unable to do so and ultimately registered a false signal, and

20 the reason it was unable to do so is someone tampered with it

21 and removed the phone wire from the panel.

22 Q.    Who discovered that?

23 A.    That was discovered by Mr. Carpenter, and I believe he was

24 with Mr. Wilkowske.

25 Q.    Who is Mr. Wilkowske?

1    A.   Mr. Wilkowske was Dr. Rattner's alarm technician.

2    Q.   So how was it that in this house that burned to the

3    ground, the alarm system was still able to be examined?

4    A.   The alarm system was not destroyed by the fire.  It

5    survived the fire.

6    Q.   And how was it that despite the fact that it had been

7    disconnected from the telephone line and therefore didn't send

8    an alarm, that the data was still -- that you've just described

9    was still readable?

10   A.   Yeah.  The alarm system that Dr. Rattner had in this house

11   was pretty sophisticated.  So although it was unable to send a

12   signal to the central monitoring station, it was able to log in

13   its data records all the activity in the house, including the

14   entry through the door, motion through the house on multiple

15   levels, and exit.  And then it picked up these fire, smoke from

16   a fire sensor, and tried to notify the central monitoring

17   company and was unable to do so.  So not all alarm systems do

18   that, but because this was an expensive, sophisticated system,

19   it did that.

20   Q.   But for the fact that it was not destroyed in the fire,

21   would you have been able to obtain that data, do you believe?

22   A.   No, we would not have.

23   Q.   And you said, I believe, that the alarm data was part of

24   Mr. Carpenter's report and was one of the bases or part of the

25   reason for his determination that the fire cause classification

D. Jaeger - Direct

409

1   was incendiary, or arson?

2   A.   That's correct.

3   Q.   In the context of this process that was now going on, you

4   have a determination that you have an arson fire, you have

5   demanded an examination under oath.  I think you said that the

6   company would also demand additional documents?

7   A.   Yeah.  Pursuant to this examination under oath provision

8   that's found on Y-4 of the policy, it also allows the company

9   to request documents that are necessary to complete our

10  investigation.

11  Q.   Was one of the types of -- or documents cell phone

12  records?

13  A.   Yeah.  One of the documents that we were interested in

14  obtaining was cell phone records for Dr. Rattner's cell phone

15  for the period around the loss, yes.

16  Q.   Again, at the risk of being obvious, why, why would you

17  want to see that?

18  A.   Because we would want to confirm her whereabouts, as she

19  stated to us, on the night of the fire.

20  Q.   Was the request for cell phone records unusual in the

21  context of an arson investigation?

22  A.   Not necessarily, no.

23  Q.   When was that request made, do you know?

24  A.   I believe that request was made sometime in April, and the

25  reason I say that is because that was being negotiated with

1   Dr. Rattner's second attorney, Josh Katz, so -- and he was

2   agreeable to it and thought it was a good idea, as we did,

3   because it would confirm for both us and for Dr. Rattner her

4   whereabouts on the night of the fire.

5   Q.   So at some point, did you receive some cell phone records

6   from Dr. Rattner's account?

7   A.   We did receive some cell phone records from Dr. Rattner's

8   account.

9   Q.   What, if anything, did they show that was significant?

10  A.   They didn't show any data for the period of right before

11  and right after the loss.

12  Q.   Did there come a time later on when additional cell phone

13  records were obtained?

14  A.   Yes, there was.

15  Q.   Could you explain to us how that unfolded?

16  A.   Sure.  After -- or during Dr. Rattner's second examination

17  under oath, just prior to that and during her questioning, we

18  received a group of text messages and communications that were

19  not disclosed to us by her realtor, Paddy Murphy.  And one of

20  the statements that Dr. Rattner had made through the course of

21  the investigation was on the date of the fire, she was unable

22  to access her security system at the Great Falls, Virginia

23  house because the WiFi or Internet was down, and when we got

24  these text messages from Paddy Murphy, they -- there was

25  writing from Dr. Rattner in the message to Paddy Murphy that

411

1   she was at her home in Bethany Beach, Delaware, listening to

2   Carol Snyder at the open house at the Great Falls house.

3           So that didn't make any sense to us, because if the

4   WiFi was down and she couldn't access the system, how was she

5   listening to Carol Snyder during this open house.

6   Q.   Do you remember the date of that open house that you're

7   talking about?

8   A.   I believe the date of the open house was November 15,

9   which was the date of the fire.

10  Q.   Go ahead.

11  A.   So based on Dr. Rattner's statements to us about not being

12  able to access the Great Falls home and Paddy Murphy's text

13  messages that she received from Dr. Rattner indicating that she

14  was accessing the Great Falls home and listening to people in

15  the house, and more specifically, Carol Snyder, that caused us

16  to ask some additional questions about how she did that.  How

17  did she actually access the systems at her various homes?

18          She had a system, I believe, called a Savant system,

19  and these are smart house systems, and they allow you to access

20  them from computers in your home.  So Dr. Rattner explained to

21  us that she can access her Great Falls home from Bethany Beach

22  through a program called GoToMyPC and that she can access the

23  Bethany Beach, Virginia -- Delaware home from the same program.

24  So wherever she is, she can access the other home through this

25  GoToMyPC program through a cell phone, or through a tablet.

D. Jaeger - Direct

412

1  Q.    And this Savant system, you said that there were texts

2  between Dr. Rattner and Paddy Murphy from November 15.  You

3  said they were turned over by whom?

4  A.    They were provided to us by Paddy Murphy.

5  Q.    Did Dr. Rattner ever provide you any of -- copies of any

6  of those texts?

7  A.    No.  We requested all communications between her and her

8  realtors relative to the sale of the house, but she never

9  provided those texts.

10 Q.    You said that as you understood it, Dr. Rattner was able

11 to look or watch what was going on in her home that day, the

12 15th?

13 A.    That is correct.

14 Q.    And that she was able to hear what people were saying?

15 A.    Yes, she was.

16 Q.    So what did you do, if anything, upon receiving this

17 information?

18 A.    We received this information during her EUO when we asked

19 her to explain how the system works.  We did some further

20 investigation and found out from GoToMyPC that they log access

21 to the system.  So we followed up with Dr. Rattner's counsel at

22 the time for an authorization to -- no, excuse me, for her to

23 get us the printout of her account activity for the relevant

24 period of time around the fire.

25 Q.    And did you ultimately -- were you successful in getting

D. Jaeger - Direct

413

1   that data?

2   A.   We were able to get that.  Dr. Rattner did provide that to

3   us.

4   Q.   And approximately when did you receive that information?

5   A.   It would have been within a week or two after her second

6   examination under oath in August.

7   Q.   The second examination under oath, you said, was in

8   August?

9   A.   I believe August 22 of 2016.

10  Q.   Tell us, please, what the data that you received in the

11  second go-round relating to the cell phone revealed.

12  A.   The, the data that we received from the second cell phone

13  request was -- the request was based on what we saw on the

14  GoToMyPC data, which was unusual because we saw in a period of

15  time, Dr. Rattner was accessing GoToMyPC from her Bethany

16  Beach, Delaware home, and there was a server that she was

17  accessing that was local to Bethany Beach, Delaware.

18           What was unusual is as you move later into the

19  evening, she was actually accessing from servers in Maryland

20  and Virginia her Bethany Beach house, which made no sense to us

21  because she was supposedly there.  So we were thinking that

22  perhaps there was another device that was not disclosed to us,

23  and that caused us to go back to AT&T and ask them if they had

24  any other devices that, that were on Dr. Rattner's account and

25  if they could tell us about them, and we learned during that

1  conversation that we did not have the complete set of records

2  for the cell towers for Dr. Rattner's account.

3  Q.   What was missing?

4  A.   The data transmissions for the dates right around the date

5  of loss.

6  Q.   Did you subsequently obtain that?

7  A.   Yes, we did.

8  Q.   And is that the data that was reviewed by Mr. Baxter?

9  A.   Yes, it is.

10  Q.   What did that review or evaluation disclose?

11  A.   That data revealed that on November 15, at approximately

12  8:30 or so, Dr. Rattner made a trip from Bethany Beach,

13  Delaware, to Tysons Corner, Virginia, remained at Tysons

14  Corner, Virginia, or her cell phone did, I should say, for --

15  during the period that the home was burning, and then a return

16  trip to Bethany Beach, Delaware, arriving at approximately

17  3 o'clock in the morning.

18  Q.   Had Dr. Rattner ever told Chubb that she had made a trip

19  from Bethany Beach to Tysons Corner and back on the night that

20  the fire destroyed her home?

21  A.   No, she didn't.  She has said throughout the course of the

22  investigation that she was at Bethany Beach, Delaware, the

23  entire time, with her cell phone under her pillow.

24  Q.   What was the significance of the discovery of this

25  information?

D. Jaeger - Direct

415

1   A.   It was very significant because it contradicted her

2   representations about her alibi and her whereabouts at the time

3   of the fire.

4   Q.   After you learned this information, did you communicate it

5   to Dr. Rattner and her lawyers?

6   A.   This was kind of surprising to us at that time because we

7   had looked at the AT&T documentation initially and didn't see

8   anything that concerned us.  Then when we got this information,

9   the first thing that we did, Mr. Freed, was we wanted to make

10  sure that we were absolutely correct in our interpretation of

11  that data.

12        Mr. Baxter is an engineer, and he's been in this

13  business for 35 years, built out cell networks and has a lot of

14  experience, but we wanted to make sure that we were right.  So

15  we sent the data to a second expert.

16  Q.   Who was that?

17  A.   Bill McGirt.

18  Q.   What, what was his expertise?

19  A.   He had the same expertise as Mr. Baxter.  I believe he is

20  former ATF, and he reviewed the data.

21  Q.   Did he provide his findings to you?

22  A.   He did.  He confirmed Mr. Baxter's analysis.

23  Q.   By confirming it, he reached -- are you saying he reached

24  the same conclusions?

25  A.   He reached the same conclusions.

1    Q.   And what was done after you received that information, the

2    second opinion?

3    A.   At that point, we felt that we needed to advise

4    Dr. Rattner's attorneys of this new information that we have

5    found and provide her with an opportunity to come back in to an

6    examination under oath and explain how this could be possible.

7    Q.   And how was that request or opportunity transmitted to

8    Dr. Rattner and her lawyers?

9    A.   That was transmitted to them verbally and, I think, in

10   writing as well.

11   Q.   What was their response?

12   A.   They refused to come in.

13   Q.   Did they say why?

14   A.   They said that Dr. Rattner had nothing else to offer on

15   the issue of her cell phone.

16   Q.   At any time, did Dr. Rattner or any of her representatives

17   tell you or any other representative of Chubb, to your

18   knowledge, that two weeks before or a week or so to two weeks

19   before, that she had had a similar malfunction of her cell

20   phone that showed a trip that never took place?

21   A.   This is the first time hearing of that.

22   Q.   Had she told you that either at her third examination

23   under oath which you offered or later, what would you have

24   done?

25   A.   We would have considered that information.  We would have

D. Jaeger - Direct

1   provided it to our cell tower experts, and we would have had

2   them provide us with an analysis to try to confirm it.

3   Q.   Was the conclusion reached by Mr. Baxter and the

4   conclusion reached by Mr. McGirt significant, and was it a

5   substantial reason for Chubb's decision to deny the claim?

6   A.   It was significant, and it was a substantial reason for us

7   to deny the claim on the two bases that we cited in the denial

8   letter.  The fact that she concealed her whereabouts on the

9   date of loss was a material misrepresentation and concealment

10  of a material fact during the course of an investigation, and

11  that also factored into our decision to deny the claim for

12  violation of the intentional acts exclusion, because in our

13  opinion and from our position, we believe that there would be

14  no reason for Dr. Rattner to lie about her whereabouts on the

15  night of the fire unless she was trying to conceal her

16  involvement in that fire.

17  Q.   The cell phone records that were analyzed by Mr. Baxter

18  and Mr. McGirt showed that the cell phone came back to

19  Virginia, I think you said, correct, on the night in question?

20  A.   It came -- it went from -- on November 15, at

21  approximately 8:30, 8:34 p.m., it traveled from Bethany Beach,

22  Delaware, to Tysons Corner, Virginia, and then later that night

23  into the early morning, it traveled back to Bethany Beach,

24  Delaware.

25  Q.   How far is Tysons Corner from Dr. Rattner's home in Great

D. Jaeger - Direct

418

1    Falls, if you know?

2    A.    It's less than 10 miles.

3    Q.    Did the fact that the cell phone was not tracked precisely

4    to Dr. Rattner's home factor into your consideration?

5    A.    It did not.

6    Q.    Why?

7    A.    Because there's many potential explanations as to why the

8    phone didn't ping off the tower that's closest to Dr. Rattner's

9    house.  Probably the most logical one is that when she went to

10   Tysons Corner, she left the phone there before she went to her

11   house.

12   Q.    During the course of your investigation, did Dr. Rattner

13   ever inform you or any other person representing Chubb, to your

14   knowledge, that on the Saturday before the fire, on

15   November 14, 2015, she had rented a black Chevy Tahoe and kept

16   that -- had that car in her possession or available to her

17   until the 17th of November?

18   A.    No, she did not.

19   Q.    Did she ever tell that you she rented a vehicle of any

20   kind because she planned to take a trip to North Carolina with

21   her 90-year-old aunt that weekend?

22   A.    I don't recall her ever saying that.

23   Q.    I wanted to go back for a moment to one of the other bases

24   that you said resulted in the denial of Dr. Rattner's claim.

25   A.    Sure.

419

1  Q.   And you talked about financial condition.  Do you recall

2  that?

3  A.   I do.

4  Q.   Would you explain to us what Chubb's investigation

5  revealed about what misrepresentations Dr. Rattner made about

6  her financial condition, please?

7  A.   Yes.  In her initial recorded statement, she indicated

8  that she was going to draw down on her investments to buy the

9  condo for $1.5 million.  That was not a truthful statement.

10 She had no intention of doing that.

11        In her first examination under oath, she changed her

12 story relative to the purchase of the condo, and she testified

13 that she was, as well as her children, beneficiaries to the

14 Rattner Family Trust, which allowed her essentially unfettered

15 access to financial resources, and it was a distribution from

16 the trust that allowed her to acquire the condo and that there

17 was no expectation that that would be paid back.

18        At her third examination under oath, she changed her

19 story yet again relative to the purchase of the condo.  She

20 said that she was mistaken about the Rattner Family Trust and

21 it did not exist and that she was led to believe that it did

22 exist by her brother, Steven Rattner, and that it actually was

23 a gift of $1.5 million from her brother, Steven Rattner, to her

24 to purchase the condo, and that there was no expectation that

25 that money would ever need to be paid back to Mr. Rattner.

D. Jaeger - Direct

420

1   Q.   In the course of this litigation, did you come into

2   possession of documents that were produced by Steven Rattner

3   and the Rattner Family Office pursuant to a subpoena that Chubb

4   issued?

5   A.   Yes, they did.

6   Q.   What did they show with regard to the testimony of

7   Dr. Rattner about her access to the Rattner Family Trust, as it

8   was referred to, or that this money was not a loan?

9   A.   Those documents, which mainly consisted of e-mails, some

10  financial documents, showed that Dr. Rattner lied about her

11  family trust at her first examination under oath.

12  Q.   How do you know she wasn't simply mistaken?

13  A.   Because her brother, who was involved in reading

14  communications and correspondence during the claim

15  investigation, sent her an e-mail confronting her with the fact

16  that her testimony about the Rattner Family Trust and her

17  access to that money was not true and needed to be corrected.

18  Q.   How did Dr. Rattner respond to that, as you recall?

19  A.   Dr. Rattner acknowledged in her e-mail to her brother that

20  she lied to Chubb, she lied so no further questions would be

21  asked about her finances.

22  Q.   If it were true that Dr. Rattner had unfettered access to

23  a family trust that would pay her as much money as she wanted

24  anytime she needed it, would that have been significant?

25  A.   It would have been very significant because it would have

1   essentially eliminated any financial motive for Dr. Rattner to

2   be involved in the fire that destroyed her house.

3   Q.   And is the fact that Dr. Rattner lied about that fact

4   significant to your conclusions about whether or not to honor

5   or deny her claim?

6   A.   It is significant because one of the important parts of an

7   investigation of an arson fire is to determine whether or not

8   an individual has a financial motive to be involved in that

9   fire, and concealment of financial condition is one indicator

10  or one fact that's considered in whether or not that individual

11  was involved in setting the fire.

12  Q.   Were any of those communications between Dr. Rattner and

13  her brother produced by her?

14  A.   No, they were not.

15  Q.   So did the first examination under oath dispel suspicions,

16  or did it -- were there still suspicions after Dr. Rattner's

17  testimony in that first proceeding?

18  A.   I think that there were still some suspicions, but the

19  focus of the investigation after the initial examination under

20  oath was still in an effort to confirm what she was swearing to

21  in her testimony.

22  Q.   Did her lawyers write letters to Chubb trying to convince

23  Chubb that there was no basis for these ongoing suspicions?

24  A.   Yes.  Shortly after the first examination under oath, we

25  received a pretty lengthy letter from Hunton & Williams where

D. Jaeger - Direct

422

1  they outlined the reasons why there was no need to conduct any

2  further investigation.

3  Q.   Would you take a look at Exhibit 196 in your binder,

4  please?

5          THE COURT:  Is there any objection to this letter?

6          MR. WASSERMAN:  No, Your Honor.

7          THE COURT:  All right, it's in.

8          (Defendant's Exhibit No. 196 was received in

9  evidence.)

10          MR. FREED:  May it be published to the jury, Your

11  Honor?

12          THE COURT:  Yes, sir.

13          MR. FREED:  Thank you.

14  Q.   Would you tell us, please, what Exhibit 196 is,

15  Mr. Jaeger?

16  A.   Sure.  This was a letter that was received from

17  Dr. Rattner's counsel two days after her sworn statement and

18  examination under oath on June 22.

19  Q.   And if you look down in the body of the letter, there was

20  a series of bullet point statements made by Mr. -- by

21  Dr. Rattner's lawyer; is that correct?

22  A.   That is correct.

23  Q.   And would you just tell us what those -- what the first of

24  those states?

25  A.   The first bullet goes into her financial resources and

1    concludes on page 2 that Dr. Rattner and her children are

2    beneficiaries to a multimillion-dollar family trust, which

3    Dr. Rattner has virtually unfettered access to funds on an

4    as-needed basis.

5    Q.   That's what you were just testifying about a moment ago?

6    A.   That's correct.

7    Q.   And is it accurate to say that that representation turned

8    out to be false?

9    A.   That is a false statement.

10   Q.   What's the second bullet point address?

11   A.   The second bullet point addresses Dr. Rattner's love for

12   her home, that she would have no reason to burn it down,

13   nothing to do with the fire, and that it was a, a love of hers

14   in building this home and creating it, and that she would have

15   no reason to ever destroy it.

16   Q.   Did your investigation turn up any information or evidence

17   that indicates that that was untrue?

18   A.   Yes, it did.

19   Q.   Could you explain what that evidence was?

20   A.   Sure.  Through the investigation and also during

21   subsequent litigation, it became very clear to us that

22   Dr. Rattner desperately wanted to sell this home.

23   Q.   How did you come to that conclusion?

24   A.   Based on writings from Dr. Rattner to her realtor about,

25   you know, she, she didn't like the home, she wanted to move,

1    she couldn't take it anymore, she didn't want to live out of

2    suitcases, it was very clear from Dr. Rattner's own writings

3    that what she was telling us about the home and that it wasn't

4    a big deal if it sold or didn't sell and she didn't mind

5    staying if it had -- if she had to stay, those were

6    contradicted by her own e-mails and writings to her realtor.

7    Q.   Which realtor was that?

8    A.   Paddy Murphy.

9    Q.   What was the third bullet point related to?

10   A.   This is related to her alibi, the fact that she was in

11   Delaware the entire weekend preceding the fire and that she

12   therefore had no opportunity to be involved in setting the

13   fire.

14   Q.   And we talked about that at length, correct?

15   A.   We did.

16   Q.   What's the fourth bullet point?

17   A.   The fourth bullet point is that she lost virtually every

18   family memento in the fire, including irreplaceable family

19   heirlooms, photographs, and, and jewelry and other things, and

20   artwork.

21   Q.   And did you ever come across evidence that indicated that

22   that representation was false?

23   A.   Yes, we did.

24   Q.   Could you explain what that evidence was, please?

25   A.   Sure.  The investigation revealed through communications

D. Jaeger - Direct

425

1  from Dr. Rattner that she was moving property out of this house

2  to two storage units that she secured and that Jose Renteria

3  was primarily responsible for moving the property out of the

4  house.

5  Q.   Did you come to any conclusions as to whether Dr. Rattner

6  was honest with Chubb in describing or disclosing the movement

7  of property from her home prior to the fire?

8  A.   Yeah.  She absolutely was not honest with Chubb about

9  moving property out.  She had told us that she moved a few

10  items of -- that belonged to her children that they wanted, but

11  the vast majority of the other property she owned was in the

12  house and destroyed in the fire.

13          And we also learned that Dr. Rattner had directed

14  people that worked for her not to divulge the existence of the

15  storage units to Chubb.

16  Q.   Who were those people?

17  A.   I believe it was Sylwia Nowek and Jose Renteria.

18  Q.   And how did you learn that?

19  A.   We learned that through communications from Dr. Rattner to

20  Sylwia Nowek.

21  Q.   Did Dr. Rattner turn over those communications?

22  A.   No, she did not.  We got them from Sylwia Nowek in the

23  course of the litigation.

24  Q.   Between the first examination under oath in June and the

25  second examination under oath in August, did Chubb receive

D. Jaeger - Direct

426

1   contact from Dr. Rattner's brother, Steven?

2   A.   Yes, we did.

3   Q.   Can you tell us about that, please?

4   A.   Sure.  After the first examination under oath, Dr. --

5   or -- I'm sorry -- Steven Rattner contacted the CEO of Chubb.

6   Q.   Who is that person?

7   A.   Evan Greenberg.

8   Q.   Do you have any personal knowledge as to the relationship,

9   if any, between those two people?

10  A.   I do not.

11  Q.   What, if anything, do you know about what the content of

12  that communication was and what happened thereafter?

13  A.   As far as I'm aware, Mr. Greenberg --

14         MR. WASSERMAN:  Objection, Your Honor.

15         THE COURT:  Wait.

16         MR. WASSERMAN:  This is pure hearsay.

17         THE COURT:  Yeah, I think this is hearsay.

18         MR. FREED:  If I may -- if I may be indulged to ask

19  one more question, I think we can --

20         THE COURT:  Before I hear the answer, let me hear the

21  question.  What's your question?

22         MR. FREED:  The question is, are communications

23  relating to these communications in the claim file?

24         THE COURT:  Well, the claim file is in evidence, and

25  so if there's something in the claim file, right -- has the

D. Jaeger - Direct

427

1    claim file been moved in yet?  Actually, I don't think it has

2    been.

3              MR. FREED:  I'm informed that it has been.

4              THE COURT:  You set up the foundation for a business

5    record exception to hearsay.  I heard all three of the factors

6    raised, but you didn't move it in.

7              MR. FREED:  Left us hanging on the precipice.  I

8    understand.  I will do so as soon as I get that exhibit number,

9    Your Honor.

10             THE COURT:  All right.  Well, Mr. Wasserman,

11   obviously, you're on your feet.  Are you objecting to the claim

12   file going into evidence?

13             MR. WASSERMAN:  Yes.  If I'm thinking of the same

14   thing that -- my understanding is the claim file is a rather

15   large exhibit, Your Honor.  We're talking thousands of pages.

16   And if it contains hearsay, it's not appropriate to try to

17   backdoor hearsay just because something is in the claim.

18             THE COURT:  I'm not sure this adds that much to the

19   case anyway, so I'm going to sustain the objection.

20             MR. FREED:  I understand.

21             THE COURT:  Let's move this along.

22   BY MR. FREED:

23   Q.   After Dr. Rattner's testimony about the supposed Rattner

24   Family Trust, after the first examination under oath, did

25   Ms. Bernstiel on behalf of Chubb ask for documents to prove its

1    existence?

2    A.   Yes, we did.   We had no reason not to believe that the

3    trust existed.   We employ a trust-and-verify approach at Chubb,

4    so we trusted what Dr. Rattner told us about her financial

5    resources, and we were trying to verify that through

6    documentation to ensure the trust did actually exist.

7    Q.   And in response to the request, did Dr. Rattner or her

8    lawyers say there is no such thing, or did they refuse to

9    provide information, or did they provide information?

10   A.   They refused to provide information, but they did not say

11   it didn't exist.   They said it wasn't relevant to our

12   investigation and they were refusing to produce it.

13   Q.   And you mentioned earlier in your testimony that during

14   the second examination under oath, this topic again arose; is

15   that correct?

16   A.   That's correct.

17   Q.   And what were you aware that Dr. Rattner stated at the

18   second examination under oath with regards to the topic of the

19   supposed Rattner Family Trust?

20   A.   Yes.   One of the areas of inquiry at her second

21   examination under oath was about the trust because she had

22   refused to provide any documentation to support that it

23   actually existed.   So upon further inquiry, she acknowledged

24   that the trust did not exist, and she gave an explanation as to

25   why she testified otherwise in her first examination under

1    oath.

2    Q.   And was that testimony honest and truthful, to your

3    knowledge?

4           MR. WASSERMAN:  Objection, Your Honor.

5           THE COURT:  I think that that's not a proper

6    question.  I'll sustain the objection.

7    BY MR. FREED:

8    Q.   Okay.  Did you ultimately determine whether that testimony

9    was correct?

10          MR. WASSERMAN:  Objection.  It's the same thing.

11          THE COURT:  Well, no, that's different.  This is did

12   you determine.  I assume and then you're going to explain how

13   that was done.

14          MR. FREED:  Yes.

15          THE COURT:  That's different than your conclusion.

16   Go ahead.

17          THE WITNESS:  Yes, we did determine that that was

18   untruthful testimony.

19          MR. WASSERMAN:  That was objected to.

20          THE COURT:  Well, the question is what is it about

21   that testimony that you found was not accurate?

22          THE WITNESS:  We found that the testimony that

23   Dr. Rattner gave about the -- how she was misled about the

24   Rattner Family Trust was inaccurate, and we confirmed that

25   through communications between her and her brother, Steven

D. Jaeger - Direct

430

1    Rattner.

2    BY MR. FREED:

3    Q.    In what way was it inaccurate?

4    A.    Steven Rattner had told her that -- or asked her in these

5    e-mail communications what she was talking about relative to

6    the Rattner Family Trust and why she had made those

7    representations and that there, there was no trust.

8    Q.    At the second examination under oath, did Dr. Rattner

9    address the question of whether or not the funds that were

10   provided to her by her brother were gifts or loans?

11   A.    Yes, she did.

12   Q.    And how did she testify with regard to that issue?

13   A.    She testified that the funds to purchase the condo were a

14   gift from her brother, with no expectation that they ever be

15   paid back.

16   Q.    And did you ultimately make a determination as to the

17   truth or falsity of that testimony?

18   A.    Yes.  That was a false statement.

19   Q.    And what did you ultimately determine to be the truth with

20   regard to that issue?

21   A.    The truth was there were communications between Susan

22   Rattner and Steven Rattner about Sue's ability to pay back that

23   money and that she needed to pay back that money because he

24   didn't want to have a gift tax assessed to him.

25   Q.    In the course of the investigation, were interviews

1    conducted of the auction company, Mr. DeCaro?

2    A.   Yes, there were.

3    Q.   And his employee, Ms. Snyder?

4    A.   Yes.

5    Q.   And did you look at the genesis or the evolution of the

6    transaction that led to her -- to Dr. Rattner's signing up for

7    an auction?

8    A.   Yes, we did.

9    Q.   And did you determine or come upon any communications

10   related to the auction that were relevant and material to you?

11   A.   Yeah.  There were several communications that were

12   relevant and material to us about the auction.  Those

13   communications were communications between Dr. Rattner and

14   DeCaro directly, and there was also communications between

15   Paddy Murphy and Dr. Rattner.

16   Q.   Tell us about the communications with DeCaro.

17   A.   We learned that Dr. Rattner, prior to accepting the

18   contract or signing the contract with DeCaro, was concerned

19   about a provision in the contract that in the event of a

20   natural or unnatural disaster, she would not be entitled to her

21   $75,000 deposit back.

22   Q.   Why was that phrase, "natural or unnatural disaster,"

23   noteworthy?

24   A.   It was noteworthy because shortly thereafter, the home

25   burned in an arson fire.

432

1    Q.   What were the communications relating to the auction with

2    Paddy Murphy that you alluded to?

3    A.   These were communications that contradicted Dr. Rattner's

4    representations to the company about how she thought the

5    auction would unfold.  Dr. Rattner had told us throughout the

6    course of the investigation, and especially in her initial

7    recorded statement, that she believed that the home would

8    realize full asking price of approximately $3.2 million, that

9    she was assured that there would be no issues, she had no

10   concerns, and she thought everything would be smooth.

11            The text messages that Paddy Murphy ultimately turned

12   over to us, which were direct communications written by

13   Dr. Rattner to Paddy Murphy, tell a completely different story.

14   Q.   What story do they tell?

15   A.   Those text messages reveal that Dr. Rattner was very

16   anxious and concerned about the auction process, and, in fact,

17   when she was listening to Carol Snyder from her home in Bethany

18   Beach during the November 15, 2016, open house, she had heard

19   Carol Snyder tell someone that if the house sells for a million

20   dollars and that's the highest bid, then it sells for a million

21   dollars.

22            And she sent a communication, I believe, via text to

23   Paddy Murphy that if they think they're going to sell my house

24   for a million dollars, over my dead body.

25   Q.   What was the significance of that testimony and the

1   evidence that you've just described to your investigation?

2   A.   Sure.  The significance of the testimony is that it

3   contradicted what Dr. Rattner had told us about the auction and

4   her belief that the house would realize full asking price.

5          The other significance was that she sent that text,

6   and less than ten hours later, her home burned to the ground as

7   a result of arson.

8   Q.   Was there an issue about a gas leak that allegedly

9   occurred on October 31, 2015, at Dr. Rattner's house?

10  A.   Yes, there was.

11  Q.   Could you explain to us, please, what that -- what that

12  involved?

13  A.   Sure.  That involved the initial open house that I believe

14  was being conducted at Dr. Rattner's home by DeCaro, and I

15  think it was to be conducted on October 31, and Dr. Rattner had

16  cancelled the open house because she said that there was a gas

17  leak at the house.

18  Q.   What about that was in any way suspicious or unusual?

19  A.   It was suspicious because we ultimately found out how she

20  described the discovery of the gas leak was not true and what

21  she told us about it was not truthful testimony.

22  Q.   Explain that, please.

23  A.   Sure.  Dr. Rattner had told us that she discovered the gas

24  leak from a communication from her housekeeper, Sylwia Nowek,

25  and that Sylwia arrived at the house and smelled gas and

D. Jaeger - Direct

434

1    contacted Dr. Rattner, who then contacted Carol Snyder and

2    Paddy Murphy, saying that we can't have the open house today;

3    you need to cancel it.

4           When we went back and looked at her communications by

5    her cell phone, we were unable to find any communications that

6    morning between -- at that relative time -- relevant time,

7    excuse me, between Sylwia and Dr. Rattner.  What we did find is

8    a communication between Dr. Rattner and Paddy Murphy that

9    occurred at approximately 5:17 a.m., and in that communication,

10   which was turned over to us by Paddy Murphy, Dr. Rattner

11   advised that a friend of hers who had been staying at her home

12   for a few days had left that Friday morning and on her way to

13   the airport smelled gas, and that was the reason Dr. Rattner

14   was cancelling the open house.

15   Q.    Did you ask her who the friend was?

16   A.    Yes, we did.

17   Q.    What was the response?

18   A.    She said she could not remember.

19   Q.    Did you find that worthy of belief?

20   A.    I found that to be unbelievable just based on my personal

21   experience.  If someone had stayed in my house for three or

22   four days, I think I would know who that would be.

23   Q.    Were you able to ascertain whether there were any records

24   that Washington Gas had ever responded to Dr. Rattner's house

25   on that day?

435

1   A.   There was no indication of a gas leak reported to

2   Washington Gas that day.

3   Q.   As part of reaching the decision to deny the claim, as

4   part of that process, is one of the things that Chubb did in

5   this case to evaluate what Dr. Rattner stood to gain by

6   intentionally destroying her home?

7   A.   Yes.  We did that analysis.  We looked at what Dr. Rattner

8   would realize if she had sold the home versus what she would

9   realize if the home was destroyed by a total loss fire.

10  Q.   Take us through that.

11  A.   Sure.  Dr. Rattner had the home for sale for roughly $3.2

12  million.  I believe that was the last listing price.  The home

13  was set to be auctioned at a no reserve auction five days after

14  the fire.  So, you know, even assuming that she got over asking

15  price, let's just say $4 million, although there is no

16  indication that would happen, she would have to pay off her

17  mortgage, and then I believe her plan was to sell her contents,

18  which were insured for $4 million, but based on my experience,

19  contents, used contents usually sell for about 25 to 30 percent

20  of their replacement cost value, which is the insured value.

21       Doing that math versus the $11 million claim and

22  paying off the mortgage and then also factoring in that

23  Dr. Rattner would be able to sell the lots where the house sat,

24  she was set to gain from a total loss fire about 7 to 8 million

25  dollars more than if she just sold the house.

D. Jaeger - Cross

436

1   Q.   Does Chubb stand behind its decision to deny and to fight

2   this lawsuit and to deny this claim?

3   A.   Absolutely.  We believe that there is overwhelming direct

4   evidence of material misrepresentation and concealment by

5   Dr. Rattner, and those material misrepresentations and

6   concealment of intentionally misrepresenting, concealing that

7   information from Chubb could have only been done to conceal her

8   involvement in this arson fire.

9          MR. FREED:  No further questions.

10         THE COURT:  All right.  Mr. Wasserman?

11                      CROSS-EXAMINATION

12  BY MR. WASSERMAN:

13  Q.   Good afternoon, Mr. Jaeger.  Is it Jaeger or "Jaeger"?

14  A.   It's "Jaeger."  Thank you.

15  Q.   "Jaeger."

16         Now, one of the things that I believe you mentioned

17  on direct was that -- my memory may not be perfect on this;

18  I'll do the best that I can -- was that the State of Virginia

19  hadn't reached a cause classification of the fire.

20         Did I understand you correctly?

21  A.   No, I don't think you understood me correctly.  I think

22  the question that was posed to me was did the State of Virginia

23  have any involvement in investigating this fire, and my

24  response was no.

25  Q.   Okay.  Then -- thank you, sir.

437

1            You're unaware that the Fairfax County Fire

2    Department, in connection with its investigation, got a report

3    from the State of Virginia, a forensics lab, with regard to

4    flammables at the scene?

5    A.   Yeah.  That's a totally different question.  Most of the

6    local fire officials will use a state police crime lab to test

7    samples for accelerants, and they will get a report back, but

8    that is different from the State of Virginia being actively

9    involved in the investigation.

10   Q.   Well, let's put it this way:  Are you aware or not that

11   the Virginia state forensics lab determined that there were no

12   flammables at the scene?

13   A.   I'm not aware of that, but I believe that we tested

14   samples as well, and there was no accelerants detected.

15   Q.   Okay.  And wasn't that important to your determination of

16   this fire as being, as you say, arson or not arson?

17   A.   Not necessarily.  You know, there are many accelerants

18   that could be used that would be undetectable through

19   traditional means.  You know, those tests are done with a -- an

20   attempt to identify petroleum base products.  So it is not

21   unusual for someone who's committing arson to become aware of

22   that and use a product that would not be detectable through

23   that testing.

24   Q.   So, in fact, in this investigation of this fire, neither

25   the State of Virginia nor Fairfax County found any detection

438

1   whatsoever of flammables; isn't that true?

2   A.   I'm not aware of any report that indicates that there was

3   an accelerant found at the scene.

4   Q.   My question was, do you know that in this case, with

5   respect to Dr. Rattner's home, that both the State of Virginia

6   and Fairfax County concluded there were no ignitable liquids or

7   other ignitable substances found?

8   A.   My review of the Fairfax County report and the lab

9   analysis that they requested from the Virginia State Police is

10  consistent with what you're stating, that there was no

11  accelerants found.

12  Q.   You nevertheless continue to believe that this was arson,

13  correct?

14  A.   I do believe that it was arson, yes.

15  Q.   And you kept the investigation open until after

16  Dr. Rattner filed this lawsuit; isn't that correct?

17  A.   Not necessarily.  Dr. Rattner was advised by -- through

18  her brother, by Paul Krump in approximately January 9 of 2017

19  that the company was going to deny the claim, and there was

20  communications between Steven Rattner and Mr. Krump relative to

21  maybe getting experts together just to make sure that there's

22  no issue with the data that was reviewed.  So it was

23  communicated to Dr. Rattner's brother, who communicated it to

24  her, that the claim was going to be denied.

25           It wasn't denied formally by letter until February 3

1   because of these ongoing communications, and we thought that we

2   were possibly going to have experts meet to discuss their

3   findings.  That never happened, and the denial letter was

4   issued before Chubb knew that there was a lawsuit filed.

5   Q.   When did Chubb decide to deny the claim?

6   A.   It was sometime prior to Paul Krump's -- shortly prior to

7   Paul Krump's communication to Steve Rattner that the company

8   was going to deny the claim.

9   Q.   When, sir?

10  A.   I don't have the specific date, sir, but I know it was

11  communicated to Mr. Rattner on January 9.

12  Q.   In fact, Dr. Rattner filed this case in -- on February 1

13  of 2017 against Chubb, correct?

14  A.   I'm not aware of the exact filing date.  I know that the

15  denial letter was sent to her counsel before Chubb was served.

16  Q.   And are you saying that Chubb was unaware that the lawsuit

17  had been filed at that time?

18  A.   Was unaware of the lawsuit being filed.  Shortly after the

19  letter was communicated or transmitted to Dr. Rattner's

20  counsel, we became aware that a lawsuit was filed, but it

21  wasn't served on us.

22  Q.   In any case, you know as a matter of fact that the lawsuit

23  was filed two days before Chubb formally denied the claim,

24  correct?

25  A.   I don't have a basis to disagree with what you're saying,

D. Jaeger - Cross

440

1    sir.

2    Q.   Now, I think it's undisputed that Chubb made some initial

3    payments to Dr. Rattner in December, right after the fire.

4    A.   There were advance payments made to Dr. Rattner.

5    Q.   And those payments were made at various times between

6    December of 2015 and March of 2016, right?

7    A.   That's correct.

8    Q.   All right.  And then they stopped?

9    A.   They did stop.

10   Q.   And they stopped because of what you just testified was

11   evidence that you were collecting at Chubb, correct?

12   A.   They stopped because of the investigation conducted by

13   Mr. Carpenter, which concluded that this was an arson fire.

14   Q.   Well, hadn't you decided when you decided to -- well, let

15   me ask you this.  I'll strike that question.

16        Who decided to stop making these sort of installment

17   payments to Dr. Rattner?

18   A.   Yeah.  I disagree with the word "installment payments."

19   They were --

20   Q.   Let me -- I'll withdraw that question.

21        Who decided to stop paying Dr. Rattner as of March of

22   2016, sir?

23   A.   I think it was a consensus agreement between the claim

24   department and SIU.

25   Q.   But it took nearly a year for Chubb to actually deny the

D. Jaeger - Cross

441

1    claim, right?

2    A.   Well, it took a year for Chubb to complete the

3    investigation of the claim so we could make a claim

4    determination, yes.

5    Q.   So is it just coincidence that Chubb completed its

6    investigation two days after Dr. Rattner filed this case?  Is

7    that what you're saying?

8    A.   What I'm saying is we had absolutely no idea that

9    Dr. Rattner was going to file suit against the company because

10   we were still in negotiations with Steve Rattner about a

11   potential meeting.  So it was somewhat surprising to us that

12   the lawsuit was filed.

13   Q.   How long did you think Dr. Rattner should wait after the

14   fire before she filed suit?

15   A.   Well, that's completely up to Dr. Rattner and

16   determination between her and her counsel.  All I can tell you

17   is what we did to try to complete the investigation and make a

18   coverage determination.

19   Q.   Now, it was important to your investigation when you

20   received the cell phone records and the report from Mr. Baxter,

21   right?

22   A.   Yes, that was an important part of our investigation.

23   Q.   Would you say that was a singular moment at Chubb in

24   connection with this fire investigation?

25   A.   I think that that was a very important moment, but I don't

D. Jaeger - Cross

442

1    know if it was the singular moment.  There was a lot of other

2    circumstantial evidence as well.

3    Q.   Well, it was important; wouldn't you say that?

4    A.   Yeah, it was an important part of the investigation.

5    Q.   And you received a report from Mr. Baxter, your cell phone

6    technician or expert, in September of 2016, right?

7    A.   It would have been around September of 2016, after we

8    obtained the additional data from AT&T.

9         THE COURT:  All right.  Mr. Wasserman, it is

10   1 o'clock.  I want to give the jury their regular break.

11        So we'll be on lunch break until 2 o'clock, ladies

12   and gentlemen.  Thank you.

13        (Recess from 1:00 p.m., until 2:00 p.m.)

14

15                 CERTIFICATE OF THE REPORTERS

16     We certify that the foregoing is a correct transcript of

17   the record of proceedings in the above-entitled matter.

18

19

20                                  /s/
                              Anneliese J. Thomson

21

22                                  /s/
                              Norman B. Linnell

23

24

25