UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| SUSAN RATTNER, | . | Civil Action No. 1:17cv136 |
| | . | |
| Plaintiff/ | . | |
| Counterclaim Defendant, | . | |
| | . | |
| vs. | . | Alexandria, Virginia |
| | . | October 12, 2017 |
| CHUBB NATIONAL INSURANCE | . | 2:00 p.m. |
| COMPANY, | . | |
| | . | |
| Defendant/ | . | AFTERNOON SESSION |
| Counterclaim Plaintiff. | . | |
| | . | |

. . . . . . . . . . .

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

VOLUME 2 - (p.m.)

APPEARANCES:

FOR SUSAN RATTNER:                    MARK W. WASSERMAN, ESQ.
                                      GRAYSON P. HANES, ESQ.
                                      Reed Smith LLP
                                      7900 Tysons One Place, Suite 500
                                      McLean, VA 22102
                                        and
                                      DOMINIC RUPPRECHT, ESQ.
                                      Reed Smith LLP
                                      Reed Smith Centre
                                      225 Fifth Avenue
                                      Philadelphia, PA 15222

FOR CHUBB NATIONAL                    LAURIN H. MILLS, ESQ.
    INSURANCE COMPANY:                 JEFFREY L. O'HARA, ESQ.
                                      LeClairRyan
                                      2318 Mill Road, Suite 1100
                                      Alexandria, VA 22314

(APPEARANCES CONT'D. ON FOLLOWING PAGE)

(Pages 443 - 597)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

444

```
 1   APPEARANCES:   (Cont'd.)

 2   FOR CHUBB NATIONAL            PHILIP N. FLUHR, ESQ.
         INSURANCE COMPANY:        LeClairRyan
 3                                 111 West Jackson Boulevard
                                   Suite 1700
 4                                 Chicago, IL 60604
                                     and
 5                                 ERIC D. FREED, ESQ.
                                   Cozen O'Connor
 6                                 One Liberty Place
                                   1650 Market Street, Suite 2800
 7                                 Philadelphia, PA 19103

 8   ALSO PRESENT:                 DAVID R. ANDERSON
                                   ERIK BOLTE
 9                                 CARLYLE BRUEMMER
                                   GARY CALZARETTA
10                                 MARK CALZARETTA
                                   SHELLY GUISINGER
11                                 DR. SUSAN RATTNER

12   OFFICIAL COURT REPORTERS:     ANNELIESE J. THOMSON, RDR, CRR
                                   NORMAN B. LINNELL, FCRR, RPR
13                                 U.S. District Court, Third Floor
                                   401 Courthouse Square
14                                 Alexandria, VA 22314
                                   (703)299-8595
15

16

17

18

19

20

21

22

23

24

25
```

445

I N D E X

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| WITNESSES ON BEHALF OF THE DEFENDANT: | | | | |
| Daniel Jaeger (Resumed) | | 446 | 468 | 470 |
| Capt. Terrance L. Fayson | 472 | 489 | 496 | 497 |
| David Magnuson | 501 | 529 | 556 | |
| Carol Snyder | 558 | 578 | 590 | |

EXHIBITS

| | MARKED | RECEIVED |
|---|---|---|
| PLAINTIFF'S: | | |
| No. 233 | | 493 |
| DEFENDANT'S: | | |
| No. 376 | | 489 |
| No. 302 | | 501 |

D. Jaeger - Cross                                                    446

1                    A F T E R N O O N   S E S S I O N

2                          (Jury present.)

3              DANIEL JAEGER, DEFENDANT'S WITNESS,

4                  PREVIOUSLY AFFIRMED, RESUMED

5              THE COURT:  All right, Mr. Wasserman, you're in the

6    midst of cross-examination.

7              MR. WASSERMAN:  Thank you, Your Honor.

8                  CROSS-EXAMINATION (Cont'd.)

9    BY MR. WASSERMAN:

10   Q.   Mr. Jaeger -- I have that right, don't I?

11   A.   You got it right.

12   Q.   I believe you testified on direct exam that you understood

13   that Dr. Rattner's side of the case was alleging that there was

14   a, another set of call detail letters that showed a trip going

15   from Bethany Beach back, back to Tysons and then back to the

16   beach that Dr. Rattner believed would be verified by a witness

17   not to have occurred?

18   A.   I'm sorry, sir, I really don't understand your question.

19   Q.   All right.  I think you on direct examination testified

20   that you were aware that Dr. Rattner believed that the call

21   detail records from AT&T showed a trip from Bethany Beach to

22   Tysons and then back to Bethany Beach that did not occur,

23   separate from the trip that your experts claim occurred?

24   A.   I'm not following you, sir.  I don't believe that

25   Dr. Rattner ever told us about a trip in the middle of the

D. Jaeger - Cross                                                    447

1    night from Bethany Beach to Tysons and back to Bethany Beach.

2           What I do know is that she gave us testimony about

3    when she left Great Falls and went to Bethany Beach, and we

4    were able to see that trip, and we were able to see the trip

5    that she made on the morning of the 16th from Bethany Beach

6    back to Great Falls.  What was undisclosed to us was the trip

7    in between that period of time when she said that she was

8    asleep in her home in Bethany Beach.

9           I'm sorry if I'm misunderstanding your question.

10          THE COURT:  Mr. Wasserman, I think you're talking

11   about a description of an incident when the phone

12   malfunctioned.  Isn't that what you're talking about?

13          MR. WASSERMAN:  I don't think so, Your Honor.

14          THE COURT:  All right.

15          MR. WASSERMAN:  Let me try again.

16          THE COURT:  I didn't know if that's what you're

17   trying to ask.

18   BY MR. WASSERMAN:

19   Q.   Let's talk about November 15 and 16.  Chubb claims that

20   according to its experts, Dr. Rattner's phone traveled from

21   Bethany Beach to Tysons before the fire and then back to

22   Bethany Beach after the fire, right?

23   A.   It started to travel back as the fire was burning.

24   Q.   All right.  In any case, that's November 15 and 16 --

25   A.   Yes.

D. Jaeger - Cross                                                    448

1    Q.   -- of 2015?

2    A.   That's correct.

3    Q.   All right.  I thought on direct exam you said that you

4    were aware of Dr. Rattner's contention of a different trip

5    earlier in time, according to the call detail records, that

6    Dr. Rattner contended didn't occur.

7    A.   I don't believe I testified to that.

8    Q.   And I thought I had understood you to say that Dr. Rattner

9    had never made that contention before, and Chubb was surprised

10   that she had.

11   A.   I don't recall that testimony, sir, about her being

12   surprised.  My testimony, based on my recollection, was that

13   the trips, the two bookend trips and the trip in the middle.

14   Q.   Let me ask you this:  And I don't have 100 percent

15   recollection, but did you mention Lucy Mondale in your direct

16   examination?

17   A.   I did not.

18   Q.   In connection with your responsibilities at Chubb, did you

19   have responsibility for subrogation claims?

20   A.   I was not directly responsible for subrogation claims, no.

21             THE COURT:  Now, someone should explain that to the

22   jury.  What is a subrogation claim?

23             THE WITNESS:  Sure.  A subrogation claim is a claim

24   by an insurance company that's made against a third party after

25   a payment is made to their insured.

D. Jaeger - Cross                                                  449

1  BY MR. WASSERMAN:

2  Q.   So in other words, just to stay with the, the labels and

3  the names in this case, if Chubb had paid Dr. Rattner on her

4  claim, Chubb would be able to assert through subrogation any

5  claims Dr. Rattner might have against third parties, right?

6  A.   If a claim did exist.

7  Q.   Right.  But that was outside your responsibility, is that

8  your testimony, that is, the subrogation claims?

9  A.   I was not directly responsible for pursuing the

10 subrogation claim.  My role was more in determining the origin

11 and cause of the fire through our independent investigator.

12 Q.   So who was responsible for subrogation claims, if any, in

13 connection with the Rattner fire?

14 A.   I think that the adjustor, Mr. Blake, if subrogation was

15 identified, would then work with one of our subrogation

16 examiners and subrogation counsel to pursue that.

17 Q.   Were there any subrogation claims -- potential subrogation

18 claims brought to your attention in connection with

19 Dr. Rattner's house burning down?

20 A.   There, there were no subrogation claims that materialized

21 because the cause of the fire was arson.

22 Q.   So at no time did Chubb consider any subrogation claims as

23 far as you know?

24 A.   That's not what I said.  Early on in the very beginning,

25 after we first spoke with Dr. Rattner, she had made some

D. Jaeger - Cross                                               450

1  allegations that potentially DeCaro Auctions was responsible

2  because they didn't arm her alarm correctly at her house, and

3  they were sent a letter putting them on notice of a potential

4  subrogation claim by our subrogation counsel at that time, but

5  that was never pursued because of the origin and cause finding.

6  Q.   So when did Chubb decide not to pursue that subrogation

7  claim?

8  A.   That subrogation claim was probably abandoned after we

9  were getting preliminary information from Mr. Carpenter that

10 the fire looked to be incendiary.

11 Q.   When?

12 A.   It was probably sometime in February, early March, into

13 March before we got Mr. Carpenter's report.

14 Q.   2016?

15 A.   Yes, I'm sorry.

16 Q.   So Chubb abandoned a potential subrogation claim against

17 DeCaro in roughly March of 2016, correct?

18 A.   I don't have the, the exact date, but once we determined

19 that there was no subrogation potential because it was an

20 incendiary fire, we did not pursue any subrogation claims at

21 that point.

22 Q.   And Chubb reached its conclusion about the fire being

23 incendiary on Mr. Carpenter, correct?

24 A.   Based on Mr. Carpenter's findings.

25 Q.   And Mr. Carpenter, in turn, based his conclusion that the

D. Jaeger - Cross                                                    451

1    fire was in his opinion incendiary on the alarm data, right?

2    A.   In part on the alarm data, but there is also evidence that

3    he relied upon in addition to the alarm data.

4    Q.   Well, wouldn't you say that primarily Mr. Carpenter

5    claimed that the fire was incendiary based on the alarm data?

6    A.   Primarily, but there was one other key piece of evidence

7    that you're not identifying, and that is, the actual tampering

8    with the alarm panel that prevented it from functioning as it

9    should have functioned.  So there was the alarm data, but also

10   the tampering with the panel prevented it from working.

11   Q.   And the tampering you refer to is the movement of a wire;

12   is that right?

13   A.   The removal of a wire from a connector that would have

14   allowed it to dial out to the central monitoring station.

15   Q.   All right.  And we're talking about a physical wire,

16   right?

17   A.   We are talking about a physical wire.

18   Q.   All right.  And when was that discovered?

19   A.   That was discovered during the course of Mr. Carpenter's

20   investigation, and it's documented in his report in a

21   photograph, and the date is on there.  I don't recall the

22   specific date.

23   Q.   Who discovered it?

24   A.   I believe it was Mr. Carpenter.

25   Q.   How about Mr. Wilkowske?

D. Jaeger - Cross                                                    452

1    A.   Mr. Wilkowske was on scene with Mr. Carpenter, I believe,

2    on the initial visit.  He was not identified by Dr. Rattner as

3    someone who would have information about her alarm system and

4    how it functioned.  Whether he was actually with Mr. Carpenter

5    at the moment he discovered that wire or not, you'd have to ask

6    Mr. Carpenter that question.

7    Q.   Now, there are a lot of names floating around, but

8    Mr. Wilkowske you knew to be the person who actually programmed

9    and installed and maintained the alarm for Dr. Rattner,

10   correct?

11   A.   I know that he was her alarm technician.  I believe he did

12   install the system, and I do believe he maintained it.  As far

13   as programming it, you know, I'm not sure.

14   Q.   All right.  Well, then, let's see if we can wrap up.

15           In connection with subrogation claims that

16   potentially existed, the decision by Chubb National to abandon

17   those claims was based upon evidence that Mr. Carpenter

18   collected and advised Chubb National about concerning the

19   alarm, including the download that Mr. Carpenter provided and

20   the missing wire that you testified about, fair?

21   A.   Kind of fair.  I'd just like to elaborate.  When you say

22   "the download that Mr. Carpenter provided," the download --

23   there was data, to my knowledge, that was observed when they

24   powered up the panel actually on scene.  The data was visible.

25   They can see entry and exit to the home and, I believe, an

D. Jaeger - Cross                                                    453

1    attempt to notify the central monitoring company.  That data

2    was visible when Mr. Wilkowske and Mr. Carpenter were on scene

3    and they first powered up the panel.

4            It wasn't until Mr. Wilkowske said that he, in order

5    to get a complete download of the panel, he would need to bring

6    the panel back to his facility and download it, and he did that

7    and provided that data to Mr. Carpenter.

8    Q.   Okay.  Well, thank you for that clarification.

9            So what actually happened was the, the alarm panel,

10   which is kind of like a big fuse box in shape, right, was, was

11   actually removed from the scene by Mr. Wilkowske, taken to his

12   shop or his lab or wherever he needed to, to examine it.  He

13   examined it, downloaded the data, and provided that back to

14   Mr. Carpenter?

15   A.   Yeah.  The only caveat to that is I would say that it was

16   examined on scene in the presence of Mr. Carpenter, and he

17   viewed that -- the data that was available on scene, and he can

18   see that it existed.  Mr. Wilkowske did take the panel back to

19   his facility and download the data.

20   Q.   Okay.  Well, in connection with the work that

21   Mr. Wilkowske did on the alarm panel, you're aware, are you

22   not, that Mr. Carpenter and Mr. Wilkowske communicated

23   extensively by e-mail about the need for Mr. Wilkowske to help

24   Mr. Carpenter by downloading the data from the alarm?

25   A.   I know there were communications between Mr. Wilkowske and

D. Jaeger - Cross                                                    454

1    Mr. Carpenter relative to that subject, and it would not

2    surprise me if Mr. Carpenter was asking Mr. Wilkowske to put

3    the data in a format that he could review.

4    Q.   And he did that, didn't he?

5    A.   I believe he did.

6    Q.   Mr. Wilkowske downloaded the data and provided it in

7    written form to Mr. Carpenter for his analysis?

8    A.   I think it was in electronic form.

9    Q.   All right.  Whatever form it was in, that form was

10   generated by Mr. Wilkowske and provided to Mr. Carpenter for

11   his review and analysis, correct?

12   A.   It was downloaded by Mr. Wilkowske, yes.

13   Q.   All right.  And it was downloaded by Mr. Wilkowske because

14   Mr. Carpenter couldn't do it for himself, right?

15   A.   I think you really would have to ask Mr. Carpenter that.

16   Q.   All right.

17   A.   I'm not sure if he could have or could not have, but I

18   know Mr. Wilkowske did it.

19   Q.   Fair enough.  In any case, in fact, the data was

20   downloaded by Mr. Wilkowske and provided to Mr. Carpenter for

21   his further evaluation, right?

22   A.   Yes, it was.

23   Q.   All right.  Now, while my memory is not very good in most

24   cases, I took notes about some of your direct, and you thought

25   it was important -- and I believe this was your testimony --

D. Jaeger - Cross                                                    455

1  that it was important for Chubb to rely upon an independent

2  fire investigator, and therefore, it chose Mr. Carpenter,

3  right?

4  A.   We always retain at Chubb independent origin and cause

5  investigators to assist us in the origin and cause

6  determination of a fire.

7  Q.   And that's important so you don't have any bias or other

8  problems with the people doing the work, right?

9  A.   We believe that the best way and most prudent way to

10 proceed is to hire someone who is not an employee of the

11 company but someone who is independent.

12 Q.   And Mr. Carpenter was independent, right?

13 A.   Yes, he was.

14 Q.   Now, we've already been through this, but let's go through

15 it in part again:  Mr. Carpenter relied on Mr. Wilkowske to --

16       THE COURT:  Now, wait.  We're not going to have

17 repetitive stuff.  Do you remember we talked about that

18 earlier?

19       MR. WASSERMAN:  I'm not repeating, Your Honor.

20       THE COURT:  Well, you just said we've been through it

21 before and we're going to go through it again.  So let's get

22 something new, all right?

23       MR. WASSERMAN:  Yes, Your Honor.  Thank you.

24 Q.   Mr. Wilkowske, who downloaded the data, was not

25 independent, was he?

D. Jaeger - Cross                                              456

1   A.   He was independent of Chubb.  He was affiliated actually

2   with Dr. Rattner.

3   Q.   Well, we know there was a wire missing, you just testified

4   about it, from the alarm panel, correct?

5   A.   I don't believe I testified that there was an alarm -- or

6   a wire missing.  There is a wire that was disconnected.  It was

7   clearly visible at the panel.

8   Q.   Let's sum it up this way so that we can make some progress

9   here:  Isn't it true that there was a potential subrogation

10  claim that Chubb had against Mr. Wilkowske and/or his company?

11  A.   I don't believe based on our comprehensive investigation

12  and the evidence that we reviewed that there was a viable

13  subrogation claim against Mr. Wilkowske given that it was an

14  incendiary fire.

15  Q.   Well, you've already testified that in respect of the

16  alarm, one of the problems was the alarm didn't contact the

17  central station when the fire broke out, right?

18  A.   Yeah, because someone removed the wire preventing it from

19  happening.

20  Q.   Well, we don't know who that someone was, do we?

21  A.   We don't know who that person was, but an important part

22  to understand is we know that the alarm was functioning earlier

23  that day and did send a signal to the central monitoring

24  company.  So it had to have been removed sometime between 4:08,

25  4:10 p.m., and sometime after entry into the house at 11:28.

D. Jaeger - Cross                                                    457

1   Q.   So you're assuming that the removal of the wire that you

2   talked about is the reason the central station wasn't contacted

3   at the time of the fire, right?

4   A.   Yeah, I don't think it's an assumption.  I think you'll

5   hear testimony from our experts on that point, that the system

6   actually logged several, several chances or several attempts, I

7   should say, to send a signal and eventually resulting in a

8   trouble fault at the panel.

9        It did try to send that signal, and I don't know if

10  it was five times or seven times, but it was multiple times,

11  until the device functioned as it was supposed to and

12  registered a trouble fault.

13  Q.   And you're saying that because someone has informed you or

14  you, in fact, have looked at the data that Mr. Wilkowske

15  downloaded, right?

16  A.   As I said before, some of this data was visible before

17  Mr. Wilkowske downloaded anything.  When they fired up the

18  panel at the scene, they were able to see the data that was on

19  the panel.  In order to get a complete data download,

20  Mr. Wilkowske brought the panel back to his facility to do

21  that.

22  Q.   Mr. -- Mr. Jaeger, I want you to focus on a pretty narrow

23  question:  Why do you believe that the central station wasn't

24  called at the time of the fire?

25  A.   I think the evidence shows that the central station was

D. Jaeger - Cross                                                          458

1    not notified because someone physically removed a wire from the

2    alarm panel preventing it from dialing out of Dr. Rattner's

3    house.

4    Q.   No, sir, what I mean is who told you that?

5    A.   That was through Mr. Carpenter and also Mr. Merck.

6    Q.   They both told you that their understanding based upon

7    whatever they had done, that the reason the central station

8    wasn't called at the time of the fire was due to the missing --

9    or the disconnected wire, right?

10   A.   Based on their evaluation of the evidence that was

11   available through the data from the panel, there was evidence

12   logged on the panel that showed that it tried to send a signal

13   and was unable to do so, and the only reasonable explanation

14   for it is that someone removed that wire, which was

15   photographed by Mr. Carpenter at his scene inspection.

16   Q.   So Chubb never considered any breach of duty that

17   Mr. Wilkowske or his company, CAM-SERV, owed to Dr. Rattner in

18   any potential subrogation claim, right?

19   A.   No, I wouldn't say that that's necessarily true.  I think

20   we considered all possibilities, but the overwhelming evidence

21   was that someone intentionally entered the home, disabled the

22   alarm so that it couldn't function properly, set a fire in the

23   house, and then left the house.

24   Q.   But Chubb never considered making any sort of a claim

25   through subrogation against Mr. Wilkowske or CAM-SERV; isn't

D. Jaeger - Cross                                                      459

1    that right?

2    A.   Again, Mr. Wasserman, we considered all potential

3    possibilities, and subrogation was one of them.  Based on our

4    comprehensive investigation and the evidence that we obtained,

5    we didn't believe that there was any viable subrogation claim

6    against Mr. Wilkowske.

7    Q.   Well, you certainly knew that Mr. Wilkowske had access and

8    could have disconnected the wire, didn't you?

9    A.   Based on the timing of everything that occurred, it would

10   be highly unlikely that Mr. Wilkowske would know that no one

11   was home, that Mr. Wilkowske would go there and, and do that.

12   Q.   Didn't you know that Mr. Wilkowske had access to the

13   house?

14   A.   I'm not under the impression that Mr. Wilkowske had access

15   to the home without Dr. Rattner's permission.

16   Q.   What did Chubb do to secure the scene of the fire after it

17   was put out by the firemen?

18   A.   After it was released, I believe we put up temporary

19   fencing around the structure.

20   Q.   When was that?

21   A.   I don't have the exact dates, sir.

22   Q.   How many weeks or months after the fire was put out?

23   A.   I think it was within -- when the fire company or fire

24   department released the scene, and I believe around the same

25   time the fencing was going up.

D. Jaeger - Cross                                                    460

1   Q.    When was that?

2   A.    Again, sir, I don't have the exact date.  I'm sure there's

3   a record in the claim file from Balfour, who is the vendor who

4   put up the fence, that would give you that exact data if it's

5   important.

6   Q.    If I understand your direct examination, Chubb National

7   supplied all information it had to Fairfax County Fire

8   Department; is that right?

9   A.    We were served with an Arson Reporting Immunity Act

10  letter, and we responded to that accordingly.

11  Q.    You didn't withhold anything that was pertinent to the

12  fire from Fairfax County, did you?

13  A.    No, we did not.

14  Q.    And one of the things that Chubb provided to Fairfax

15  County was the alarm panel data that Mr. Wilkowske had

16  downloaded, right?

17  A.    I believe so.

18  Q.    And you know that Fairfax County relied on the alarm panel

19  data in connection with its investigation, right?

20  A.    Yes, they did.

21  Q.    In connection with your testimony about someone tampering

22  with this wire, the wire that was not connected where it

23  apparently should have been connected to call the central

24  station, when was that discovered, as you say, by

25  Mr. Carpenter?

D. Jaeger - Cross                                              461

1   A.   I don't have the exact date.  It's in his report, and he

2   photographed it and labeled the photograph and dated it.

3   Q.   And I believe your testimony was, based upon the fact that

4   the wire was not connected to what it should have been

5   connected to, there was tampering?

6            MR. FREED:  Judge, I'm going to object.  We've

7   covered this multiple times.

8            THE COURT:  Sustained.

9   BY MR. WASSERMAN:

10  Q.   Let's talk about cell phone records for a moment, please.

11  Isn't it a fact that Dr. Rattner consented to releasing her

12  cell phone records so that Chubb National and its experts could

13  analyze them?

14  A.   Yes, she did.

15  Q.   Now, you also talked about intermittent -- I'm sorry --

16  you talked about the fact that your understanding was Chubb --

17  let me start again.

18            I believe you testified that Chubb was suspicious in

19  some way about Dr. Rattner because she had told you she could

20  not access the Internet from her beach house in Bethany Beach,

21  and you learned the contrary was, in fact, the case, right?

22  A.   During the course of the investigation, Mr. Wasserman, we

23  learned that Dr. Rattner was listening to an open house on

24  November 15.  That contradicted what she was telling us about

25  the fact that the Internet was down and she couldn't access the

D. Jaeger - Cross                                                        462

1   system in the home.  That's what made us curious about how that

2   happened.

3   Q.    So the answer to my question was yes, right?

4   A.    The answer to your question is yes.

5   Q.    Okay.  Thank you.

6         Now, you know that sometimes Internet access isn't

7   consistent, right?  You can't always, in other words, get

8   Internet access even from the same point if you're using a

9   wireless device?

10  A.    If you're using a wireless device, but if you're on a, a

11  modem or a, you know, some type of server in your house, I

12  think it's quite reliable.

13  Q.    But wireless is not, right?

14  A.    Wireless through cellular technology?

15  Q.    Wireless if you're using a laptop, for example?

16  A.    Well, I mean, I guess what I'm trying to understand is

17  people have devices in their house, and that's a wireless

18  device that I can walk around my house and have WiFi in my

19  house.  And then there's cellular wireless, which is on a cell

20  tower, going through a cell tower.

21        My -- what I'm trying to say is that when you use it

22  in your house, the WiFi network in your house, it is usually

23  very reliable.  When you're out in the car or driving around,

24  it's probably less reliable than in your home.

25  Q.    Well, you're not telling the jury that it's impossible for

D. Jaeger - Cross                                                      463

1    a wireless device not to connect, are you?

2    A.   I'm not telling the jury that at all.  I'm just giving you

3    my understanding of those devices.

4    Q.   Now, you mentioned -- I believe his name was Bill McGirk;

5    is that right?

6    A.   Yes.

7    Q.   And Mr. McGirk, I believe you testified on direct,

8    confirmed the conclusions reached by Mr. Baxter?

9    A.   Yes.  He reviewed the data that Mr. Baxter reviewed and

10   confirmed the analysis from Mr. Baxter.

11   Q.   Mr. McGirk is no longer in this case or never was; isn't

12   that right?

13            MR. FREED:  Objection.

14            THE COURT:  I don't even know what the relevance of

15   that is to this.  I'll sustain the objection.

16   BY MR. WASSERMAN:

17   Q.   You're relying on Mr. Baxter and Mr. Magnuson as your

18   experts on cell phone technology in this case, right?

19   A.   That's correct.

20   Q.   Now, insofar as the conclusions of Mr. Magnuson and

21   Mr. Baxter are concerned, their analysis says that

22   Dr. Rattner's cell phone allegedly was in Tysons on the night

23   in question, not Great Falls, correct?

24   A.   Yeah.  I don't think there is an "allegedly" in there.  I

25   think their analysis based on the records confirm that the cell

D. Jaeger - Cross                                                           464

1   phone was in Tysons for a period of time, traveled from Bethany

2   to Tysons, back to Bethany.

3   Q.   My point is neither of your experts, neither Mr. Baxter

4   nor Mr. Magnuson claim that Dr. Rattner's cell phone was in

5   Great Falls where the house was?

6   A.   That's correct, sir.

7   Q.   Let's talk briefly about the Rattner Family Trust.  You

8   found that to be, Dr. Rattner's reliance and reference to the

9   Rattner Family Trust as a misstatement, correct?

10  A.   It was a false statement, correct.

11  Q.   False statement, right?

12  A.   Correct.

13  Q.   But whether -- sorry.

14        The materiality of that false statement really should

15  focus on whether or not Dr. Rattner had unfettered access to

16  money as opposed to where it came from and the entity from --

17  who wrote the check; isn't that true?

18  A.   No, I disagree with that.  I mean, I think that we asked

19  that question.  It was a relevant area of inquiry.  We were

20  trying to understand her financial condition.  And she made a

21  representation to us that was false, and, you know, that

22  information was untruthful, and if it was relied upon without

23  any further investigation, it could have caused us to do

24  something that we shouldn't have done because it wasn't true.

25  Q.   Well, in fact, the Rattner Family Office provided funds to

D. Jaeger - Cross                                                    465

1   Dr. Rattner, not the Rattner Family Trust, right?

2   A.   The Rattner Family Office did provide funds to Dr. Rattner

3   but under a much different set of circumstances than

4   Dr. Rattner testified to during the claim investigation.

5   Q.   Regardless, the Rattner Family Trust and the Rattner

6   Family Office might not be the same thing, but the Rattner

7   Family Office provided more than a million dollars to

8   Dr. Rattner to buy the condo in Arlington, right?

9   A.   It provided more than a million dollars to buy the condo

10  in Arlington, but I do not agree with your representation or

11  statement about, about those two things, what they mean, what

12  they represent, and Dr. Rattner's access to money.

13  Q.   Well, have you ever seen a promissory note relating to the

14  money that the Rattner Family Office gave to Dr. Rattner in

15  connection with the purchase of the condominium in Arlington?

16  A.   I don't recall if there was a promissory note, but what I

17  do recall is documentation that the Rattner Family Office was

18  carrying that as a loan to Dr. Rattner, and there is an

19  expectation through documentation that we got in the litigation

20  that that money would be paid back to Steven Rattner.

21  Q.   When you talk about Dr. Rattner's financial condition,

22  your testimony is that was important and that's why the Rattner

23  Family Trust or Office is important, right?

24  A.   Any type of loss like this where there is an arson,

25  financial condition is an extremely important part of the

D. Jaeger - Cross                                                    466

1    investigation.

2    Q.   Well, don't you know that at Chubb National's request,

3    Dr. Rattner produced significant documentation and other

4    evidence regarding her financial condition?

5    A.   I understand that Dr. Rattner produced documents relative

6    to her monthly income and produced some other financial

7    documents relative to her assets, but going back to the initial

8    recorded statement, there was misrepresentations in there about

9    her assets and how she was going to fund this condo.

10   Q.   Well, didn't you learn that Dr. Rattner had more than

11   $30,000 in tax-free income each month because she was on

12   disability for MS?

13   A.   We did learn that Dr. Rattner was on full disability from

14   her MS.

15   Q.   And that provided a very level cash flow and had provided

16   such a cash flow tax free for many years; isn't that true?

17   A.   There was a cash flow for many years.

18   Q.   And it was steady because it was an insurance policy,

19   right?

20   A.   It was steady because it was an insurance policy.

21   Q.   And Dr. Rattner had used that money plus her other assets

22   to pay the mortgage on the beach house in Bethany Beach and her

23   home in Great Falls for many years; isn't that right?

24   A.   I'm not sure how long she had the beach house, but she was

25   the owner of the Great Falls home for many years.

D. Jaeger - Cross                                                467

1    Q.   And she had paid the mortgage on both of those properties

2    for years before the fire and afterwards as well; isn't that

3    true?

4    A.   She did pay the mortgage.

5    Q.   Now, you talked about -- in your direct exam, you talked

6    about DeCaro Auctions, right?

7    A.   Yes, I did.

8    Q.   All right.  And you knew, did you not, that the

9    arrangement between Dr. Rattner and DeCaro allowed Dr. Rattner

10   to cancel the auction up until 11 a.m. the day of it, right?

11   A.   There was a provision that allowed that, but there would

12   be a loss of her $75,000 deposit.

13   Q.   But you knew she could cancel the auction up until that

14   time, didn't you?

15   A.   Yes, with penalty.

16   Q.   With a penalty of $75,000, correct?

17   A.   Correct.

18   Q.   And I believe near the end of your testimony, you

19   mentioned that doing sort of just arithmetic, that Dr. Rattner

20   would have, in your view, netted more money if she burned down

21   the house than if she sold it.  Wasn't that your point?

22   A.   Yes, absolutely.

23   Q.   Isn't that true with many people in that same

24   circumstance; that is, that the replacement value of the house

25   and the loss of the contents would net more money than simply

D. Jaeger - Redirect                                          468

1    selling the house?

2    A.   That's a possibility, but this was an arson.

3    Q.   I didn't hear the last part, sir.

4    A.   This was an arson.

5    Q.   Well, that's what your claim is.  You know Dr. Rattner

6    hotly disputes it, don't you?

7    A.   I understand that.

8             MR. WASSERMAN:  Nothing further, Your Honor.

9             THE COURT:  Any redirect?

10            MR. FREED:  Very briefly, Your Honor.

11                      REDIRECT EXAMINATION

12   BY MR. FREED:

13   Q.   Mr. Jaeger, did part of Chubb's investigation include

14   looking not only at the income that Dr. Rattner was receiving

15   but at the expenses that she was incurring?

16   A.   Yes, it did.

17   Q.   And what did it reveal with regard to that?

18   A.   Dr. Rattner spent a considerable amount of money on

19   high-dollar vacations, clothing, and other items.

20   Q.   Did that include travel all over the world?

21   A.   Yes, it did.

22   Q.   Did that include expensive furniture?

23            MR. WASSERMAN:  Your Honor, I didn't get into this.

24   This is well beyond any scope of cross.

25            THE COURT:  No, I think you got into the economics.

D. Jaeger - Redirect                                                          469

1    I'm going to permit that because income and outgo are related.

2    Overruled.

3    BY MR. FREED:

4    Q.   Did that include expensive furniture?

5    A.   Yes, it did.

6    Q.   High-end art?

7    A.   Yes.

8    Q.   Collectibles?

9    A.   Yes.

10   Q.   In your experience as the investigator for Chubb, which is

11   an insurance company whose niche is ensuring people who are,

12   "high net worth," right, are there occasions where people who

13   have great amounts of income sometimes commit insurance fraud

14   or arson?

15   A.   Yes, there is.

16   Q.   Now, you were asked about Mr. Baxter reached the

17   conclusions that you testified to about the movement of the

18   cell phone, correct?

19   A.   That's correct.

20   Q.   And Mr. McGirk?

21   A.   That's correct.

22   Q.   And counsel pointed out that there's a third expert,

23   Mr. Magnuson.

24   A.   That's correct.

25   Q.   Are you familiar with Mr. Magnuson's credentials?

D. Jaeger - Recross                                                470

1   A.   I am somewhat familiar with them.

2   Q.   What are they?

3   A.   I believe he is a retired FBI agent who worked in a

4   special department that analyzed cell tower records.

5   Q.   What was Mr. Magnuson's conclusion with regard to the

6   movement of Susan Rattner's cell phone on the night of November

7   15?

8   A.   Mr. Magnuson's conclusion was the exact same as

9   Mr. Baxter's.

10           MR. FREED:  Thank you.  No further questions.

11           THE COURT:  Any recross, Mr. Wasserman?

12           MR. WASSERMAN:  One question, Your Honor.  I hope

13   it's just one.

14           THE COURT:  Let's see.  Okay.

15                        RECROSS EXAMINATION

16   BY MR. WASSERMAN:

17   Q.   Mr. Baxter and Mr. Magnuson are Chubb's retired experts,

18   and they're being paid for their time; is that not correct?

19   A.   I think you meant to say retained, not retired.

20           But yes, they were retained by the company.

21   Q.   And they're being paid for their time?

22   A.   Yes, they are being paid for their time.

23           THE COURT:  Does anybody anticipate calling this

24   witness again in the future?

25           Mr. Wasserman?

D. Jaeger - Recross                                                      471

1           MR. WASSERMAN:  No, Your Honor.

2           THE COURT:  Mr. Freed?

3           MR. FREED:  I do need to entertain the possibility

4    that he could be recalled on rebuttal.

5           THE COURT:  All right, then.  You can leave the

6    courthouse today, but you're still under the potential call of

7    being a witness.  So you're not to discuss your testimony or

8    anything you've seen or heard in court with any witness who has

9    not yet testified.

10          THE WITNESS:  I understand.  Thank you.

11          THE COURT:  You're free to go at this time.  Thank

12   you.

13                         (Witness stood down.)

14          THE COURT:  All right.  Now, are we ready to go back

15   to the deposition?  Is that fixed up?

16          MR. O'HARA:  Your Honor, if I may?

17          THE COURT:  Yes.

18          MR. O'HARA:  We spoke with counsel during the break.

19   Captain Terrance Fayson from the Fairfax County Fire Marshal's

20   Office is here.

21          THE COURT:  We need to get him out of here.

22          MR. O'HARA:  He was under subpoena yesterday, and he

23   has child care issues this afternoon.  So counsel has given us

24   permission to put him on the stand next.

25          THE COURT:  All right.  So that's your next witness

T. Fayson - Direct                                                      472

1   then.

2            MR. O'HARA:  Yes.  We would call Captain Terrance

3   Fayson to the stand.

4    CAPTAIN TERRANCE LAMONT FAYSON, DEFENDANT'S WITNESS, AFFIRMED

5            MR. FREED:  Your Honor, may we have permission to

6   hand up the single exhibit that we'll be using with Captain

7   Fayson?

8            THE COURT:  Hand it to the court security officer.

9            What's the exhibit number for this?

10           MR. FREED:  Exhibit 376, Your Honor.

11           THE COURT:  All right.

12           MR. FREED:  May I inquire?

13           THE COURT:  Yes, sir.

14           MR. FREED:  Thank you.

15                        DIRECT EXAMINATION

16   BY MR. FREED:

17   Q.   Good afternoon, Captain.

18   A.   Good afternoon.

19   Q.   Would you state your full name?

20   A.   Terrance Lamont Fayson.

21   Q.   Where do you work, sir?

22   A.   Fairfax County Fire and Rescue Department, Office of the

23   Fire Marshal.

24   Q.   How long have you been so employed?

25   A.   Over 19 years.

T. Fayson - Direct                                                    473

1  Q.   Can you briefly tell us about your career in the fire

2  department?

3  A.   Yes, sir.  My career started in 1997.  I came in as a

4  firefighter, completed the Fairfax County Fire and Rescue

5  Academy, was assigned to the field as a firefighter, promoted

6  up through the ranks as a driver, and eventually promoted to

7  lieutenant and went into the Fire Marshal's Office, at which

8  time I conducted my training to be a fire and arson

9  investigator, starting with the Police Academy, then NFPA 1031

10 through the Virginia Department of Fire Programs, which is my

11 basic fire inspector training, on to my Virginia Department of

12 Fire Programs 1033, fire and arson investigations training.

13          I've completed the ATF post-blast training, am

14 promoted to captain, went to -- spent a year and a half in

15 inspections, and then I've been back in the Fire Marshal's

16 Office as a shift lead investigator for the past three years.

17 Q.   What do you do as an assistant fire marshal on a

18 day-to-day basis?  What's your job?

19 A.   My main job is we respond to fire incidents to determine

20 the origin and cause of the fire as well as environmental crime

21 issues and other code enforcement issues within the county.

22 Q.   Do you sometimes have occasion to be called to testify in

23 court?

24 A.   I do.

25 Q.   And have you done so?

T. Fayson - Direct                                                          474

1   A.    I have.

2   Q.    And have you done so with regard to the origin and cause

3   of the fires?

4   A.    I have.

5   Q.    Have you been qualified as an expert in the field of the

6   investigation of the origin and cause of fires?

7   A.    I have.

8   Q.    In what courts?

9   A.    I've been in the Fairfax County General District Court and

10  twice in the U.S. Eastern District Court.

11  Q.    This court where we are today?

12  A.    Correct.

13          THE COURT:  Is there any dispute about the expert

14  qualifications of this witness?

15          MR. WASSERMAN:  No, ma'am.

16          THE COURT:  All right.  Then, ladies and gentlemen,

17  because I know we will have several expert witnesses in the

18  course of the trial, let me just tell you that normally we

19  don't let witnesses testify as to any conclusions about facts

20  in the case.  We make an exception for people who are deemed to

21  be an expert in a certain area that we feel the jurors might

22  not from their own common knowledge be able to come to a

23  conclusion.

24          Now, the testimony of experts, however, is to be

25  evaluated just like you would evaluate any other witness in the

T. Fayson - Direct                                                    475

1   case.  Ultimately, you are the fact-finders, and you can accept

2   all of the expert's testimony, only a portion of it, or none of

3   it at all.  In evaluating an expert's testimony, you want to

4   look at the expert's background and expertise, the methodology

5   that he or she may have used, the reasons that he or she is

6   offering for the conclusions reached, that kind of analysis,

7   but we will allow experts to testify as to their conclusions,

8   but again, ultimately, you are the fact-finders.

9            All right.  Go ahead.

10           MR. FREED:  Thank you, Your Honor.

11  Q.   Captain, you mentioned the initials NFPA?

12  A.   Yes, sir.

13  Q.   What is that?

14  A.   That is the National Fire Protection Association.

15  Q.   And what relevance does the NFPA -- or significance does

16  that entity have to fire investigations?

17  A.   The National Fire Protection Agency, they actually wrote

18  the codes that are utilized for -- that our county adopted and

19  the state adopted for arson investigation, which is NFPA 1033.

20  They also are the authors of the guide NFPA 921, which also

21  takes you through the process and steps to conduct origin and

22  cause investigations.

23  Q.   Did you follow the mandates of NFPA 921 in conducting an

24  investigation in this case?

25  A.   I did.

T. Fayson - Direct                                                    476

1   Q.   Can you approximate for the jury approximately how many

2   fires you have had occasion to investigate during your career?

3   A.   I've investigated well over 300 fires in my, in my career.

4   Q.   And did you have occasion to investigate the fire at the

5   property located at 151 River Park Lane, in Great Falls,

6   Virginia, that occurred on November 16, 2015?

7   A.   Yes.

8   Q.   When did you first become involved in that investigation?

9   A.   I first became involved with the investigation

10  approximately July -- I'm sorry, June of 2016, but I had been

11  to the scene previously in November of 2015.

12  Q.   Okay.  What, what was your status with regard to the fire

13  as of November of 2015?

14  A.   I had no involvement with the fire during November 2015.

15  I just conducted a site visit, as my shift was working and we

16  went to check to see if the assigned investigators needed any

17  assistance with anything.

18  Q.   At that time, was there a different assistant fire marshal

19  who had responsibility for this matter?

20  A.   There was.

21  Q.   Who was that person?

22  A.   That was Captain Rocco Alvaro.

23  Q.   And did there come a time later when you assumed

24  responsibility for the investigation?

25  A.   Yes.

T. Fayson - Direct                                                     477

1   Q.   Is that the second date that you gave, in June?

2   A.   Yes, sir.

3   Q.   And what were the circumstances under which you assumed

4   responsibility for this investigation?

5   A.   Captain Alvaro was promoted out of our section, so he was

6   reassigned.

7   Q.   And it was then -- responsibility was then transferred to

8   you?

9   A.   That is correct.

10  Q.   And since then, have you been the assigned lead fire

11  investigator for this matter?

12  A.   I have.

13  Q.   Prior -- or at the time that you assumed the role of chief

14  investigator, did you have occasion to speak to Captain Alvaro?

15  A.   I did.

16  Q.   And did you discuss his findings and conclusions as they

17  existed as of that time?

18  A.   I did.

19  Q.   How was the fire being classified as of the date that you

20  took over responsibility?

21  A.   As of the date that I took over responsibility, the fire

22  was listed as undetermined and under investigation.

23  Q.   Has that classification changed?

24  A.   It has.

25  Q.   And to what has it changed?

T. Fayson - Direct                                                    478

1    A.    The fire classification has been changed to incendiary in

2    nature.

3    Q.    And when did that occur?

4    A.    That occurred in October of this year.

5    Q.    Could you explain to the jury, please, what facts and

6    circumstances led to the change of classification of this fire

7    to incendiary?

8    A.    I can.

9    Q.    Please do.

10   A.    Okay.  Once I assumed responsibility to the fire, I looked

11   over Captain Alvaro's information, his notes, all of the

12   evidence that he had gathered as far as alarm panel readings,

13   phone -- phone records, recorded statements, examination under

14   oath, and examined everything, and I was able to determine that

15   there were some inconsistencies and trends that led me to

16   believe that the fire was indeed incendiary in nature.

17   Q.    And what were some of those?

18   A.    Well, I was on the day of the fire looking at the alarm

19   sensor panel records, you -- I was able to show a pattern that

20   someone entered the home, had purposeful movement into the two

21   main areas of the home, one being the lower apartment where the

22   alarm panel was located, the other being a storage room where

23   the recorder for the cameras for the home was located, and then

24   they milled around the house for approximately 32 minutes, and

25   then they exited back through the mudroom door, which was then

1    closed, and approximately one minute after that, we then had

2    smoke alarms sounding and activating within the house.

3            Some other significance was that earlier that day, if

4    you look at the record -- the alarm panel records, there was an

5    RF supervisory failure of the -- I believe it was the apartment

6    glass break sensor.  When that communication error was

7    received, it sent a message to the central station, who then

8    received the trouble signal and made two attempts to contact

9    the owner, Susan Rattner, of the, the failure.  But at the time

10   of the fire, there was never a communication made to the

11   central station alerting them to the fact that there was a fire

12   in the house on the day of the, the incident.

13   Q.   Did you investigate to try to ascertain why that central

14   station function did not work on the night of the fire?

15   A.   I did.  I conducted an interview with John Wilkowske, who

16   was the alarm panel -- or alarm technician familiar with the

17   system in the home.  Also, reviewing the records and

18   photographs provided by -- Doug Carpenter, who was the fire

19   investigator for the insurance company, he provided photos of

20   the alarm panel, and there was one picture in which a wire was

21   removed and attached to the mount -- where a mount -- where the

22   panel mounts to the wall.  It was attached to the mount screw.

23           They conducted a subsequent revisit to the house to

24   examine the alarm panel again, and then when they returned,

25   that, that wire was moved back to the original position.  So

T. Fayson - Direct                                              480

1  obviously, it was determined that at the time of the fire, with

2  that wire being moved to the screw mount, it would not transmit

3  a signal to the, to the central station at that time.

4  Q.   Did that indicate to you whether someone had necessarily

5  tampered with the alarm system?

6  A.   It did.

7  Q.   What was your conclusion on that issue?

8  A.   So my conclusion was that someone had entered the home and

9  went to the, the alarm panel room to disable the alarm system

10 for the purpose of setting a fire or hiding evidence of a

11 crime.

12 Q.   How was it that there was still an alarm panel in

13 existence at the house after the fire?

14 A.   I would say because the fire more than likely occurred

15 remote from that area, and the doors were shut, which provided

16 a barrier.

17 Q.   Had the fire destroyed that alarm panel, would that data

18 have been available?

19 A.   No, it would not.

20 Q.   Did you follow what's called the scientific method in

21 applying your -- in conducting your investigation in reaching

22 these conclusions?

23 A.   I did.

24 Q.   And how do you understand the meaning of the scientific

25 method?

T. Fayson - Direct                                                    481

1   A.    The scientific method is a process in which you use a

2   systematic approach to conducting a scientific experiment or

3   investigation.  It starts by, obviously, recognizing a problem,

4   defining that problem, and then you collect the data, you

5   analyze the data, then you formulate a hypothesis, you test

6   that hypothesis, and then you select your final hypothesis at

7   the end.

8   Q.    Is that the methodology that is mandated by NFPA 921?

9   A.    It is.

10  Q.    And is NFPA 921 the most widely followed protocol for the

11  investigations of fires?

12  A.    It is.

13  Q.    Does the NFPA 921 make a distinction between a fire cause

14  and a fire classification?

15  A.    They do.

16  Q.    Could you explain to us, please, the difference?

17  A.    Yes.  Most times, in order to determine the cause of a

18  fire, you have to determine the first material ignited, the

19  source of that ignition, and the circumstances that brought

20  those items together.  If you cannot determine those factors,

21  then you should make -- the fire should be classified as

22  undetermined.  However, in NFPA 921, the circumstances of the

23  case can allow you to have a classification of an undetermined

24  fire as incendiary.

25  Q.    Is it accurate to say, Captain, that when you are talking

1    about undetermined cause, what is undetermined is precisely how

2    the fire was ignited, in other words, whether it was a match or

3    a candle or a blow torch, and what the material was that, that

4    it ignited?

5    A.    Correct.

6    Q.    But is it also accurate to say that notwithstanding the

7    inability to figure out exactly what was lit to cause the fire

8    to start, that that fire was intentionally set?

9    A.    That's correct.

10          THE COURT:  I'm just curious.  What are the other

11   classifications?

12          THE WITNESS:  Well, your other classifications, you

13   have accidental, natural, undetermined, and incendiary.

14          THE COURT:  All right.  So natural would be like

15   lightning hitting the house?

16          THE WITNESS:  Correct.

17          THE COURT:  All right.  Thank you.

18   BY MR. FREED:

19   Q.    Would a typical situation in which a classification

20   determination was made but not a cause determination be such as

21   existed in this case, that where the location where the fire

22   started was so badly destroyed that it was impossible to make

23   that determination?

24   A.    Correct, yes.

25   Q.    And is that the reason for your cause classification being

T. Fayson - Direct                                                           483

1    incendiary?

2    A.   Yes.

3    Q.   And were there any other factors aside from what we've

4    talked about that led you to that conclusion?

5    A.   I'm sorry, can you repeat that?

6    Q.   Sure.  Aside from what we've talked about so far, was

7    there anything else that led you to reach the conclusion that

8    the fire was -- should be classified as incendiary?

9    A.   No.

10   Q.   Did you also do some analysis of cell phone records?

11   A.   I have.

12   Q.   Whose cell phone records did you analyze?

13   A.   Ms. Rattner's.

14   Q.   And what did you do?

15   A.   I looked at the phone records specifically for the date

16   and time surrounding the incident.  The cell phone records

17   provided cell tower location information.  I was able to

18   manually enter the coordinates that were received at the tower

19   that the cell phone was hitting off of during that time.

20        The day previous, the first coordinates I did early

21   in the day were her phone would hit off the tower at her --

22        MR. WASSERMAN:  Your Honor, excuse me.

23        THE COURT:  Wait, wait.  Excuse me.

24        MR. WASSERMAN:  I believe he's competent and

25   qualified to talk about fires.  Now we're talking about cell

T. Fayson - Direct                                                        484

1    phones.  He's not been qualified in that respect.  Now --

2           THE COURT:  This -- the captain is not an expert in

3    cell phones, but he can say that he looked at whatever

4    information he was given, and he could say that he could draw

5    conclusions from what he saw.  That's, that's certainly within

6    his area, so to that extent, the objection is overruled.

7    BY MR. FREED:

8    Q.    You may proceed, Captain.

9    A.    Okay.  So when I plotted the data from her cell phone

10   earlier in the day, the tower her cell phone hit off of was

11   located in proximity to her Bethany Beach house in Delaware.

12          During the time of the fire, I noticed that the

13   coordinates changed, and when I entered those manually into the

14   mapping, they were pinging off the towers.  There were three

15   distinct locations.  One was in the Route 50 corridor in New

16   Carrollton, Maryland; the second was in Fairfax, Gallows Road

17   near Fairfax Hospital; and then the third location was in --

18   near the Tysons Corner area near Route 7.

19          So I requested the phone records.  I haven't

20   completed everything to map it out, but based on the recorded

21   statement and interview that was provided to Captain Alvaro in

22   his notes, Ms. Rattner stated that she was in possession of the

23   phone and it was with her in Bethany Beach and that's where she

24   was at the time of the fire.  However, right now I can't find a

25   reason why her phone should be hitting off towers in that

T. Fayson - Direct                                              485

1    location.

2    Q.   Is it accurate to say that your -- that the Fairfax County

3    fire marshal's investigation of that issue is ongoing?

4    A.   It is.

5    Q.   It has not concluded?

6    A.   No, it has not.

7    Q.   Is it unusual for an official investigation of a fire such

8    as this to be open two years later?

9    A.   No, it's not unusual.

10   Q.   Has the revised classification for this fire been included

11   in an updated report?

12   A.   It has.

13   Q.   And would you take a look at what's in front of you,

14   Captain, and been marked as 376, please?

15   A.   Yes.

16   Q.   And can you identify that exhibit for us?

17   A.   I can.  This is my origin and cause report that I've

18   created.

19   Q.   And does this include the current classification of the

20   fire as incendiary?

21   A.   It does.

22   Q.   Captain, as part of your investigation, did you also make

23   an attempt to ascertain whether any similar fires or events to

24   what happened to the Rattner home on November 15, 2015, had

25   occurred in your jurisdiction during that time period?

T. Fayson - Direct                                                  486

1    A.   We did.   We looked at police reports to see if there's any

2    criminal activity in that area during the time.

3    Q.   What did you conclude?

4    A.   There were no other criminal activity reports found at

5    that time.

6           THE COURT:   And when you say "at that time," what

7    time period were you looking at?

8           THE WITNESS:   I was looking before and around

9    November 15.

10          THE COURT:   A couple of days?   A couple of weeks?

11   What's the timeframe?

12          THE WITNESS:   It would be a couple of weeks.   We were

13   able to go into the police report and, and see, and there was a

14   wide gap before any reports.   I think the most found was maybe

15   a noise complaint, which was several months before the fire.

16          THE COURT:   So you were looking at both police

17   reports as well as fire reports?

18          THE WITNESS:   Yes.   Our database when we enter an

19   address or name, it will, one, show if another report or fire

20   come up.   So I guess I should say there was a previous fire

21   report that came up for that area, and it actually came up for

22   this address.

23   BY MR. FREED:

24   Q.   Was that a fire that occurred in September of 2015?

25   A.   Yes.

T. Fayson - Direct                                                    487

1    Q.    A laundry room small fire?

2    A.    It was a utility room but --

3    Q.    And that had burned itself out?

4    A.    Yes.

5    Q.    Aside from that, any other indications of fires?

6    A.    No.

7    Q.    Could you describe the neighborhood where the Rattner home

8    is located?

9    A.    Yes.  It's a rural area, large, large homes, quiet

10   residential neighborhood.

11   Q.    Not a high-crime area?

12   A.    Not a high-crime area.

13   Q.    Captain, do you know if any firefighters were injured in

14   fighting the blaze on November 15 and 16 of 2015?

15   A.    I do not know if there were any firefighters injured.  To

16   the best of my knowledge, there was not.

17   Q.    At some point during the course of your investigation, did

18   you become aware of a writing that was put on a mirror in the

19   Rattner property?

20   A.    Yes.

21   Q.    Could you tell us about that, please?

22   A.    During the photographs provided to me by Captain Alvaro

23   and I believe it was during the time of revisiting the scene,

24   someone had written on the soot in the bathroom for the lower

25   level powder room around the nanny suite, I believe it said, "I

T. Fayson - Direct                                                                488

1   am watching you," or, "We are watching you."

2   Q.   You saw that on the photograph?

3   A.   I did.

4   Q.   And that was a photograph that was taken by

5   Captain Alvaro?

6   A.   I do not know who the actual photographer was.

7   Q.   Understood.

8           How did that strike you?

9   A.   I thought it was odd maybe that someone was, you know,

10  either trying to throw you off or kind of muddy the -- it was

11  odd to be there.

12  Q.   Did you see it as someone returning to the scene of a fire

13  and writing the note, or did you see it as somewhat of a ruse?

14  A.   I saw it as someone possibly trying to throw us off, maybe

15  make us believe that, that they did it.

16          MR. FREED:  Thank you, Your Honor.  I have no further

17  questions, Your Honor.

18          THE WITNESS:  All right.

19          THE COURT:  Mr. Wasserman?

20          MR. WASSERMAN:  Thank you, Your Honor.  Good

21  afternoon.

22          MR. FREED:  Your Honor, before I finish, I apologize,

23  may I simply ask the Court to enter into evidence Defendant's

24  Exhibit 376?

25          THE COURT:  Is there any objection to the report?

T. Fayson - Cross                                                    489

1              MR. WASSERMAN:  No, Your Honor.

2              THE COURT:  All right, 376 is in evidence.

3              (Defendant's Exhibit No. 376 was received in

4    evidence.)

5                         CROSS-EXAMINATION

6    BY MR. WASSERMAN:

7    Q.   Good afternoon, Captain.

8    A.   Good afternoon.

9    Q.   Now, you and I briefly spoke yesterday, I believe, for

10   about five-ten minutes, right?

11   A.   Yes, sir.

12   Q.   All right.  I'm not sure you said this, but did, did you

13   recently get promoted as well as Captain Alvaro?

14   A.   I was promoted approximately three years ago.

15   Q.   All right.  In any case, Captain Alvaro was promoted

16   relatively recently, and you became the chief investigator, is

17   that right, on this particular matter?

18   A.   Yes.  In 2015 -- in November 2015, when he was assigned to

19   the case, sometime after that, he was the lead, he got promoted

20   and left the section, and then I was reassigned to the case.

21   Q.   When were you reassigned to the case, sir?

22   A.   I'm going to say it was June of 2016, June or July.  I

23   think I have it in my report, if I can -- you want me to refer

24   to it?

25              THE COURT:  Do you need him to refer to it,

1    Mr. Wasserman?

2              MR. WASSERMAN:  I don't, Your Honor.

3              THE COURT:  All right.  So June or July of 2016.

4    BY MR. WASSERMAN:

5    Q.    Thank you, Captain.

6              And it's my understanding that just this month, you

7    made the decision to change the fire cause classification from

8    undetermined to incendiary; is that correct?

9    A.    Correct.  Well, correction.  It was from under

10   investigation.  It was always listed as under investigation.

11   Q.    Okay.  In any case, now it's, according to what my

12   understanding is, it's now incendiary, right?  That's shown in

13   Plaintiff's 376 that you've testified about?

14   A.    Yes.

15   Q.    All right.  And were you the one at the fire department

16   that made that change to the prior report?

17   A.    I did.

18   Q.    And if I'm tracking your testimony, there were really two

19   things that caused you to make this change to incendiary:  one,

20   your conversations with John Wilkowske; and two,

21   Mr. Carpenter's photos regarding the wire that was not

22   connected?

23   A.    Correct.

24   Q.    Now, I want to be sure I'm understanding the wire that was

25   unconnected.  Was it your understanding that at the time of the

T. Fayson - Cross                                                    491

1    fire, it had to be connected, and that someone subsequently

2    after the fire disconnected it, or the reverse, or something

3    different?

4    A.    It would be, I would say, something different.

5    Q.    Okay.

6    A.    It's kind of reverse, but based on the alarm panel data,

7    the communications from the alarm to the central station up

8    to -- between 4:08 on the 15th, the alarm panel was

9    communicating appropriately with central station, but once the

10   fire occurred, the alarm panel failed to communicate to the

11   central station.  Therefore, I believe at that time is when it

12   was -- somewhere between there, it was tampered with, with the

13   entrance of someone or someones into the home.

14   Q.    So would I be right to say that your theory is in

15   connection with the fire classified as incendiary, that some

16   unknown person disconnected the wire between 4:08, when the

17   trouble signal went to the central station, and when the fire

18   broke out?

19   A.    Correct.

20   Q.    And you saw a photograph that Mr. Carpenter gave you of

21   the wire disconnected; is that right?

22   A.    That's correct.

23   Q.    Now, I believe you also said that you had talked to

24   Mr. Wilkowske in connection with your investigation.

25   A.    Yes.

T. Fayson - Cross                                                    492

1    Q.    Did Mr. Wilkowske mention to you that he might have

2    accidentally caused that wire to have become disconnected?

3    A.    No, he did not.

4    Q.    He didn't say that in form or in substance in any way?

5              MR. FREED:  Objection.  Asked and answered.

6              THE COURT:  Well, I'm allowing it.  Overruled.

7              THE WITNESS:  Okay.  Sir, can you say it?

8    BY MR. WASSERMAN:

9    Q.    Sure.  Without limiting yourself to exactly the way I

10   phrased the question, did Mr. Wilkowske tell you in any way,

11   shape, or form that he could have been responsible accidentally

12   for causing that wire to become disconnected?

13   A.    No.

14   Q.    Now, I guess it happened before you were a part of the --

15   or at least before you were in charge of the investigation, but

16   Captain Alvaro requested the Virginia Department of Forensic

17   Science to analyze some samples from the fire, correct, sir?

18   A.    That is correct.

19   Q.    And on February 29 of 2016, the Department of Forensic

20   Science sent a report and a certificate of analysis with regard

21   to those samples, correct, sir?

22   A.    That is correct.

23   Q.    And that report is a part of your file, right?

24   A.    It is.

25   Q.    And that report says that these various samples were

T. Fayson - Cross                                                    493

1   analyzed by the, the lab, and no ignitable liquids were

2   identified from any of those samples, correct, sir?

3   A.   That is correct.

4              MR. WASSERMAN:  Your Honor, I'm going to offer --

5              THE COURT:  Is that report in part of your report

6   that was just entered into evidence?

7              THE WITNESS:  No, ma'am, it's not part of this

8   report.

9              THE COURT:  All right.  Do you have any -- all right.

10  Do you have an exhibit number for that?

11             MR. WASSERMAN:  Yes, Your Honor.  Our Plaintiff's

12  Exhibit 233.

13             THE COURT:  Any objection to 233?

14             MR. FREED:  No objection, Your Honor.

15             THE COURT:  All right, it's in.

16             (Plaintiff's Exhibit No. 233 was received in

17  evidence.)

18             THE COURT:  Do you want to show that to the witness?

19             MR. WASSERMAN:  I do, Your Honor.

20             THE COURT:  All right.

21             MR. WASSERMAN:  Thank you.

22  Q.   Now, Captain, Plaintiff's 233 is the first report or at

23  least the report prior to the one that you recently changed,

24  right?

25  A.   Yes, sir.

T. Fayson - Cross                                                494

1    Q.   Okay.  And the very last two pages are the certificate of

2    analysis from the State of Virginia with respect to the fire

3    samples, or samples from the fire, that you just testified

4    about, right?

5    A.   Correct.

6    Q.   Let me take you back just briefly to Mr. Wilkowske and the

7    Carpenter photos.  No, strike that.  I'll withdraw that.

8         You testified about some writing on a mirror, "I am

9    watching you," or something to that effect, right?

10   A.   Correct.

11   Q.   All right.  And the writing on the mirror didn't have

12   anything to do with your scientific method and your analysis of

13   the cause of this fire, did it?

14   A.   No, it did not.

15   Q.   Do you know when that writing was discovered?

16   A.   No, I do not.

17   Q.   In proximity to the, the time of the fire?

18   A.   If I'm not mistaken, I believe when they went back out to

19   the scene to take a look, almost it maybe was like December

20   when that writing was there.

21   Q.   All right.  And in respect of that particular incident,

22   someone had obviously come onto the, the fire scene and somehow

23   marked on the mirror and written down that "I am watching you,"

24   or words to that effect, right?

25   A.   Correct.

T. Fayson - Cross                                                          495

1   Q.   So the fire scene was not secured at that time to prevent

2   somebody from trespassing into the fire scene and putting that

3   up on the mirror; is that fair?

4   A.   That is fair.

5   Q.   And I take it it's not the fire department's job to --

6   after the fire is all out and there's no more possibility of

7   flame-ups, it's not the fire department's job to secure the

8   perimeter of the scene of the fire to prevent trespassing; is

9   that right?

10  A.   That's correct.

11  Q.   Now, you testified about a fire in September, right?  Let

12  me withdraw that and ask you a different question.

13          You testified to some extent on direct exam through

14  counsel about a fire, a smaller fire at the house September 29,

15  right?

16  A.   Yes.

17  Q.   All right.  And that would have been 2015, correct?

18  A.   Correct.

19  Q.   And at that time, there was no report to the central

20  station, right?

21  A.   No.

22  Q.   Was there a report to the central station or not, sir?

23  A.   Pardon me?  No, there was no report to the central

24  station.

25          MR. WASSERMAN:  All right.  No further questions.

1   Thank you, Your Honor.

2               THE COURT:  Any redirect?

3               MR. FREED:  Very briefly, if I may, Your Honor.

4                        REDIRECT EXAMINATION

5   BY MR. FREED:

6   Q.   Captain, given what you observed and what you know about

7   the fire scene, were you surprised that the samples came back

8   negative?

9   A.   I can't answer that question because I wasn't involved in

10  the collection of the samples.  I don't know where the samples

11  were collected from as far as where in the debris pile, so I

12  can't really offer an opinion on how they came back.

13  Q.   Sure.  Is it fair to say that if a fire scene is exposed

14  to the weather and if a fire scene is not dug out completely

15  before samples are taken, that that would increase the

16  possibility that samples would be negative?

17  A.   Yes.

18  Q.   You also made a statement, I believe, that you thought it

19  was person or persons who were responsible for causing this

20  fire.

21  A.   Yes.

22  Q.   Do you personally have an opinion as to whether it was one

23  or more?

24  A.   My -- personally, I believe there was more.

25  Q.   Based on what?

T. Fayson - Recross                                               497

1   A.   Based on the, the time with the sensor activations, and it

2   seems that they're going in two separate locations.

3           MR. FREED:  Thank you, Captain.

4           THE COURT:  Any recross?

5           MR. WASSERMAN:  Very briefly, Your Honor.

6                       RECROSS EXAMINATION

7   BY MR. WASSERMAN:

8   Q.   So one of the things that you analyzed was the alarm panel

9   data, right?

10  A.   Yes.

11  Q.   All right.  And Mr. Wilkowske provided that to you?

12  A.   He did.

13  Q.   And what form was it?  Was it electronic or was it paper?

14          MR. FREED:  I am going to object, Your Honor.  This

15  is beyond the scope of redirect.

16          THE COURT:  Unless you're getting into this last

17  point, Mr. Wasserman, there was very limited redirect.  I mean,

18  the only thing that came in new on redirect was this hypothesis

19  there was more than one person.

20          MR. WASSERMAN:  That's what I'm trying to get to.

21          THE COURT:  Okay.  Get right to it then, all right?

22          MR. WASSERMAN:  Yes, ma'am.

23  Q.   Your hypothesis that there was more than one person was

24  based on the data Mr. Wilkowske gave you, right?

25  A.   Yes.

T. Fayson - Recross                                                498

1    Q.    What form was it?

2    A.    I received it, I have both electronic and a printout.

3              MR. WASSERMAN:  Thank you, sir.

4              THE COURT:  All right.  Does anybody expect to call

5    the captain again during the course of the trial?

6              MR. WASSERMAN:  No, ma'am.

7              MR. FREED:  We do not, Your Honor.

8              THE COURT:  All right.  Then, Captain, thank you for

9    your testimony.  You're released as a witness.  You can stay in

10   court and watch the proceedings or leave, but you're not to

11   discuss your testimony or anything you see or hear in court

12   with any witness who has not yet testified, all right?

13             THE WITNESS:  Thank you, Your Honor.

14             MR. FREED:  Thank you, Your Honor.

15                         (Witness excused.)

16             THE COURT:  Now, shall we do the Rattner depo --

17             MR. O'HARA:  May we approach for one minute, please?

18             THE COURT:  Yes.

19             (Bench conference on the record.)

20             THE COURT:  Yes.

21             MR. O'HARA:  It's for purposes of scheduling.

22   Mr. Magnuson is here and ready to testify.  He has -- he lives

23   in Florida.

24             THE COURT:  Is he the one you were going to have come

25   out on Monday?

1          MR. O'HARA:  No, ma'am.

2          THE COURT:  All right.

3          MR. O'HARA:  No.  Mr. Magnuson is here and has a

4    flight back.  We spoke with counsel last night.  We expect that

5    direct examination will be an hour.  We expect that

6    cross-examination will be somewhere between 30 minutes and an

7    hour, and so while --

8          THE COURT:  All right.  Let's put him on now.

9          MR. O'HARA:  Thank you, Judge.

10          THE COURT:  All right.

11          (End of bench conference.)

12          THE COURT:  Ladies and gentlemen, we're going to

13    actually have to call another witness out of sequence.  We're

14    trying to get Rattner -- Mr. Rattner's testimony in only so we

15    can technically complete the plaintiff's case, but sometimes

16    witnesses are from out of town and they -- you know, they need

17    to make flights, etc.  So we're going to call another defense

18    witness.

19          Mr. Magnuson?

20          MR. O'HARA:  Thank you, Your Honor.  On behalf of

21    Chubb, we call Mr. Dave Magnuson.

22          THE COURT:  All right.

23          NOTE:  The witness is duly affirmed.

24          MR. FLUHR:  Your Honor, Phil Fluhr on behalf of Chubb

25    National.  Your Honor, before I begin Mr. Magnuson's testimony,

1    I'd like to move into evidence Defense Exhibit 302, which the

2    parties have stipulated to, and that consists of the AT&T call

3    detail records, and they'll be referred to throughout

4    Mr. Magnuson's testimony.

5            THE COURT:  All right.  Mr. Wasserman, there's no

6    objection to 302?

7            MR. WASSERMAN:  I just want to put eyes on them, Your

8    Honor.

9            THE COURT:  Yeah, I want them, too, so somebody needs

10   to get them up on the bench.

11           Do we have one for the witness?

12           THE COURT SECURITY OFFICER:  Not yet, ma'am.

13           THE COURT:  Not yet?

14           MR. FLUHR:  Your Honor, the exhibit is voluminous, so

15   we have it electronically, and we'll be prepared to show it on

16   the screen for Your Honor's review.

17           THE COURT:  Well, Mr. Wasserman, again, there's no

18   objection to 302?  You said you wanted to put your eyes on it,

19   and I'm told now it's too big to put your eyes on it.

20           MR. WASSERMAN:  Well, it's not that big, Your Honor.

21   I'm afraid to say until I see it, Your Honor.

22           THE COURT:  I don't disagree with you.  Counsel need

23   to have a hard copy ready for the Court.  We told you about

24   that the other day.

25           Is 302 here in a hard copy?

1          Ladies and gentlemen, I hate to have jurors have to

2   just sit here and watch this sort of thing.  I'm going to give

3   you a 15-minute break to try to get this case organized.

4   Fifteen-minute recess.

5              (Recess from 3:20 p.m., until 3:35 p.m.)

6          NOTE:  After the afternoon recess, the case continues

7   in the presence of the jury as follows:

8   JURY IN

9          THE COURT:  Before we get started, ladies and

10  gentlemen, sometimes counsel have to take care of logistical

11  problems with witnesses and exhibits.  So if any of the

12  attorneys have to briefly step out of the courtroom, don't get

13  worried about it.  I know that that could be happening.

14         All right.  Go ahead, sir.

15         MR. FLUHR:  Your Honor, we have conferred with

16  plaintiff's counsel regarding the exhibit, and our

17  understanding is that there is no objection.  We would move

18  that it be entered into evidence.

19         MR. WASSERMAN:  Correct, Your Honor.

20         THE COURT:  All right, that's fine.

21         (Defendant's Exhibit No. 302 was received in

22  evidence.

23         MR. O'HARA:  Thank you, Your Honor.

24         DAVID MAGNUSON, called by counsel for the defendant,

25  first duly affirming, testifies and states:

D. Magnuson - Direct                                                502

1        DIRECT EXAMINATION

2    BY MR. FLUHR:

3    Q.   Sir, would you please state your full name and spell your

4    last name for the record.

5    A.   Yes, sir.  It is David Magnuson.  It's M-a-g-n-u-s-o-n.

6    Q.   And, sir, what is the line of work that you are presently

7    in?

8    A.   I provide consulting services to the legal community and

9    law enforcement community.

10   Q.   And how long have you been working in that consulting

11   capacity?

12   A.   Approximately six months now.

13   Q.   And what did you do prior to six months ago?

14   A.   I was an FBI special agent.

15   Q.   How long were you with the FBI?

16   A.   Over 25 years.

17   Q.   And by FBI, you are --

18            THE COURT:  Coming from New York?

19            THE WITNESS:  Yes, ma'am.

20            THE COURT:  Do I detect a little bit of that New York

21   accent?

22            THE WITNESS:  Thank you, ma'am.

23            THE COURT:  All right.

24            THE WITNESS:  Thank you, Judge.

25   BY MR. FLUHR:

D. Magnuson - Direct                                                      503

1   Q.   Where do you currently reside, sir?

2   A.   Florida.

3   Q.   By the FBI, you are referring to the Federal Bureau of

4   Investigation, correct?

5   A.   Yes, sir.

6   Q.   And with regard to your formal education, what degrees

7   have you obtained, if any?

8   A.   I have an associate's degree in electronic engineering

9   technology from the community college of the Air Force.  And I

10  have a business degree from Columbia College.

11  Q.   And regarding your tenure with the FBI, what was your

12  general duties and responsibilities as a special agent?

13  A.   Well, over the course of 25 years I have investigated

14  matters and cases in a myriad of programs, including organized

15  crime, drug trafficking, money laundering, gangs, public

16  corruption, fraud.

17          Most recently, I was embedded in the violent crimes

18  task force in Miami where we pursued -- investigated bank

19  robberies, armored car robberies, shootings, kidnappings,

20  fugitive matters.

21  Q.   I would like to focus on those latter years in your

22  career.  Now, were you assigned to a particular unit?

23  A.   Yes, most recently I was reassigned to the FBI CAST unit,

24  which stands for the Cellular Analysis Survey Team, and based

25  out of Washington, D.C., but embedded in the violent crimes

D. Magnuson - Direct                                              504

1   task force down in Miami.

2   Q.    What is the mission of the FBI's CAS team?

3   A.    It is a team of FBI special agents who have received

4   training, specialized training, in cellular network technology

5   and how to analyze, interpret the records from the different

6   mobile phone companies.

7   Q.    And you received that specialized training during your

8   tenure as an FBI agent?

9   A.    I did, yes, sir.

10  Q.    And approximately how many hours of formalized training

11  did you receive in that -- in that area?

12  A.    Initially in excess of 300 hours over a two-year period of

13  various courses provided by the FBI, private telecommunications

14  firms, which contract to the government and military for

15  cellular technology and equipment, and other federal agencies,

16  as well as the engineers and legal compliance people from the

17  phone companies themselves.

18  Q.    And in the latter stages of your career before your

19  retirement earlier this year, would you say you were primarily

20  focused on this area of endeavor, historical cell site

21  analysis?

22  A.    Yes.  I was, again, assigned to Washington, D.C. as a

23  national asset.  I am in Miami, but I report to FBI

24  headquarters and I provide this type of service -- we provided

25  this type of service nationwide and internationally, cell site

D. Magnuson - Direct                                              505

1   analysis and such.

2   Q.    Have you conducted cell site analysis in a number of

3   investigations during your tenure with the FBI?

4   A.    Yes, sir, I have.

5   Q.    And can you estimate the total number of investigations

6   that you were involved in?

7   A.    Probably in excess -- hundreds, over a hundred in the past

8   five years, ten years.

9   Q.    And have you provided training to other agents and other

10  law enforcement organizations regarding historical cell site

11  analysis?

12  A.    Yes, sir.  In my capacity as a CAST FBI special agent I've

13  organized and participated as an instructor in various training

14  courses that we developed and we put on for other federal and

15  state and local law enforcement investigators and agents and

16  analysts, who -- and provide them with the tools and the

17  knowledge on how to interpret and analyze historical call

18  detail records.

19  Q.    And has some of the work that you have done or that you

20  did as an FBI Special Agent been subjected to peer review by

21  others in this field?

22  A.    Yes, sir.

23  Q.    And have you been qualified to testify as an expert in

24  cell site analysis in other cases in other jurisdictions?

25  A.    Yes, sir.

D. Magnuson - Direct                                                506

1  Q.    And in approximately how many such cases?

2  A.    Over 50 times.

3           THE COURT:  All right.  Is there any issue about the

4  expert qualifications of this witness, Mr. Wasserman?

5           MR. WASSERMAN:  No, Your Honor.

6           THE COURT:  All right.  Then, again, we will have Mr.

7  Magnuson qualified as an expert in the area of cell tower data

8  analysis.

9           MR. FLUHR:  Thank you, Your Honor.

10 BY MR. FLUHR:

11 Q.    Sir, shortly after your retirement from the FBI earlier

12 this year, were you retained through defense counsel to perform

13 historical cell site analysis in this case?

14 A.    Yes, sir, I was.

15 Q.    And did you ultimately complete historical cell site

16 analysis at Chubb National's request?

17 A.    Yes, sir.

18 Q.    And were you paid by Chubb National for your work in

19 connection with the work that you performed?

20 A.    So far, yes, sir.

21 Q.    And how much were you paid hourly for your work?

22 A.    My fee currently is $250 an hour for a cell site --

23 historical cell site analysis and consultation.

24 Q.    And can you estimate the number of hours that you devoted

25 to the work that you have done in this case?

1  A.   Probably between 50 and 60 hours over a six-month period.

2  Q.   All right.  And can you just generally describe what is

3  historical cell site analysis?

4  A.   Yes, sir.  It's -- all the phone companies maintain

5  records of our cell phone's activities.  These records can be

6  analyzed and it contains information relating to the date and

7  times of our calls, duration of our calls, and also it contains

8  what we refer to as location information, which is the cell

9  tower which the phone connected to at the time it required

10 resources from the network.

11 Q.   And, sir, in connection with your preparations for

12 testifying, did you prepare a couple of brief presentations to

13 help explain how cellular telephone technology works?

14 A.   Yes, sir.  I was able to take the call detail records,

15 reference them against the AT&T tower records, and simply

16 create what I call a mapping solution slide to show graphically

17 where the phone was historically when it made or received a

18 call or a text message.

19 Q.   And before we go into the actual application of that

20 analysis in this case, I would like to ask you to just explain

21 a little bit about how cellular telephone networks work and how

22 the information from those networks is actually memorialized in

23 records of the cellular telephone providers.

24           So, Your Honor, with your permission, I am going to

25 play -- I would like to play a demonstrative aid, which is in

D. Magnuson - Direct                                          508

1   the form of the video for Mr. Magnuson to explain to the jury

2   some of these matters that I believe will be helpful to them.

3              THE COURT:  Have you seen this, Mr. Wasserman?

4              MR. WASSERMAN:  No, Your Honor.  I don't think I

5   have.

6              MR. FLUHR:  It was sent.

7              THE COURT:  Well, we will start it.  If it appears to

8   draw an objection, we will stop it.  So have whoever is running

9   it technologically, make sure that they can hit the button, all

10  right?

11             Was this prepared by Mr. Magnuson?

12             MR. FLUHR:  Yes, Your Honor.

13             THE COURT:  You prepared the video we are about to

14  see?

15             THE WITNESS:  Yes, sir.

16             THE COURT:  All right.  Let's see how it goes.

17  BY MR. FLUHR:

18  Q.   Okay.  Mr. Magnuson, would you please explain how cellular

19  telephone networks work.

20  A.   Yes, sir.  Our phones have antennas in them.  And our cell

21  phones have two antennas so we communicate with a cell tower

22  antenna and we can talk and listen at the same time.

23             The cell tower also has transmitting and receiving

24  antennas so they can communicate at the same time up and down

25  link.

1           This particular video is provided for just general

2    overview of a cellular network and how the infrastructure is

3    supported in the community.  In our community that we see here,

4    we see some bodies of water, seashore, and a little town.  And

5    you also see some residences.  You see some cell towers.  And

6    this is typical, we see cell towers all over our community.

7           THE COURT:  You can touch that screen if it is set up

8    correctly and annotate if you want to.

9           Is it working?

10          THE WITNESS:  No.

11          THE COURT:  No?  All right.  Well --

12          THE WITNESS:  So components of a cellular network.

13   We have the handset, the smart handset.  We have cell tower

14   antennas, which is the interface between the handset and the

15   network and the rest of the world.  And the cell tower antenna

16   routes the data from the handset through cables, fiberoptic

17   cables or microwave transmission to what's called a switching

18   center.

19          A switching center is nothing more than a fortified

20   facility which the mobile phone companies construct and it

21   houses their super computers which manage all the activities of

22   their subscribers.

23          Also, one of the products that we can obtain from the

24   phone companies, among others, is what is called a call detail

25   record.  It is simply a printout of our database, of our phone,

D. Magnuson - Direct                                              510

1    a particular phone, with all the details and the historical

2    dates and times.  And it memorializes everything that we do on

3    our phone.

4              So let's take a look at the handset.  We all know

5    these handsets are computer -- handheld computers now.  And we

6    use them to do voice calls, SMS, short message service or text,

7    as well as data sessions.  We can surf the Internet now.

8              And how do we communicate with the rest of the world?

9    Initially, we communicate via wireless technology from the

10   handset to typically the nearest cell tower and the antenna on

11   that cell tower.

12             Now, if we take a look at a cell tower, we will find

13   out that the typical cell tower has a area of responsibility to

14   provide cell service of 360 degrees around it.  But since the

15   antennas on cell towers propagate radio frequency energy in one

16   direction like a nozzle, they carve it up into three sectors,

17   three sectors of 120 degrees.  120 times 3 is 360.  That's why

18   each cell tower has got a footprint that is similar to this, a

19   circle.

20             And when you communicate with the cell tower, it in

21   turn has -- at the bottom of each cell tower has cables

22   communicating with the switching center, which does what?  It

23   routes our calls, our texts.  It interfaces us with the

24   Internet and other applications.  That's where all the good

25   stuff happens.

D. Magnuson - Direct                                            511

1            It also documents and memorializes all the activity

2   on our phone for going back some time, several years in some

3   cases.

4            So the ultimate product out of that, which we can

5   obtain, is the call detail record.  And when we look at that,

6   what is that?  It's a simple database printout of our phone's

7   activity in English.

8            And if we look from left to right, if you look at --

9   I'm sorry.  If you look at the top, it is mobility usage, the

10  usage of our phone or a phone, with cell location.

11           As we move from left to right in this spreadsheet, we

12  will see different columns with different titles on them,

13  communication, the date of the call, the time, the type,

14  whether it was SMS, data, or voice, the length, the originating

15  number, the terminating number, all the details.

16           Additionally, on the far right we have what we call

17  the location information.  It's the cell tower and the antenna

18  which the phone connected to when it obtained resources from

19  the network.

20           Similar very much to a credit card statement we get

21  every month which lists all our credit card activities, you

22  could actually do a historical geolocation for the past 30 days

23  on your credit card statement.  I was at -- Monday I was at

24  WalMart.  Tuesday I was at Macy's.  Wednesday I was at

25  McDonald's.  You can look at your credit card and similarly

D. Magnuson - Direct                                          512

1   with these records, it's showing us historical activity, which

2   can be regenerated and looked at and discovered where a phone

3   was historically.

4   BY MR. FLUHR:

5   Q.   Okay.  And, Mr. Magnuson, does this technology, after the

6   fact, allow individuals who are conducting the analysis that

7   you have described to do tracking of a cell phone's location?

8   A.   Yes, sir.  In essence, it is tracking.  It's historical

9   tracking based on historical information, but there is enough

10  information provided by the phone company, i.e., their call

11  detail record and their tower lists, where we can actually go

12  back and map out where the phone was geographically.

13  Q.   Now, I'm going to display on the screen -- it is going to

14  continue with additional video footage showing the tracking

15  activity of a cell phone.

16          Would you describe how that works for the jury.

17  A.   Yes, sir.  So you're in your house.  You have your phone

18  on.  It's in idle mode.  You're not making any calls or

19  anything, but your phone is constantly scanning the environment

20  for the best signal.  And if you make an outgoing call, it is

21  going to connect to the nearest cell tower.  That cell tower is

22  going to report to the switching center.  The switching center,

23  the computer is going to populate the call detail record with

24  the information that it just received, the antenna used, the

25  phone's identity, and the date and time duration and the

D. Magnuson - Direct                                                513

1    location.

2         So as we move through the community, going to

3    different spots in our community here, making phone calls, you

4    are connecting to different towers.  They light up, they

5    communicate with the switching center, boom, they memorialize

6    everything that the phone is doing.

7         If the phone decides -- or the person using the phone

8    travels a short distance or a great distance, it is connecting

9    to towers throughout the United States.  All the phone

10   companies have thousands and thousands of cell towers posted

11   throughout the United States.  And as you come into a cell

12   tower which has a stronger or better signal, you are leaving

13   one that as your distance goes, that radio frequency energy is

14   getting weaker and you're coming into a stronger one, and there

15   is a hand-off.  It's seamless and transparent to us, but we can

16   drive down 95 for 50 miles and be handed off to 20 different

17   towers and we wouldn't even know it.  That's how they handle

18   the streaming seamless service.

19        And it's all -- we can reconstruct this historically

20   by looking at the call detail record and reading and analyzing,

21   interpreting, and then creating a map.

22   Q.   And, sir, just to follow up on a couple points that you

23   raise in your presentation, what factors determine which cell

24   tower the handset or the telephone will actually connect to?

25   A.   Our phones are constantly scanning the environment for the

D. Magnuson - Direct                                                514

1  strongest and cleanest signal.  And that's in its number one.

2  It also has a neighbor's list.  So it's constantly what they

3  call stacking and racking.  Similar to if you look at a WiFi

4  and you see -- if you are in your house and you see your WiFi

5  signal, yours is typically the strongest.  Your neighbor might

6  have five bars.  Your neighbors on each side might have four

7  and four.

8           But the phone is constantly looking for the

9  strongest, cleanest signal and it knows it's going -- where it

10 is going to go to when you hit send, and it will select

11 typically the closest tower and which antenna is facing it.

12 Q.   Mr. Magnuson, can you -- are you familiar with the Do Not

13 Disturb features on cell phones?

14 A.   I am, yes, sir.

15 Q.   And if a user places their phone on Do Not Disturb mode,

16 does that mean that the phone cannot communicate with the

17 cellular network that you have just described?

18 A.   No, sir.  That is similar to turning a ringer off.  The

19 phone is still receiving the information.

20 Q.   And still communicating with the nearest cell tower with

21 the strongest and cleanest signal?

22 A.   Typically, yes.  And the Do Not Disturb function allows

23 you to filter out -- allows some calls that you want to come

24 through and will block out other calls that you do not want.

25 So it gives you a little more functionality than just turning

D. Magnuson - Direct                                        515

1   off the entire ringer.

2   Q.   With regard to the major cellular telephone providers, are

3   you familiar with the call detail records from all of them?

4   A.   Yes, I am.

5   Q.   And what are some of the major cellular telephone

6   providers in the United States?

7   A.   Sprint, AT&T, T-Mobile, Verizon, the big four.  And they

8   purchased -- T-Mobile purchased MetroPCS recently, and I

9   believe AT&T purchased U.S. Cellular.  So, yeah.

10  Q.   And which one of those cellular telephone service

11  providers is at issue in this case?

12  A.   That would be AT&T.

13  Q.   Now, with regard to AT&T and the way that it catalogs its

14  call detail records, does it divide out in the records the

15  different types of communications, SMS or short message service

16  texts, voice, and data sessions?

17  A.   Yes.  The way AT&T develops and issues their call detail

18  records, the format that they have chosen to use, for example,

19  in this case it is six months worth of records from August 2015

20  through, I believe, February 2016.  So they will give you a

21  digital file or a large printout.  And all the data

22  memorialized will be in chronological order, date and time.

23          So they break it up into sections.  The first

24  section, August through February, is voice.  Then there is

25  another section, August through February, is SMS.  And then

D. Magnuson - Direct                                               516

1   another section is the data sessions, August through February.

2   So it just runs like that.

3          Other providers, they will actually intersperse SMS

4   with voice calls chronologically in the same format.  AT&T just

5   breaks it out.

6   Q.   And for AT&T call detail records -- or actually let me

7   rephrase that.

8          With regard to call detail records for data

9   connections, what causes an entry in the call detail records to

10  be made?

11  A.   Connection with the network.  The network populates the

12  antenna in the cell tower which the phone is connected to.

13  Q.   And those connections to the network can occur through a

14  voluntary action of the user, such as opening a browser, or an

15  involuntary action where there is connect -- there is just

16  contact with the network?

17  A.   That's correct, yes.  The phone could receive an

18  unsolicited update or request or something that you requested

19  through an app to update you on weather or time or something.

20  Q.   And when a user is not doing any of those voluntary

21  actions, such as opening a browser, for AT&T approximately how

22  often will there be a communication between the cellular

23  network and the device?

24  A.   I'm sorry, could you repeat that?

25  Q.   When someone is not actually doing anything with their

D. Magnuson - Direct                                          517

1   phone, it's on and it's able to communicate with the cellular

2   network, how often will there be communication between that

3   device and the cellular network?

4   A.   AT&T, pretty much every hour or so.  If your phone is on,

5   it's in idle mode, you are not using, you are not receiving,

6   you are not sending any texts or voice, you are not browsing,

7   your phone is on, the phone will interrogate your -- the AT&T

8   network computer will interrogate your phone every 60 minutes

9   for a location update and a data update.  Because we are all on

10  data plans, so they are constantly monitoring how much you are

11  using.

12          In fact, just today or yesterday I received a message

13  that I am down to 10 percent, but I fall over tomorrow to my

14  next 30 days.  But they do this to manage -- you know, manage

15  your account for you.

16  Q.   And that's occurring whether or not the user is doing

17  anything?

18  A.   Yes.

19  Q.   Sir, in your experience with AT&T call detail records, are

20  there instances for data connections that indicate that the

21  cell phone in question communicated with a cell phone or a cell

22  phone tower that was not the nearest cell phone tower to the

23  device in question?

24  A.   Yes.

25  Q.   And in these instances, are the cell phone towers that are

D. Magnuson - Direct                                           518

1  listed in the call detail records sometimes a considerable

2  distance away from where the cell phone is known or suspected

3  to be?

4  A.   Yes.  I have seen on occasion, rare occasion, when the

5  phone is typically operating multimodal, meaning you are doing

6  a lot -- it's during the day.  The network is busy.  You are

7  texting.  You are making voice calls.  You are browsing.  You

8  are in a multimode.  And every once in a while, the network

9  will populate a tower that is some distance from where the

10 phone really is.

11 Q.   And do those kinds of instances occur when the phone is

12 not being used in multimodal -- for multimodal purposes?

13 A.   No.  I have never seen it operate in -- when it is just

14 idle.  Only when it's -- the phone is busy, the network is

15 busy.  And for some reason in the millions of lines of software

16 that AT&T has for the phones, there is a function that says if

17 this happens, then populate this tower.  So --

18 Q.   Are there ways to scrutinize call detail records to filter

19 or except out some of those occurrences?

20 A.   Yes.  There is a way to remedy that and filter that out

21 and render that -- it's useless in cell site analysis.

22 Q.   Is that because if it is in multimodal use, you can look

23 to the companion records for voice or SMS to determine the

24 location information?

25 A.   Yes, sir.  That's exactly what I have done many times, is

1    I am comparing the voice activity, the text activity, and the

2    data activity, and ensuring that they all line up and I know

3    where the phone is before -- in cases I would send out search

4    and rescue or law enforcement, we'll plan an operation, yes.

5    Q.    So, sir, in your experience and training, how frequently

6    do these one-off scenarios tend to happen?

7    A.    They happen, but they are rare.  And when you know how to

8    filter it, if you understand the technique and the technology,

9    then you understand it and you can render it pointless.  It

10   doesn't affect anything.  It doesn't affect the accuracy of the

11   records all.

12   Q.    So it's your opinion that there is not any reason to be

13   concerned with the reliability of using AT&T call detail

14   records for historical cell site analysis?

15   A.    Absolutely not.

16   Q.    Now, sir, let's turn now our attention to the analysis

17   that you performed in this case.

18              Were you provided with the AT&T call detail records

19   for a cellular telephone account of interest in this case?

20   A.    I was, yes, sir.

21   Q.    And what was the telephone number associated with that

22   cellular telephone account?

23   A.    The number is area code 703-220-8220.

24   Q.    And, sir, what is your understanding as to who the

25   subscriber was for that cellular telephone account in the

D. Magnuson - Direct                                              520

1  November 2015 time frame?

2  A.   I understand it was subscribed to one Susan Rattner.

3  Q.   And what records did you review in conducting your

4  historical cell site analysis in this case?

5  A.   Well, I reviewed the call detail records, which was

6  provided to me.  I reviewed the associated cell tower listing,

7  which I need to compare to, look up to, and other summaries

8  which were provided to me.

9  Q.   And was one of the other items of information that you

10 received a report that was prepared by another consultant

11 regarding cellular signal measurements that were done through a

12 drive test?

13 A.   Yes, sir.  Yes, sir.

14 Q.   And what was your understanding as to the results of

15 that --

16         THE COURT:  Why don't you explain to the jury, if you

17 know, what a drive test is.

18         MR. FLUHR:  Yes, Your Honor.

19         MR. WASSERMAN:  Well, Your Honor, if I may.  I

20 object.  The drive test was actually the work of the other

21 expert, Mr. Baxter.

22         THE COURT:  I understand.  I just want the jury to

23 know what is a drive test.  All right.  Do you know what a

24 drive test is?

25         THE WITNESS:  Yes, ma'am.

D. Magnuson - Direct                                           521

1              THE COURT:  Have you ever done a drive test?

2              THE WITNESS:  Yes, Your Honor.

3              THE COURT:  Explain generically to the jury, what is

4    a drive test?

5              THE WITNESS:  Yes, Your Honor.  A drive test is

6    something that the network operators utilize.  It is taking a

7    scanner type of equipment or it could be equipment unique to

8    their company, and they put it in a car and they drive every

9    street in a neighborhood or a community, never ending, and they

10   are collecting all the radio frequency signals for that

11   company.

12             Then they take all those results back and they

13   perform what is called an interpolation.  And they are able to

14   overlay on a map the actual service coverage area provided by

15   cell tower antennas.  And it gives us an indication of seamless

16   service throughout.

17             In this particular case, I did review that -- those

18   drive test results.  And it indicated to me that clearly there

19   was --

20             MR. WASSERMAN:  Objection, Your Honor.

21             THE COURT:  That's beyond what I just asked you.

22   Thank you.

23             MR. FLUHR:  Thank you, Your Honor.

24             THE COURT:  Although, just so we don't have a whole

25   bunch of objections, an expert can testify as to the basis upon

D. Magnuson - Direct                                                        522

1  which he forms a conclusion.  So if an expert looks at a

2  different expert's report, it doesn't mean that that report is

3  necessarily accurate, but it is one of the building blocks that

4  the expert uses to develop his opinion.

5            So let's move this along.

6            MR. FLUHR:  Yes, Your Honor.

7  BY MR. FLUHR:

8  Q.   Mr. Magnuson, what did the drive test show in this case

9  that you reviewed?

10 A.   Well, I recall there was two preferred routes from Bethany

11 Beach, Delaware, to the McLean, Virginia, and Great Falls area

12 in Virginia.  And it just showed clearly along those routes,

13 east/west routes, that the cell service was available.

14           MR. FLUHR:  Okay.  Your Honor, with the Court's

15 permission, I would like to show an additional presentation as

16 a demonstrative aid to assist Mr. Magnuson's presentation.

17           THE COURT:  Again, was this presented to plaintiff's

18 counsel?

19           MR. FLUHR:  Yes, it was, Your Honor.

20           MR. WASSERMAN:  Well, Your Honor, my understanding is

21 it came sometime late last night and --

22           THE COURT:  Did it go late --

23           MR. WASSERMAN:  I do try to sleep during the trial.

24           THE COURT:  When did you send it over to plaintiff's

25 counsel?

D. Magnuson - Direct                                                    523

1           MR. FLUHR:  That is my understanding, Your Honor.  It

2    went last evening.

3           THE COURT:  What time last evening?

4           MR. FLUHR:  I believe it was late in the evening,

5    Your Honor.

6           THE COURT:  Well, you know, the rules are you all are

7    supposed to file your trial exhibits actually weeks before

8    trial.  That's not fair.  So I am going to sustain that

9    objection.

10          The witness can testify as to what he has to say.

11   And I would assume you have other exhibits that were filed in

12   this very large volume, but that's too late.

13          MR. FLUHR:  Your Honor, I will just point out for the

14   record, it's not -- it's a demonstrative aid, it's not --

15          THE COURT:  I still expect counsel to be more

16   courteous to one another and not to be filing things late at

17   night on a -- not right in the middle of trial.

18          MR. FLUHR:  Thank you, Your Honor.

19   BY MR. FLUHR:

20   Q.   Mr. Magnuson, with regard to the cellular -- historical

21   cell site analysis you performed for the subject device, did

22   you scrutinize any particular time frames of interest in this

23   matter?

24   A.   Yes, sir, I did.

25   Q.   What were those time frames?

D. Magnuson - Direct                                              524

1  A.    It was Sunday, November 15, 2015, evening into

2  November 16, early morning, 2015.

3  Q.    And with regard to activity of the device on that evening,

4  did you consult the call detail records from AT&T that you

5  discussed earlier?

6  A.    Yes, sir.

7  Q.    And what did the call detail records show regarding the

8  activity of the phone on the evening of November 15, 2015?

9  A.    It reflected that at 8:18 p.m. on the evening of

10  November 15, the phone was in Bethany Beach, Delaware.  And

11  then sometime after that it traveled north and then west and

12  then to -- connecting to cell towers in what's known as the

13  Tysons Corner community.

14         And then it returned to Bethany Beach via the same

15  route, connecting to cell towers both ways round trip, and then

16  coming to rest back in Bethany Beach, Delaware, home tower at

17  3:06 a.m.

18  Q.    With regard to the time frame, when approximately did the

19  device, according to the call detail records, arrive in the

20  Tysons Corner area?

21  A.    10:50 -- the first connection to the network was at 10:58

22  p.m. on November 15, 2015.

23  Q.    And according to the call detail records, did it appear

24  that the device remained in that area for a period of time?

25  A.    Yes.  There was a subsequent hit at 11:58 p.m. that

D. Magnuson - Direct                                                    525

1    evening, where it's connected to the exact same tower as an

2    hour previous, Tysons Corner.

3              MR. FLUHR:  Your Honor, with the Court's permission,

4    I would like to publish Exhibit 378, which is already in

5    evidence.

6              THE COURT:  All right.

7    BY MR. FLUHR:

8    Q.   Mr. Magnuson, do you see the exhibit displayed on the

9    screen next to you?

10   A.   Yes, sir.

11   Q.   And there is an address highlighted at the top of that

12   document.  Can you state what that is?

13   A.   Yes, sir.  It's 8251 Greensboro Drive in McLean, Virginia,

14   22102.

15   Q.   As part of the analysis that you did in this case, did you

16   compare that address location to the location of the cell phone

17   towers that the device was at between 10:58 and 11:58 on

18   November 15, 2015?

19   A.   I did, yes, sir.

20   Q.   What is the approximate proximity between those locations?

21   A.   I found that at 10:58 and 11:58 on November 15, 2015, this

22   phone connected to a cell tower approximately a half mile south

23   of this address, of Enterprise address.

24   Q.   Did you also -- and there is also a date and time out and

25   a date and time in reflected on Chubb -- or Defense Exhibit 378

1   on November 14 and November 17.

2           Did you review the call detail records to determine

3   where the device was located at those approximate times?

4   A.   I did.  And I found that at the checkout time and the time

5   in, that this phone connected to cell towers in close proximity

6   to the Enterprise address, approximately three-quarters of a

7   mile, I think, on this.

8   Q.   Mr. Magnuson, you stated earlier that the device appeared

9   to return from Tysons Corner back to Bethany Beach.

10          Can you describe the approximate timeline of that

11  movement?

12  A.   Yes, I believe there was a -- after the 11:58 connection,

13  there was a connection at 12:58 a.m. early morning November 16,

14  2015, at 12:58, I believe.  Then there was one at 1:58 as the

15  phone is traveling east and then south down to Bethany Beach.

16  Q.   Approximately what time did the device appear to return to

17  the Bethany Beach, Delaware, area?

18  A.   Approximately 3:06 a.m.

19  Q.   Now, Mr. Magnuson, for the call detail records for that --

20  those events, that cell phone activity, what type of

21  communications were involved in those call detail records?  And

22  again, by that I mean voice, text, or data?

23  A.   These were data connections that evening, yes, sir.

24  Q.   Now, with regard to these, you know, what we have called

25  sort of one-offs, one-off records, were there any of those

D. Magnuson - Direct                                                    527

1  kinds of one-offs in the records that you reviewed for the cell

2  phone activity on the 15th and into the early morning of the

3  16th of November 2015?

4  A.    No, sir.

5  Q.    Did you perform similar historical cell site analysis for

6  the activity of the -- of the subject device subscribed to

7  Dr. Rattner for November 14, 2015?

8  A.    I did, yes.

9  Q.    What did that show?

10  A.    I found that the phone was originally connecting to a cell

11  tower in the Great Falls community, close by the Great Falls

12  residence, and that the phone traveled west -- I'm sorry --

13  east and then south to Bethany Beach on that Saturday, yes,

14  sir.

15  Q.    And the nature of the call detail records that allowed you

16  to plot that travel, what -- what kind of records in the call

17  detail records were those?

18  A.    That was data activity, yes, sir.

19  Q.    Did you also perform historical cell site analysis for the

20  activity of the device subscribed to Dr. Rattner for the

21  morning -- later morning hours of November 16, 2015?

22  A.    I did, yes, sir.

23  Q.    And did you -- what did you conclude?

24  A.    I saw a similar pattern of activity, of cell site

25  activity, on the morning of November 16, early morning, when

D. Magnuson - Direct                                          528

1   the phone traveled from Bethany Beach, Delaware, to the Great

2   Falls vicinity.

3   Q.   Mr. Magnuson, as a result of the historical cell site

4   analysis that you performed in this matter, did you form an

5   opinion as to the whereabouts of Dr. Rattner's cellular

6   telephone during the late hours of November 15, 2016, into the

7   early morning hours of November 16, 2015?

8   A.   I did --

9            COURT REPORTER:  I am sorry, counsel, would you

10  repeat that, please.

11           MR. FLUHR:  Yes, sir.

12  BY MR. FLUHR:

13  Q.   Mr. Magnuson, as a result of the analysis that you

14  performed and the records you reviewed, did you form an opinion

15  as to the whereabouts of Dr. Rattner's cellular telephone

16  during the late hours of November 15, 2015, into the early

17  morning hours of November 16, 2015?

18           MR. WASSERMAN:  Objection, Your Honor, asked and

19  answered.

20           THE COURT:  Well, I don't think so.  My court

21  reporter needed it redone.  Go ahead.  You can answer the

22  question.

23  A.   I did, yes, sir.

24  BY MR. FLUHR:

25  Q.   And what is your opinion as to where the device in

D. Magnuson - Cross                                           529

1   question was located during that time frame?

2   A.   Well, clearly the records reflect that this phone did a

3   round trip from Bethany Beach to Tysons Corner and returned on

4   that evening.

5   Q.   And in your opinion, is it possible that the subject

6   telephone remained stationary in Bethany Beach during that time

7   frame?

8   A.   No.

9   Q.   And, sir, do you hold these opinions to a reasonable

10  degree of certainty in the field of historical cell site

11  analysis?

12  A.   I do.

13          MR. FLUHR:  One moment, Your Honor.

14          THE COURT:  Go ahead.

15          MR. FLUHR:  No further questions at this time, Your

16  Honor.

17          THE COURT:  All right, Mr. Wasserman.

18      CROSS-EXAMINATION

19  BY MR. WASSERMAN:

20  Q.   Good afternoon, sir.

21  A.   Good afternoon, sir.

22  Q.   As you might have guessed, I represent Dr. Rattner.

23  A.   Yes, sir, thank you.

24  Q.   Mr. Magnuson, firstly, have you ever heard of something

25  called NELOS, N-E-L-O-S?

1  A.   NELOS, yes, sir.

2  Q.   NELOS, what is NELOS?

3  A.   It's a product of the switch center where the network

4  computer is analyzing active signals for signal strength,

5  signal clarity and such.

6  Q.   It's based on GPS, right?

7  A.   No.

8  Q.   What's it based on, sir?

9  A.   It is based on round trip timing.

10  Q.   Round trip timing of what, sir?

11  A.   Timing advance of the network to have the phone

12  communicate with the antenna without hitting other subscribers

13  or interfering with other subscribers.

14  Q.   Was any NELOS data made available to you in connection

15  with Dr. Rattner's phone?

16  A.   I do not recall seeing any.

17  Q.   Now, sir, I am going to ask you a few questions about your

18  career.  Firstly, I think you have an associate's degree in

19  electrical engineering technology.  Did I get that right?

20  A.   Electronic engineering technology, yes, sir.

21  Q.   What is that, sir?

22  A.   It is a two-year associate's degree in applied science in

23  electronics.

24  Q.   All right.  And it looks like you got that, that degree,

25  when you and I were a little younger; is that right?

D. Magnuson - Cross                                                    531

1    A.    Yes, sir.

2    Q.    When did you get that degree, sir?

3    A.    '80, '81.

4    Q.    All right.  And then if memory serves, you got another

5    degree later in life; is that right?

6    A.    Yes, sir.  1988, bachelor's degree in business.

7    Q.    And it looks like you were in school while you were

8    working for -- or in the military, am I right, when you were

9    young?

10   A.    I served in the U.S. Air Force.  I worked for the

11   Department of the Navy, Department of the Army, DoD, FBI.

12   Q.    Well, if I am understanding your credentials, sir, in

13   approximately 1985 or '86 you left the Department of the Army

14   and went with Martin Marietta, right?

15   A.    Correct, yes, sir.

16   Q.    And from there you went to -- well, let me backup.

17         When you were employed -- well, when you were in the

18   Air Force and up to the time you were with the Department of

19   the Navy and then the Department of the Army, you weren't

20   working on cell phones, were you?

21   A.    No, sir.

22   Q.    All right.  And you then went from the Department of the

23   Army to Martin Marietta, correct?

24   A.    Department of the Army to Department of the Navy and then

25   to Martin Marietta, Missile Systems Group.

1   Q.   All right.  And when you were at Martin Marietta in

2   approximately 1984, 1985, you were using -- or working in

3   connection with test equipment for missile systems and

4   monitored defense contracts, am I right?

5   A.   Yes, sir.

6   Q.   Didn't have anything to do with cell phones then, right?

7   A.   No, sir.

8   Q.   You then went to something in -- have I got this right,

9   you went to the FBI in roughly 1992?

10  A.   Correct, yes, sir.

11  Q.   And at the beginning of your career, you didn't work on

12  cell phones at all, did you?

13  A.   I don't think anybody did.

14  Q.   Right.  When did you start with the FBI, sir?

15  A.   I just started February 1992.

16  Q.   All right.  And am I right, sir, based on your resumé,

17  that roughly October 2009 you started working with cell phones?

18  A.   Actually, in more of a CAS type capacity, more -- prior to

19  that I would work with phones, hard lines and mobile phones,

20  individually on individual cases, but I wasn't supporting other

21  cases.

22  Q.   How long have you been do this historical location of cell

23  phones?

24  A.   Yes, sir.  Ten years.

25  Q.   So you started with the FBI, right?

D. Magnuson - Cross                                                    533

1    A.    Yes, sir.

2    Q.    All right.  And are you saying you started roughly in

3    2007?

4    A.    Yes, sir.

5    Q.    And if I understand your resumé, you never were employed

6    by AT&T, the provider of the records in this case; is that

7    correct?

8    A.    Yes, sir.

9    Q.    Let me ask you a real basic question about how you do your

10   job in connection with opining on the location of a cell phone

11   with AT&T records.

12            I want to be sure I have it right and the jury

13   understands it.  You take a cell phone record, you had a couple

14   of the AT&T records up in your short video, you take the data,

15   and there is an item number on the left-hand column for a

16   particular data connection.  And then you work across the page

17   and there is some other information there.  Some of that

18   information is latitude and longitude for a particular data

19   connection, right?

20   A.    Yes, for a particular cell tower, yes.

21   Q.    And there is a time, right, and that time is in GMT,

22   correct?

23   A.    Yes, sir.

24   Q.    All right.

25            THE COURT:  Now, maybe some of the jurors know what a

D. Magnuson - Cross                                              534

1    GMT is.

2              MR. WASSERMAN:  Beg your pardon, Your Honor.

3    Greenwich Mean Time.

4              THE COURT:  Correct.

5    BY MR. WASSERMAN:

6    Q.   So the cell phones records -- am I correct Greenwich Mean

7    Time is the time for the data connection on the AT&T reports?

8    A.   Yes.  It is also referred as UTC or UCT, uniform time.

9              THE COURT:  It's not, however, 4:30?  I'm looking at

10   our clock right now.

11   BY MR. WASSERMAN:

12   Q.   4:30 is military time, is it not, sir?  In other words, it

13   is a 24-hour clock?

14   A.   GMT?

15   Q.   In UCT.

16   A.   Yes.

17   Q.   Okay.  So to figure out what time in the location of the

18   phone in question for the particular data connection, you need

19   to convert the time firstly from UCT time or Greenwich Mean

20   Time and then do a further correction for local time, correct?

21   A.   No.  The conversion is just UTC to East Coast time.

22   Q.   Okay.

23   A.   And then it could be either in standard time format or

24   military time format.  I think that's what you were asking.

25   Q.   All right.  Well, which format is it in the records in

D. Magnuson - Cross                                                    535

1  this case?

2  A.    The records are, I believe, in military time.

3  Q.    So that means a 24-hour clock?

4  A.    24-hour clock, yes, sir.

5  Q.    All right.  So what you would do -- what you did in this

6  case was you took the AT&T records, you converted from

7  Greenwich Mean Time, if we can use that label, to local time --

8  A.    Yes, sir.

9  Q.    -- and you correct it for military time to get the time of

10  the cell tower connection, right?

11  A.    Yes.

12  Q.    All right.  And then you went over to the lat and

13  longitude and you looked at that data, correct?

14  A.    Yes, sir.

15  Q.    And then you went to software to actually find out what --

16  where on the map the latitude and the longitude was for the

17  call?

18  A.    Correct.

19  Q.    All right.  And did you use GoogleEarth to do your

20  latitude and longitude?  What did you do?

21  A.    I used a mapping program off the shelf called MapPoint.

22  It's like MapQuest with a few more functionality buttons on it.

23  Q.    All right.  And so boiled down, that's what you did,

24  nothing more, nothing less.  You took the AT&T data, you did

25  your correction for GMT to local time and military time for a

D. Magnuson - Cross                                              536

1  particular data connection, and you then went over to latitude

2  and longitude, used your software to find out where that cell

3  tower was for that particular connection?

4  A.   Correct, that's how it's done.

5  Q.   All right.  So it might take you for one entry in this

6  sort of process, if you will, what, less than a minute to find

7  the location?

8  A.   No.

9  Q.   Longer?

10  A.   Longer.

11  Q.   How long?

12  A.   It depends what set, what is going on there.

13  Q.   In this case, using the AT&T records that you used, how

14  long did it take you, just on the average, to give the jury an

15  idea, of how long it took you from the time you looked at a

16  particular data connection on the AT&T call detail record to

17  when you plotted it?

18  A.   To go from the raw data to a finished mapping product for

19  one item is probably at least two hours of time.

20  Q.   For one entry?

21  A.   Yes, sir.

22  Q.   For one location on the map?

23  A.   Yes.

24  Q.   All right.  So for the -- what you called, I think, the

25  round trip that you say Dr. Rattner's phone made on the night

D. Magnuson - Cross                                                537

1   of November 15 with a return trip on the 16th, how long did it

2   take you to do that work?

3   A.   I was tasked with analyzing several days of activity.  So

4   I didn't break it down to it took me 12 hours to do this and 18

5   to do this and then 20 to review everything.  I couldn't tell

6   you with that particular event, the night of the 15th, how long

7   that took me because I had other issues and other documentation

8   to review.  So --

9   Q.   You were looking at other things?

10  A.   Documents provided by -- yes, sir.

11  Q.   So you can't give the jury any estimate for how long it

12  took you to plot the points that you used to base your opinion

13  on that the phone traveled this route from Bethany Beach to

14  Tysons and back to Bethany Beach; is that right?

15  A.   That's right.  I think you are asking a compound question.

16  Can I type in -- can I take one minute and type in a latitude

17  and longitude on a map and hit go and it will go send a

18  pinpoint to that and I know that's where the tower is?  Yes.

19           But to create a professional mapping solution slide,

20  with correct activity and other information, addresses, takes

21  some time.

22  Q.   Well, we don't have any mapping solution slides.  I am

23  just talking about the information.

24           Is it your testimony that you didn't just get the

25  information so you could see the different points, but rather

D. Magnuson - Cross                                                        538

1   you actually were creating a map at the same time using some

2   other software?

3   A.   Yes, sir.  I have taken the raw call detail records from

4   AT&T, which lists all the call activity, and I have to review

5   that, convert the time, create a whole report, a format, and

6   check it, and, you know, prepare it.

7   Q.   All right.  Well, let me ask you this.  Can we agree that

8   the source document for your work is the AT&T call detail

9   record?

10  A.   Yes, sir.

11  Q.   All right.  Every bit of data that you relied on in

12  connection with your opinions that Dr. Rattner's cell phone

13  actually moved and traveled, as I believe you called it, from

14  Bethany Beach to Tysons, Virginia, and then back to Bethany

15  Beach, every bit of that data came out of the AT&T call detail

16  records, right?

17  A.   Yes, sir.

18  Q.   And you got them from one of the lawyers in the case,

19  correct?

20  A.   Correct, yes, sir.

21  Q.   So you assumed, did you not, sir, that all the data in the

22  AT&T call detail records was accurate?  Right?

23  A.   I analyzed the records.  I know they are accurate, yes,

24  sir.

25  Q.   You assumed they were accurate, right?

D. Magnuson - Cross                                                    539

1    A.    Yes.

2    Q.    You didn't do anything independently to go back to AT&T to

3    find out if those records were accurate, did you?

4    A.    I didn't have to.

5    Q.    You didn't do it, did you, sir?

6    A.    No, I didn't do it.

7    Q.    Now, I think I remember from your introductory video that,

8    at least in the AT&T case, there are three types of connections

9    between a phone and a tower.  Firstly, there would be a

10   connection resulting from a telephone call; secondly, texting

11   or SMS --

12   A.    Yes, sir.

13   Q.    -- and, thirdly, data.  Am I right about that?

14   A.    Yes, sir.

15   Q.    All right.  And in this case, in the case of your opinions

16   related to Dr. Rattner's phone and your testimony that the

17   phone traveled on the night of the 15th and the early morning

18   of the 16th, every single one of the connections that you use

19   for your opinions were data connections, correct?

20   A.    Correct.  Right from the call detail record.

21   Q.    So there is not one telephone call during this period when

22   the phone you say was traveling, correct?

23   A.    Correct.

24   Q.    Nor is there one text or SMS message that generated a

25   connection to a cell tower during this period when you said the

D. Magnuson - Cross                                            540

1    phone was traveling from Bethany to Tysons and back to Bethany?

2    A.   Correct.

3    Q.   So you assumed that the data connections upon which you

4    based your opinions that the phone traveled were accurate and

5    reliable; is that fair?

6    A.   They are, yes.

7    Q.   Now, let me take you back to the time when you were at the

8    FBI.  You were doing this type of work at the FBI, right?

9    A.   Yes, sir.

10   Q.   Isn't it true that in your career at the FBI when you were

11   doing this type of work, that is, locating cell phones in

12   various cases the FBI was involved in, that you never testified

13   in court as to the location of a cell phone based upon a data

14   connection?

15   A.   I wouldn't say that.  Years ago, yes.

16   Q.   You did testify --

17   A.   Yes.

18   Q.   -- in court as to the location of a cell phone based

19   solely upon data connections as opposed to calls or texts?

20   A.   I can't recall solely, no, sir.

21   Q.   Now, you would agree with me, would you not, sir, that

22   certain anomalies appear in call detail records, right?

23   A.   I don't know -- understand what you mean by an anomaly.

24   Q.   Well, for example, in this case in connection with

25   Dr. Rattner's phone, isn't it true that there are call

D. Magnuson - Cross                                                541

1    connections shown on the call detail records that are literally

2    impossible?

3    A.    I'm sorry, could you repeat that?

4    Q.    Sure.  Isn't it true that the call detail records for

5    Dr. Rattner's phone that you used in connection with your

6    opinions have numerous instances where a phone is connecting to

7    a tower at the same time and it is also connecting with a

8    second tower at the very same time and those towers are so far

9    apart, it is literally impossible?

10   A.    That's correct, yes.

11   Q.    So there are mistakes in these call detail records,

12   correct?

13   A.    No, sir, that's not a mistake.  That's a function of the

14   network computer.

15   Q.    Well, let's talk about that.  We just established, I

16   think, that some of the call detail records actually show a

17   phone connecting to two towers at the same time and those

18   towers are so far apart they cannot, in fact, be connected to

19   those two towers, right?

20   A.    Correct.

21   Q.    All right.  So one of those, maybe both, but at least one

22   of them is a mistake, right?

23   A.    I wouldn't call it a mistake.

24   Q.    What do you call it, sir?

25   A.    I call it network activity.  The call detail record, the

1   network computer populates our call -- our phone details.  And

2   it also, we find what we call -- even though that's network

3   activity, we find something that's internal to the network, it

4   is populated in the CDR.

5   Q.   You are going to have to help me with that explanation,

6   sir.  You are saying that the phone in fact connected to two

7   towers at the same time even though it was literally impossible

8   for it to do so?

9   A.   No, sir.

10  Q.   In my parlance, if that is presented to me on an AT&T call

11  detail record and it shows connections between two towers that

12  are impossible because of the distance --

13  A.   Right, yes, sir.

14  Q.   -- one of them is a mistake, if not both.  And what is

15  your explanation?

16  A.   Well, it's not a mistake.  It's just a function of the

17  software for AT&T.  And if you know how to analyze their

18  records, if you talk to their engineers about this issue, you

19  understand it and can you remedy it when you are doing an

20  analysis and you can find people.  You don't rely on that

21  one-off.

22  Q.   So certain of them are unreliable; is that fair?

23        That is, certain of the entries in the call detail

24  records -- for example, in my hypothetical when I said they

25  were so far apart that they couldn't connect, that would be

1   something that's unreliable in the call detail records, right?

2   A.   No, because it is readily identifiable, so you would just

3   dismiss it.

4   Q.   Well, which one do you dismiss, sir?

5   A.   Well, I would look at the texts and the voice and then do

6   a congruency check to make sure the data and the voice and the

7   text line up and that's where the phone really is.

8   Q.   You would do what, sir?

9   A.   A congruency check.

10  Q.   Congruency check.  What is that?

11  A.   It is where I compare the voice activity, say, on

12  November 15 at 12 p.m., with any text activity at 12 p.m. on

13  that date, and any data activity on that date at 12 p.m., or

14  close to that time.

15  Q.   So if I am understanding what you are saying, Mr.

16  Magnuson, if the call detail records show an impossible

17  connection at the very same time because these two towers are

18  so distant, what you would do is you would -- you would

19  recognize it, assuming you did, and you would try to reconcile

20  which one is right and which one is wrong by looking at texts

21  or calls around the same time, because they are more reliable

22  than data; is that right?

23  A.   Well, they are reliable as most of the data, but it's

24  additional data that I can use.

25  Q.   Okay.  So you go -- if you have two -- two connected -- a

D. Magnuson - Cross                                                544

1    connection to two different towers at the same time that is

2    literally impossible, you hunt around in the call detail

3    records for a connection to a cell tower made by a telephone

4    call or a text to see if you can -- if you can eliminate one

5    because it is -- it is not supported by a call or a text

6    connection; is that fair?

7    A.   That's correct.  Yes, sir.

8    Q.   All right.  So you look to the calls and the texts in the

9    same vicinity at the same time as to these two disparate

10   impossible points and you try to rule one in or one out based

11   upon whether there are reliable calls or texts, right?

12   A.   Correct.

13   Q.   Did you do that in this case --

14   A.   It wasn't necessary.

15   Q.   -- in connection with Dr. Rattner's phone?

16   A.   I'm sorry, repeat, please.

17   Q.   Did you do that in this case with respect to Dr. Rattner's

18   phone?

19   A.   No.

20   Q.   Didn't need to?

21   A.   Didn't need to.

22   Q.   Well, let me ask you this.  With respect to these types of

23   calls where the connections to two towers at the same time are

24   so far apart it is impossible, did you try to determine in the

25   case of Dr. Rattner's phone how many there were?

1   A.   How many instances of one-offs there were?  I don't

2   understand the question, I'm sorry.

3   Q.   In your parlance, is a one-off an episode where you have

4   two data connections to towers so far apart that one of them

5   has got to be wrong?

6   A.   Yes.

7   Q.   Okay.  And I'm sorry, you call that a one-off?

8   A.   Yes, sir.

9   Q.   All right.  In this case with respect to Dr. Rattner's

10  phone, did you try to determine the rate of the one-offs?

11  A.   No.  It was not necessary.

12          THE COURT:  Well, did you observe any one-offs when

13  you looked at the data?  Did you see any instances where on

14  the -- at the exact same moment, as I understand where you are

15  going, Mr. Wasserman, there were two different locations that

16  were so far apart that it couldn't be possible that they are

17  both accurate?  Did you see any of that kind of data?

18          THE WITNESS:  No, Your Honor, not with the data

19  connections on the dates and times that I analyzed.  There were

20  no one-offs.  And the reason is it doesn't occur when the phone

21  is idle and only communicating via data.

22          THE COURT:  All right.

23          MR. WASSERMAN:  Excuse me, Your Honor.

24  BY MR. WASSERMAN:

25  Q.   Now, you provided all the lawyers with reports in this

D. Magnuson - Cross                                                    546

1    case, did you not, sir?

2    A.    Yes, sir.

3    Q.    Do you recall addressing a one-off in Dr. Rattner's phone

4    records from AT&T in your rebuttal report?

5    A.    I do.

6    Q.    So there was a one-off in the call detail records for

7    Dr. Rattner's cell phone, right?

8    A.    There are one-offs in the thousands of entries of records,

9    but not during the time frame that I was requested to analyze

10   on this event.

11   Q.    What was the anomaly that you recall putting into your

12   report, sir, or the -- sorry.  What was the one-off that you

13   recall putting into your report?

14   A.    I did not address anomalies in my report except to address

15   someone else who brought up the anomaly and I deconstructed it,

16   as a mentioned before, referencing it to text messages and

17   voice messages, and it's very easily filtered out and

18   dismissed.

19   Q.    You say they were filtered out and dismissed; is that

20   right?

21   A.    Yes.

22   Q.    Excuse me, Your Honor.

23         Do you recall addressing the AT&T records for

24   Dr. Rattner's phone as they relate to November the 16th of

25   2015?

D. Magnuson - Cross                                                 547

1   A.    I'm sorry, November 16?

2   Q.    Yes.

3   A.    Yes, sir.

4   Q.    And do you recall that there were two data connections to

5   towers 60 miles apart at the same time?

6           MR. FLUHR:  Objection.  I would like to request

7   clarification as to the time frame on November 16.

8   BY MR. WASSERMAN:

9   Q.    At any time during the period when he believes and has

10  opined the phone is traveling.

11  A.    No.

12  Q.    You don't recall that?

13  A.    No.

14  Q.    Well, if that occurred, it would be one of these one-offs,

15  right?  Because a cell phone can't be connected to two towers

16  at the same time, right?

17  A.    Well, sir, I didn't see any of that activity.

18  Q.    Is it correct, sir, that a cell phone cannot be connected

19  to two towers 60 miles apart at the same time?

20  A.    Correct.

21  Q.    So if that occurred in the CDRs, the call detail records,

22  in the AT&T -- for the AT&T phone in this case owned by

23  Dr. Rattner, you don't have any recollection of it, firstly,

24  right?

25  A.    No.

D. Magnuson - Cross                                                    548

1    Q.   So you don't recall an AT&T data connection very near the

2    Chesapeake Bay Bridge --

3              MR. FLUHR:   Again, Your Honor, there has to be

4    clarification as to the time of that.

5              MR. WASSERMAN:   Well, let me finish the question.

6              THE COURT:   Let him finish the question.

7    BY MR. WASSERMAN:

8    Q.   You don't recall a data connection on November 16, 2015,

9    at 2:45 a.m. between a tower just east of Annapolis and in

10   Bethany Beach at exactly the same time, sir?

11   A.   No, sir.

12   Q.   And you don't recall that being a part of the data that

13   supports your testimony that the phone moved that night,

14   November the 16th, on its way back to Bethany Beach?

15   A.   I'm sorry, could you rephrase, please.

16   Q.   Part of your opinion in this matter is that Dr. Rattner's

17   telephone moved from Tysons, Virginia on the early morning

18   hours of November the 16th, 2015, to Bethany Beach, right?

19   A.   On the morning of the 16th?  The early evening, the early

20   morning of the 16th, yes.

21   Q.   All right.  And you don't recall these types of disparate

22   pings and one of them being a one-off on that trip that you say

23   the phone traveled?  Is that your testimony?

24   A.   Correct, I did not locate any one-offs during the data

25   sessions.

1    Q.    And you don't recall opining in your rebuttal report

2    either that you could somehow reconcile one of these one-offs?

3    A.    You can reconcile it.   That's what I have been trained to

4    do.

5    Q.    Did you do it or not, sir?

6    A.    Excuse me.

7    Q.    Did you do it or not?

8    A.    Can you repeat the question?

9    Q.    Did you try to reconcile one of these one-offs on the

10   return trip or what you say is the return trip of Dr. Rattner's

11   cell phone on the night -- or it's really the early morning of

12   November 16, 2015?

13   A.    No.

14   Q.    And that's not in your report; is that right?

15   A.    I'm sorry?

16   Q.    You didn't -- you didn't address one of these one-offs in

17   your rebuttal report in this case, did you?

18         MR. FLUHR:   Objection to form.   He is --

19         THE COURT:   I think it has been asked and answered.

20   I think he has said he did not address it.

21         MR. WASSERMAN:   Understood, Your Honor.   Thank you.

22   BY MR. WASSERMAN:

23   Q.    Now, did you look at the AT&T call detail records for

24   Dr. Rattner's cell phone for any other times when the phone

25   traveled from Bethany Beach to the Tysons, Virginia area or

D. Magnuson - Cross                                                    550

1    Great Falls and back to Bethany Beach, sir?

2    A.    Yes.

3    Q.    Did you notice, sir, a trip, like I just described, on

4    October 29 and 30 of 2015?

5    A.    No, sir, I had no opportunity or was never requested to

6    look at October 29.

7    Q.    Well, let me ask you this.  In connection with the work

8    that you were asked to do by the attorneys for Chubb, did they

9    direct you to look only at November 15 and 16 of 2015?

10   A.    14, 15, and 16, yes, sir.

11   Q.    They asked you to look only at November 14, 15, and 16,

12   2015, in the call detail records?

13   A.    That was the request.  But during my analysis, I review

14   quite a bit of other activity in there and I had reviewed other

15   entries in there.

16   Q.    So did you review the AT&T call detail records for

17   Dr. Rattner's phone beyond those that reflected connections on

18   November 14, 15, and 16, 2015?

19   A.    I may have reviewed them, but the only ones that I

20   provided mapping slides for was the three trips that she took

21   on the 14th, 15th, and the 16th.

22   Q.    So your opinions in this case are limited to the time

23   period November 14, 15, and 16, 2015; is that right?

24   A.    Yes, sir.

25   Q.    Did you try to check your work, sir?

D. Magnuson - Cross                                                    551

1   A.    Yes, sir.

2   Q.    To make sure that your opinions were well supported by the

3   call detail records?

4   A.    Yes, sir.

5   Q.    Did you use anything other than the call detail records to

6   check your work?

7   A.    The tower listings.

8   Q.    What is a tower listing that you are referring to?

9   A.    It is a separate database that AT&T maintains where they

10  are constantly updating their tower information, their

11  location, the technology, and the orientation of the antennas.

12  Q.    Did you use anything else?

13  A.    No, sir.

14  Q.    So you didn't, for example, have access to the records

15  showing when Dr. Rattner's E-ZPass crossed the Bay Bridge; is

16  that right?

17  A.    I did have access to those.

18  Q.    You did?

19  A.    Yes.

20  Q.    So did you check those records so that you would know a

21  point in time where Dr. Rattner was against the call detail

22  records?

23  A.    Yes, sir.

24  Q.    And what did you find?

25  A.    I found no correlation to that, what you are suggesting.

D. Magnuson - Cross                                                    552

1   Q.    You found no correlation?

2   A.    I found nothing in E-ZPass to suggest time -- date and

3   time or location that corresponded with the events of the

4   evening of 11/15/2015.

5   Q.    So if I told you that the E-ZPass records showed that

6   Dr. Rattner's E-ZPass crossed the Bay Bridge, the Chesapeake

7   Bay Bridge on October 27, 2015, and at that time, at that very

8   time the phone was connected to four different widely dispersed

9   cell towers at the same time, including Virginia and Delaware,

10  you wouldn't know about that?

11  A.    October 29?  I wasn't requested to review that date, sir.

12  Q.    October 27, sir.

13  A.    Okay.  The same answer.

14  Q.    I thought you looked at E-ZPass records?

15  A.    I did, yes, sir.

16  Q.    Were they provided to you by the lawyers for Chubb?

17  A.    Yes, sir.

18  Q.    And did you look at those E-ZPass records to see when

19  Dr. Rattner was crossing the Bay Bridge?

20  A.    I don't see -- I don't recall seeing an entry for a

21  E-ZPass date and timestamp, sir, otherwise I would have

22  referenced it to the phone -- the data hits.

23  Q.    Well, but you did look at the Bay Bridge records, right?

24  A.    I looked at several sets of E-ZPass type records which may

25  contain date and time and location information which I could

D. Magnuson - Cross                                                    553

1   relate to, and I could find nothing that would correspond to

2   those times of the events of 11/15.

3   Q.    So you checked and found nothing out of the ordinary?  Is

4   that what you are saying?

5   A.    No, I didn't find anything.

6   Q.    You didn't find any inconsistencies?

7   A.    There was records there, but there was -- the information

8   was not usable for location or date and time information.

9   Q.    It wasn't usable for location of what, sir?

10  A.    The vehicle.

11  Q.    When you say "the vehicle," do you mean Dr. Rattner's car?

12  A.    I assume that's what you are alluding to, her driving

13  across the bridge and stroking an E-ZPass.  Didn't show up on

14  the records that I saw.

15  Q.    But you looked at the E-ZPass records, right?

16  A.    I looked at some E-ZPass records, yes.

17  Q.    For what period of time, sir?

18  A.    I don't recall.

19  Q.    And do you recall what they were and what they showed?

20          MR. FLUHR:  Objection, Your Honor.  Asked and

21  answered.

22          THE COURT:  Yeah.  This is becoming too repetitive.

23          MR. WASSERMAN:  Can I have just a minute, please,

24  Your Honor?  Excuse me just a second, Your Honor.

25  BY MR. WASSERMAN:

D. Magnuson - Cross                                                    554

1   Q.   There should be a binder at your elbow, sir.

2        Mr. Bailiff, would you be kind enough to deliver the

3   one with his name on it.

4        Sir, would you look -- Mr. Magnuson.

5   A.   Yes, sir.

6   Q.   Would you take a look at 185A, Plaintiff's Exhibit 185A,

7   sir?

8   A.   Yes, sir.

9   Q.   And would you look, sir, at the entry for October 27,

10  2015.  It's towards the bottom.

11  A.   Yes, sir.

12  Q.   All right.

13       MR. FLUHR:  Your Honor, objection.  The witness has

14  already testified that he did not review records for this time

15  frame.

16       THE COURT:  That is correct.

17       So where you going with this, Mr. Wasserman?

18       MR. WASSERMAN:  Maybe I can clear it up this way.

19  BY MR. WASSERMAN:

20  Q.   Sir, did you look at E-ZPass records including this one,

21  185A?

22  A.   Excuse me?

23  Q.   Did you look at what's shown here, 185A, an E-ZPass record

24  relating to Dr. Rattner's phone?  E-ZPass, pardon me.

25  A.   Really, this does not look familiar to me.

D. Magnuson - Cross                                                          555

1   Q.   So you didn't look at the entry for --

2           THE COURT:  He said it didn't look familiar,

3   Mr. Wasserman.

4           MR. WASSERMAN:  Understood, Your Honor.

5           THE COURT:  I think you need to move this along.

6           MR. WASSERMAN:  No further questions, Your Honor.

7           THE COURT:  Any redirect?

8           MR. FLUHR:  Your Honor, may we be heard?  May we

9   approach before redirect?

10          THE COURT:  Yes.

11          NOTE:  A side-bar discussion is had between the Court

12  and counsel out of the hearing of the jury as follows:

13  AT SIDE BAR

14          MR. FLUHR:  Your Honor, during Mr. Wasserman's

15  cross-examination he remarked that we don't have any matching

16  solution slides.  So it's Chubb's position that he has opened

17  the door to permit us to present a presentation that was

18  supplied, albeit late, to plaintiff's counsel.

19          THE COURT:  No.  We are not going to get into that.

20  This has been very tedious, and I don't think it's fair to the

21  jury to hit them with this kind of stuff this late in the day.

22          MR. FLUHR:  Okay.  Thank you, Your Honor.

23          THE COURT:  All right.

24          NOTE:  The side-bar discussion is concluded;

25  whereupon the case continues before the jury as follows:

D. Magnuson - Redirect                                             556

1   BEFORE THE JURY

2          MR. FLUHR:  Your Honor, just a few questions on

3   redirect?

4       REDIRECT EXAMINATION

5   BY MR. FLUHR:

6   Q.   Mr. Magnuson, on cross-examination Mr. Wasserman asked you

7   a series of questions about your background and your lack of

8   experience with cell phone technology when you were in the Air

9   Force and worked for other agencies of the government.

10          Can you just describe briefly what you did in the Air

11  Force.

12  A.   Yes.  I worked on B-52 bombing radar navigation systems.

13  Q.   So in connection with that, you became familiar generally

14  with radio frequencies and things of that nature?

15  A.   Yes, sir.

16  Q.   And though not directly related to cell phone technology,

17  radio frequency is used for cell phones, correct?

18  A.   Yes.  The radio frequency technology has been around for a

19  long time, and it hasn't changed since my foundation of

20  electronic theory and radio frequencies.

21  Q.   And you continued to do similar type work with the

22  Department of the Navy, as well as Martin Marietta, a private

23  company?

24  A.   Yes.  Martin Marietta Missile Systems Group, yes, sir.

25  Q.   Mr. Wasserman also asked you about not being employed by

D. Magnuson - Redirect                                        557

1   AT&T.  In your work as a member of the CAS Team at the FBI, did

2   you have occasion to interact with engineers from AT&T and the

3   other major cell phone providers?

4   A.   Yes, sir.

5   Q.   And in those interactions, what would often be discussed?

6   A.   The situation with the rollout of 4G, LTE, what this means

7   to how they're going to format their new call detail records.

8   They're coming up with new naming conventions for towers and

9   such for the LTE technology.  So there's a lot of change going

10  on, and we want to keep abreast of that, and any issues that

11  they may have, we'll be aware and they can let us know how to

12  deal with these.

13  Q.   Now, with respect to the AT&T call detail records, you

14  were asked about that on cross-examination, and your assumption

15  that they were accurate.

16        The records as they appeared in this case in Defense

17  Exhibit 302, is that consistent with the format of the records

18  you received on numerous occasions in prior investigations.

19  A.   Yes, sir.

20        MR. FLUHR:  No further questions, Your Honor.

21        THE COURT:  All right.  Any recross?

22        MR. WASSERMAN:  No, Your Honor.

23        THE COURT:  All right.  Does anybody expect to call

24  Mr. Magnuson again?

25        MR. WASSERMAN:  No, Your Honor.

C. Snyder - Direct                                                    558

 1              MR. FLUHR:  Chubb does not, Your Honor.

 2              THE COURT:  All right.  Then, sir, you're excused as

 3    a witness.  That means you can stay in court and watch the

 4    proceedings or leave, but you're not to discuss your testimony

 5    or anything you see or hear in court with any witness who has

 6    not yet testified.

 7              THE WITNESS:  Thank you, Your Honor.

 8              NOTE:  The witness stood down.

 9              THE COURT:  Thank you.  Now can we hear the Rattner

10    video?  Are we ready for that, or is there another witness.

11              MR. FREED:  Your Honor, if I may, there is one other

12    live witness who has been here the majority of the day, Carol

13    Snyder.  I believe she will be brief.

14              THE COURT:  Yes, let's put her on.

15              NOTE:  The witness duly affirms.

16              CAROL SNYDER, called by counsel for the defendant,

17    first duly affirming, testifies and states:

18              MR. FREED:  May I inquire, Your Honor?

19              THE COURT:  Yes.

20              MR. FREED:  Thank you.

21         DIRECT EXAMINATION

22    BY MR. FREED:

23    Q.   Good afternoon.

24    A.   Hello.

25    Q.   Would you please tell us your name.

C. Snyder - Direct                                                559

1   A.    Carol Snyder.

2   Q.    Ms. Snyder, what town do you live in?

3   A.    Severna Park, Maryland.

4         THE COURT:  Ms. Snyder, move closer to the microphone

5   and speak up with a nice, loud voice.

6         THE WITNESS:  Sure.  Severna Park, Maryland.

7   BY MR. WASSERMAN:

8   Q.    Are you married?

9   A.    I am.

10  Q.    Do you have kids?

11        THE COURT:  Is that relevant?  I really don't want

12  irrelevant questions.  Let's get right to it.

13  BY MR. FREED:

14  Q.    What's your profession?

15  A.    I'm a real estate agent.

16  Q.    And where do you work currently?

17  A.    Primarily in the greater Annapolis market area.

18  Q.    What's the company that you work for?

19  A.    Monument Sotheby's International Realty.

20  Q.    And for how long have you been so employed?

21  A.    Well, actually, I'm self employed, but I've been a realtor

22  for just under ten years.

23  Q.    The company that you just mentioned, Monument Sotheby's,

24  how long have you been associated with that company?

25  A.    January 1 of this year.

C. Snyder - Direct                                                    560

1    Q.    And prior to that, where were you employed?

2    A.    I was an independent contractor with Coldwell Banker.  And

3    I also -- I was an independent contractor working for DeCaro

4    Luxury Auctions for a period of time.

5    Q.    What is DeCaro Luxury Auctions?

6    A.    It's a luxury real estate auction company.

7    Q.    And please tell us what they do.

8    A.    Typically they auction nondistressed luxury properties

9    around the country and internationally.

10   Q.    What's a nondistressed luxury property?

11   A.    Usually, it's a property that is not being forced to sell,

12   meaning there's not a foreclosure or bank-owned sale, nothing

13   along those lines.

14   Q.    Who is the owner of that company?

15   A.    Daniel DeCaro.

16   Q.    And you said that DeCaro Luxury Auctions sells -- auctions

17   real estate where?

18   A.    Across the country and sometimes outside of the country

19   into the islands, et cetera.

20   Q.    For how long were you associated with DeCaro?

21   A.    About two years.

22   Q.    What did you do for DeCaro while you were associated with

23   that company?

24   A.    I had a couple of different functions, depending on the

25   situation.  Sometimes I would procure properties, meaning I

C. Snyder - Direct                                                561

1    would meet with real estate agents and sellers, talk to them

2    about the process, explain to them what it was and have them

3    sign a contract to go ahead and auction their property.

4           Sometimes I would just be working the open houses on

5    a property and handling broker presentations and broker open

6    houses and public open houses on a property that I didn't

7    necessarily procure.

8    Q.   How does the auction process, as engaged in by DeCaro,

9    differ from a typical listing with a real estate agent?

10   A.   So the auction process is more of a marketing process.

11   They don't actually have a listing agreement in the fashion

12   that a traditional real estate listing agreement would be.

13   It's more of a marketing agreement.  And so, then they're

14   promoting the opportunity to purchase a property either at

15   auction or prior to auction with a preauction offer.

16          They do several weekends of open houses, some broker

17   open houses, promoting the auction through marketing avenues

18   and through presentations at brokerages, et cetera.  And then

19   it culminates in a final day, which is the auction day, where

20   they have a live action for the property.

21   Q.   So in the typical DeCaro engagement, from soup to nuts,

22   what kind of time period are we talking about?

23   A.   Typically, it's about a 45 to 60-day period from when they

24   sign an agreement with the seller to auction day, and then the

25   property will settle within 30 days.

C. Snyder - Direct                                                    562

1   Q.    How does DeCaro get paid in an auction deal?

2   A.    DeCaro gets paid by a buyer's premium.  So a buyer is

3   going to pay a 10 percent premium on top of whatever the hammer

4   price is.  So if the hammer price is a million, they're going

5   to pay $100,000.  That $100,000 goes to DeCaro.  And out of

6   that, they'll pay a buyer's agent commission so that the seller

7   no longer has to pay a buyer's agent commission.

8   Q.    Does the seller pay anything to DeCaro in one of these

9   transactions?

10  A.    Typically, the seller pays upfront marketing costs to

11  market the property that are used towards actual marketing.

12  But as far as the transfer of the property on settlement day,

13  the seller is not typically paying DeCaro.  The buyer is paying

14  that buyer's premium, which is paid to DeCaro.

15  Q.    And in instances where DeCaro is auctioning a property, do

16  they typically -- in your experience, did they typically work

17  with a realtor for the seller?

18  A.    Yes.  So most properties are typically already listed with

19  a real estate agent, and so they work in tandem with that real

20  estate agent to, you know, move that property towards auction.

21  Q.    And how does the real estate agent get paid?

22  A.    The real estate agent usually is paid still by the seller.

23  So they keep that part of their agreement in tactic, that the

24  real estate agent is paid by the seller at the time of

25  settlement.

1    Q.    While you were working at -- or in association with

2    DeCaro, who else worked there?

3    A.    There were several different people that worked there, but

4    the main people were, of course, Mr. DeCaro and his wife,

5    Diana.  And then the senior vice-president, Randy Haddaway.

6    And then there was myself.  And then there were a handful of

7    other people who helped with open houses and tried to procure

8    property, but they didn't, they weren't as involved, I guess,

9    on a regular basis.

10   Q.    Can you describe the typical customer of DeCaro and what

11   was motivating them in your experience.

12   A.    So the typical customer of DeCaro was a wealthy individual

13   that really understood the value of time, of sense of urgency,

14   of setting a deadline, supply and demand.  They're typically

15   very savvy individuals that were business savvy.

16         Most of them were not in a distressed situation.  So

17   although they were somewhat nervous about an auction, they were

18   usually pretty easy to work with because they were -- I don't

19   know.  They understood the process.

20   Q.    In your experience in the auction business, do homes sold

21   at auction typically sell for less than they would if offered

22   in a traditional real estate marketing -- marketed by a realtor

23   in a traditional transaction?

24   A.    It's hard to say that specifically because most of the

25   properties that we auctioned were extremely luxury, high-end

C. Snyder - Direct                                                         564

1    properties, and that market is not so easy to say, oh, this

2    proper is going to sell for X, right?  They're not cookie

3    cutter.

4            But I would say usually they're selling for about 10

5    percent or so less than market, somewhat of a discount to be

6    able to have a sale when you get to control the time, the

7    terms, et cetera, as a seller.  It's being sold as is, where

8    is, settles in 30 days, cash deals.

9    Q.   So is it accurate to say that in return for a quick sale,

10   the seller generally takes a 10 percent haircut?

11   A.   Yeah, but in some cases they're going to sell for higher

12   if there's a lot of interest.  I mean, you just never know.

13   Q.   As an auctioneer, what is your goal regarding attracting

14   bids or bidders?

15   A.   We want to create the most interest in the property as we

16   can.  We want all level of bidders to be present because they

17   drive price higher.  Our goal is to get the highest possible

18   price for a seller.  Ultimately, that benefits us as well

19   because then we make more money.

20   Q.   How does DeCaro go about marketing properties that it

21   lists for auction?

22   A.   They approach it based on each property, but for the most

23   part it's a combination of print media, online advertising, and

24   kind of boots on the ground, so really making sure that the

25   real estate community is very aware of the property and how

C. Snyder - Direct                                                     565

1   they can participate with their buyers and earn the buyer agent

2   commission.

3   Q.   And does the -- do the costs associated with that

4   marketing process come out of the up-front money paid by the

5   seller?

6   A.   The hard costs do, yeah.

7   Q.   And what is the typical up-front payment?

8   A.   That varies drastically, depending on the property, and

9   it's usually more location driven than it is necessarily

10  property itself driven because different markets are more

11  expensive.

12          I mean, to buy an ad in, you know, a Baltimore

13  magazine versus the New York Times is very different.  So if

14  the buyers are likely going to come from that market, it's

15  going to be more expensive.  But you can see anywhere from

16  25,000 to several hundred thousand of up-front marketing.

17  Q.   Did there come a time when you were involved in the effort

18  to auction the home of Dr. Susan Rattner at 151 River Park Lane

19  in Great Falls, Virginia?

20  A.   I was responsible for the open houses and brokers open

21  houses and brokerage presentations for that property.

22  Q.   What's a brokers open house?

23  A.   That's an open house that is targeted towards the real

24  estate community, and so it's not for the public, it's for the

25  real estate agents to come through the property.

C. Snyder - Direct                                                566

1  Q.    And do you recall when that effort occurred?

2  A.    I don't recall the specific date, but I do recall that we

3  had one, and the real estate agent was involved in helping us

4  with that.

5  Q.    And so what exactly -- what activities did you personally

6  engage in with regard to the effort to auction Dr. Rattner's

7  property?

8  A.    Actually physically hosting the open houses, the public

9  open houses and the broker open house, and physically giving

10 presentations at real estate brokerage offices.

11 Q.    And do you recall interacting with the realtor who had

12 been involved with Dr. Rattner prior to DeCaro getting

13 involved?

14 A.    The only real estate agents that I interacted with were

15 the ones that were already under contract with Dr. Rattner at

16 the time.

17 Q.    Who was that?

18 A.    Paddy Murphy and her daughter, Nicole.

19 Q.    And did you have occasion to meet them?

20 A.    Yes.

21 Q.    Where?

22 A.    My very first meeting with them was at her office, at

23 Paddy's office.

24 Q.    And did you have occasion to meet Dr. Rattner?

25 A.    At her home.

C. Snyder - Direct                                                      567

1   Q.   Was that at the beginning of the process?

2   A.   Of when I got involved.  I don't think it was -- it wasn't

3   at the very beginning of the process of her communicating with

4   DeCaro, she had already signed an agreement with DeCaro prior

5   to me meeting her.

6   Q.   Did you have any involvement in the negotiation of the

7   contract that Dr. Rattner signed with DeCaro?

8   A.   I did not.

9   Q.   Do you know how much up-front money Dr. Rattner paid to

10  DeCaro?

11  A.   I do not.

12  Q.   You've never seen that contract?

13  A.   I have not.

14  Q.   Do you recall that there came a time when the property was

15  supposed to be listed or advertised for open house?

16  A.   Yes.

17  Q.   And was it your job to attend the open houses?

18  A.   Yes.  I was hosting the open houses.

19  Q.   Do you recall an event that occurred on or about

20  October 31, 2015, the date of the first open house?

21  A.   That was the first date of the open house.  I received

22  communication from Dr. Rattner that I was not to have the open

23  house because there was a gas leak in the property.

24  Q.   Did you go to the open -- did you go to the property that

25  day?

C. Snyder - Direct                                                    568

1    A.    I did not step foot on the property, but I went to right

2    outside of the property, outside the driveway because there is

3    no way to cancel an open house to the public.  So I knew people

4    would still pull up and then, you know, try and get on the

5    property and knock on the door and not understand.  So I wanted

6    to meet them before they stepped on the property to say, you

7    know, we could not have the open house today, but here is

8    information on the property, give them a packet, that sort of

9    thing.

10   Q.    Was there an open house the following day?

11   A.    Yes.

12   Q.    November 1, a Sunday?

13   A.    Yes.  To my recollection, there was.

14   Q.    And while you were -- how long were you at the property on

15   October 31?

16   A.    I should have -- I was there -- we always do open houses

17   from 1 to 4.  So I most likely arrived just a few minutes

18   before 1 and left a few minutes after 4.

19   Q.    At any time did you see any repair vehicles from

20   Washington Gas or any other contractor come to the home?

21   A.    I did not.

22   Q.    Did anybody go in or out of the home while you were there?

23   A.    Not to my knowledge.

24   Q.    On the next day when you went back on November 1, did an

25   open house occur?

C. Snyder - Direct                                                      569

1   A.    To my recollection, yes.

2   Q.    And did you see any indication that there was anything

3   amiss or problems within the property when you went in that

4   day?

5   A.    I did not.

6   Q.    Can you describe your initial impressions of Dr. Rattner's

7   property when you first saw it.

8   A.    It's a very contemporary style property, which isn't that

9   common in that general market area.  So I guess I wasn't all

10  that surprised that it hadn't sold yet.  It had some really

11  nice updates, but some spaces it still needed to be updated.

12  But it was very well kept and clean and organized and pretty --

13  you know, it was nice.

14  Q.    Were you told how long it had been on the market?

15  A.    I probably was, but I don't recall.  I mean, we're really

16  used to working with properties that have been on the market

17  for an extended period of time.  And the sellers have finally

18  got to the point that they are -- don't want to wait around any

19  longer.  So it is not uncommon for us to take on a property

20  that has been on the market for awhile.

21  Q.    In your experience, can you describe the general demand

22  that existed at that time for contemporary homes.

23  A.    Again, in that market area, it is not a common style, so

24  there is not a massively high demand for that style in that

25  market area.

C. Snyder - Direct                                                  570

1   Q.   And just so we're -- I make sure we are clear.  When you

2   in your business talk about contemporary, what does that mean?

3   A.   More modern, more -- not a traditional layout.  Sharper

4   lines as far as architecture is concerned.  A lot of times they

5   are like a wood-sided house and not like a brick or a stone.

6   Q.   So if the first weekend for the auction process was to --

7   supposed to be October 31 and November 1, how many additional

8   weekends would open houses have been held?

9   A.   Additional, two other additional weekends, and then the

10  final weekend is auction weekend.  There is always a preview

11  the Friday before the auction, and then the auction itself is

12  typically Saturday morning at 11:00 a.m. with registration

13  beginning at 9:00.

14  Q.   What occurred -- what, if anything, do you recall

15  occurring on November 1 on the first open house?

16  A.   I don't recall specifically for that date as to what

17  occurred, except that we had an open house.

18  Q.   Do you recall an instance where Dr. Rattner was in the

19  home while you were conducting an open house?

20  A.   So I wasn't sure that she was in the house, although there

21  was an instance -- I don't know if it was that date or

22  another -- where she was texting me asking why I was doing

23  something or not doing something.  And I said, how do you know

24  what I am doing?  And I believe she indicated that she was in

25  the home, but I couldn't see her in the home.  I never saw her

C. Snyder - Direct                                                    571

1    in the home, which was a little off-putting, but --

2    Q.    Did you ever learn that Dr. Rattner had cameras and

3    microphones in the house?

4    A.    Well, I eventually figured that out because she said, I

5    can see what you are doing and I can hear what you're saying.

6             So I eventually figured that out because she had said

7    that to me, you know, something along those lines in a text.

8    Q.    How would you describe your relationship with Dr. Rattner?

9    A.    I would say that my relationship with Dr. Rattner was

10   fully about what my job was.  We didn't have any other

11   communication or relationship outside what my job was.

12   Q.    Now, do you recall the date on which the auction was

13   scheduled to take place on Dr. Rattner's home?

14   A.    I feel like it was either November 19 or 21st or

15   something, you know, before Thanksgiving, in the middle of

16   November.

17   Q.    So is it accurate to say that the last open house before

18   that would have been held on the 15th and 16th, if those were

19   the Saturday and Sunday before?

20   A.    The last Saturday or Sunday open house.  There was always

21   a final preview open house the day before the auction, which

22   would have been Friday.  But the last one that we were able to

23   hold because of the circumstances of the house burning down was

24   that Sunday.

25   Q.    You were present at the open house that occurred on

C. Snyder - Direct                                                      572

1   November 15, the afternoon before the fire?

2   A.    Yes.

3   Q.    And who else was there on behalf of DeCaro?

4   A.    Chad Boykin.

5   Q.    Was Dr. Rattner there that day?

6   A.    Not to my knowledge.

7   Q.    Did you receive any messages from her on that day?

8   A.    When I -- I believe when I arrived that day, that was the

9   day that one of the garage doors was open when I arrived.  And

10  so, I had texted her to let her know that one of the garage

11  doors was open and that I had closed it, but I just wanted to

12  make her aware.  So my -- I know that I communicated with her

13  in that fashion.

14  Q.    Had you experienced any difficulty in either arming or

15  disarming the alarm system at Dr. Rattner's home --

16  A.    Yes.

17  Q.    -- during the period when you were involved with the

18  house?

19  A.    Yes.

20  Q.    Can you explain that or describe what --

21  A.    It is a little bit hard to explain.  When I first got to

22  property, she had told me that the way to arm and disarm the

23  alarm was through one of the iPads.  She had multiple iPads

24  throughout the property that could control music and lighting

25  and that sort of thing.

C. Snyder - Direct                                                      573

1          And so, the one in the kitchen, there were certain

2    things for me to press, and that would arm the alarm.   I

3    attempted to do that, but she sent communication to me via

4    text, via e-mail that I had not done it correctly, but that she

5    could do it remotely.

6          Every time I tried to set it for the first couple of

7    weeks, I struggled.  And so did Paddy Murphy even the day that

8    we did the brokers open house.

9          And so, Dr. Rattner asked me to then use the keypad

10   that was like a normal alarm keypad by the door to go out by

11   the garage.  And so, that was what I ended up using towards,

12   you know, the end of my time that I spent doing the open houses

13   there.

14   Q.   If you can estimate for us, approximately how many times

15   did this occur where Dr. Rattner, to your knowledge, armed the

16   alarm remotely?

17   A.   I am not sure.  I feel like it was more than once.  I know

18   it happened at least once, but it was definitely at least one

19   time, and I feel like multiple times.

20   Q.   At the end of the open house on that last Sunday, the 15th

21   of November, were you the last person out of the house?

22   A.   Yes.

23   Q.   And before you left, did you walk through the home?

24   A.   Yes.  So Chad and I always walk through the house and make

25   sure all the doors are locked, turn off all the lights, you

C. Snyder - Direct                                                   574

1   know.

2   Q.    Who is Chad?

3   A.    Chad is who helped me.  He was also an independent

4   contractor and he would help with open houses.

5   Q.    What's his last name?

6   A.    Boykin.

7   Q.    And he was there with you that day to run the open house?

8   A.    Correct.

9   Q.    And was there -- did some people come?  Was there some

10  traffic through the house?

11  A.    I believe there was.

12  Q.    And is that part of the reason that you go through the

13  house, to make sure everybody is out and the lights are off and

14  everything is okay before you leave?

15  A.    Yeah, we always secure a house to the best of our ability

16  before we leave.

17  Q.    What do you recall occurred when you left that afternoon?

18  A.    So when we were setting the alarm, Chad had kind of bent

19  down to tie his shoe.  I set the alarm.  He bent down to tie

20  his shoe.  I had to wait for him to tie his shoe, and then we

21  walked out the door.  When we had walked out the door, the

22  alarm started sounding.

23            So I went back in, punched in the code to turn the

24  alarm off, and then punched in the code again to re-alarm the

25  property, and walked out the door.

C. Snyder - Direct                                                575

1   Q.   At the time you left or at the time you did your last pass

2   through the home, did you notice anything out of the ordinary?

3   A.   No.

4   Q.   Did you smell any smells that were unusual or seemed --

5   A.   No.

6   Q.   -- caused you to take notice?

7   A.   No.

8   Q.   And as far as you know, when you left, was the house

9   secured?

10  A.   To my understanding, it was.

11  Q.   How did you learn about the fire?

12  A.   I was awoken by my cell phone at 2-something in the

13  morning.  I got a voicemail from a fire chief or whoever it was

14  saying that the property was engulfed in flames and to call him

15  back.

16  Q.   Where were you when you got that cell phone call?

17  A.   I was at home in bed.  It was like 2 a.m.

18  Q.   And how far do you live from Great Falls?

19  A.   I mean, if you don't hit any traffic, I guess it is

20  probably about 50 minutes, but if you -- you almost always hit

21  traffic.

22  Q.   Like an afternoon like today probably.

23  A.   Yeah.  It is going to be fun going home, yeah.

24  Q.   Do you know how or why the fire department called you?

25  A.   No.  It was actually a little bazaar to me that they even

C. Snyder - Direct                                                          576

1    had my phone number.

2    Q.    And what did you tell them?

3    A.    They asked me if I knew if Dr. Rattner was home, if

4    anybody was home in the property.  And I said I didn't believe

5    she was home.  To my understanding, she was at her place in

6    Bethany.  But they said they were trying to call her and nobody

7    was answering.

8          And so, I asked them if they were calling her cell

9    phone.  And they said the only number they had was her home

10   phone.  So then I gave them her cell phone number.

11         And then I ended up subsequently speaking with that

12   fire chief one or two more times, and I gave him the phone

13   number of Paddy Murphy, I gave him the phone number of Dr.

14   Rattner's housekeeper, I guess.  Sylwia, I think, is her name.

15   Q.    Why did you have Sylwia's phone number?

16   A.    I believe the very first day I met Dr. Rattner she gave it

17   to me in case I had any issues with anything.

18   Q.    And had you ever dealt with Sylwia personally?

19   A.    I had not.

20   Q.    Did you ever return to the property after that?

21   A.    On the day of the auction I was asked to stand outside on

22   the street just like I had the very first open house day and

23   turn anybody away who came to bid on the property.

24   Q.    And was that the last time that you ever were to the

25   property?

1   A.   Yes.

2   Q.   And when before that would you say was the last time you

3   were face-to-face with Dr. Rattner?

4   A.   One of those days that I, you know, met her at the house.

5   I hadn't seen her in -- until today.

6   Q.   Was there a time in one of your early open houses when

7   Paddy Murphy was there along with Dr. Rattner?

8   A.   We met there one day, the three of us did meet at the

9   property one day.  I don't exactly remember the specific time

10  or date that it was.

11  Q.   Do you recall an instance where Paddy Murphy asked you to

12  come and sit down and explain the auction process to

13  Dr. Rattner?

14  A.   Yes, that's the day I am referencing.  We had already --

15  that's the day I am referencing.  We had already begun the open

16  houses at that point, I do believe.

17  Q.   And did you provide all the information that was

18  requested?

19  A.   To my understanding, I answered the questions that they

20  had asked.

21  Q.   After the fire, did you ever receive any correspondence

22  from Dr. Rattner?

23  A.   I did not directly.  I believe -- I don't believe I

24  directly did.

25  Q.   Did you ever see any correspondence that she had sent to

1  Mr. DeCaro?

2  A.   Mr. DeCaro did share one or two e-mails with me that she

3  had sent.

4  Q.   And what was the general tenor of the e-mails that she

5  sent?

6  A.   She was not happy with the way that they had handled

7  things, and she was somewhat threatening that, you know, we had

8  left her home unsecure and that we were somehow responsible.

9  Q.   Did she ever institute any kind of legal action, to your

10  knowledge, against you or DeCaro?

11  A.   Not to my knowledge.

12         MR. FREED:  I have no further questions.  Thank you.

13         THE COURT:  All right.  Mr. Hanes.

14     CROSS-EXAMINATION

15  BY MR. HANES:

16  Q.   Ms. Snyder, my name is Grayson Hanes.  I represent

17  Dr. Snyder -- Dr. Rattner.

18  A.   Okay.

19  Q.   Where did you say you live?

20  A.   Severna Park, Maryland.

21  Q.   And so when you got the call the night of the fire, you

22  were in Severna Park?

23  A.   Yes.

24  Q.   And you had no knowledge of the contract entered into

25  between DeCaro and Dr. Rattner?

C. Snyder - Cross                                                     579

1    A.    No, I do not recall ever seeing the contract that she

2    signed with DeCaro.

3    Q.    No knowledge of the details?

4    A.    No.

5    Q.    And you didn't negotiate, have any part of the

6    negotiations?

7    A.    No.  All of that was done prior to me being brought into

8    the process.

9    Q.    When were you brought into the process?

10   A.    After she signed an agreement with DeCaro.

11   Q.    When was that?

12   A.    Just prior to starting the open houses.

13   Q.    And the first open house was when?

14   A.    I believe it was October 31.

15   Q.    How many open houses were there?

16   A.    There is always three weekends of open houses, and then a

17   final preview day the day before the final auction.

18   Q.    So there were four?

19   A.    We do it every Saturday and Sunday from 1 to 4 for three

20   weekends prior to the open house, and then the Friday before

21   the auction.

22   Q.    So in this case how many were there?

23   A.    Well, technically there were five because she cancelled

24   the first one because of a gas leak.  And then we were unable

25   to have the seventh one, which would be the final preview day,

C. Snyder - Cross                                                      580

1    because the home was already destroyed.

2    Q.   And you talked about a typical contract and a typical

3    seller?

4    A.   I didn't talk about a typical contract, but I talked about

5    a typical process and a typical seller, yes.

6    Q.   In your typical process, how soon after the auction does

7    the sale take place?

8    A.   Per the terms and conditions of most auctions, the sale --

9    the settlement is supposed to occur within 30 days of the

10   auction date.

11   Q.   Is there any study period during that period of time?

12   A.   No.  Any study period, any studies that a buyer would like

13   to do, they must do prior to the auction date.  The property is

14   sold completely as is, where is.

15   Q.   So is the buyer allowed to bring in someone for a home

16   inspection?

17   A.   If they choose to do so, they must coordinate it, of

18   course, with us and the seller, and they must do it prior to

19   the auction.

20   Q.   So when they bid at the auction, no inspection, must

21   settle within 30 days?

22   A.   Right.  If they wanted to do an inspection, they must do

23   it prior to the auction.

24   Q.   And how do you communicate that to the prospective buyers?

25   A.   It's in the terms and conditions that are given to them

C. Snyder - Cross                                                        581

1   when they come to the property and when they register as a

2   bidder.

3   Q.    Now, this is 2015?

4   A.    Correct.

5   Q.    You were in the business in 2008?

6   A.    I got my license in 2008, I got my real estate license.

7   But I didn't work for the auction company until -- hold on, let

8   me do the math -- until -- I think I started with the auction

9   company in 2014.

10  Q.    And are you aware that 2008 is what is called The Great

11  Recession in real estate?

12  A.    I am aware.

13  Q.    And did the -- this property ever recover from that?

14          MR. FREED:  Objection.

15          MR. HANES:  She is --

16          THE COURT:  What's the basis for the objection?

17          MR. FREED:  I don't understand how this witness could

18  comment upon whether this particular property, A, had been

19  affected or recovered from the real estate downturn.

20          THE COURT:  Do you have any basis upon which you can

21  answer that question?

22          THE WITNESS:  Unfortunately not.  I was not --

23          THE COURT:  That's the answer.  Thank you.

24          THE WITNESS:  Okay.

25          THE COURT:  Sustained.

C. Snyder - Cross                                                        582

1   BY MR. HANES:

2   Q.   In 2015, you say this was a very contemporary home?

3   A.   I don't know that I said "very," but I did say

4   "contemporary," yes.

5   Q.   Yes.  And weren't there other contemporary homes in the

6   Great Falls area?

7   A.   I am sure there are other contemporary homes in the Great

8   Falls area, but it is not a typical property for that market

9   area.

10  Q.   And did you look at those other homes, contemporary homes

11  as to the ability to find out who might be interested in this

12  home?

13  A.   I did not particularly look at those contemporary homes.

14  I don't know exactly what you are asking of what I would look

15  at.

16  Q.   Did you have anything to do with marketing of this house?

17  A.   The only function that I had with marketing was presenting

18  the opportunity to the brokerage community.  Otherwise, I was

19  not involved with the marketing of that property.

20  Q.   And were you given the, the pad, the information to get in

21  on the pads, the -- to enter the property?

22  A.   What are you asking me?

23  Q.   I am asking you about the codes.

24  A.   What about the codes?

25  Q.   Were you -- did you have the codes?

C. Snyder - Cross                                                    583

1   A.    Yes, that's how I gained access when I did the open

2   houses.

3   Q.    Do you still have the codes?

4   A.    I do not.

5   Q.    Do you recall what the code was?

6   A.    I do not.

7   Q.    And how did the entry of the property, if I were entering

8   the property on the 14th of November, how would I get into the

9   property?

10  A.    If you were me or if you were someone from the general

11  public coming to see the property?

12  Q.    General public.

13  A.    You would have to come in the front door, and I would come

14  in the front door and I would write down your name and contact

15  information and give you information on the property.

16  Q.    And the door was opened?

17  A.    It was unlocked, but I manned the front door, yes.

18  Q.    And how did you -- you left the property with Chad Boykin?

19  A.    Correct.

20  Q.    How did you do that?

21  A.    We would secure the property, lock the doors, and then put

22  in the code for the alarm system, and walk out of the door by

23  the garage that automatically locks behind you and has a code

24  to be able to get in.

25  Q.    And when you showed the property, did you -- were you

C. Snyder - Cross                                                584

1   familiar with the various cameras, with what you were selling

2   basically, the cameras as well as the security system?

3   A.   I really wasn't selling the cameras or the security

4   system.  I was selling an opportunity.  That's what my job was,

5   to sell an opportunity.

6   Q.   You did not familiarize yourself with those items?

7   A.   With the cameras?

8   Q.   Yes.

9   A.   No.

10  Q.   You didn't show those then to prospective buyers?

11  A.   I didn't even know where the cameras were located.  The

12  cameras are inconsequential in the sale of the property.

13  Q.   So as the prospective buyers entered the home, what did

14  you do?

15  A.   I welcomed them.  I asked them for their contact

16  information, what their name was, phone number, e-mail address,

17  how they heard about the property, asked them to either take

18  their shoes off or put booties on their shoes, asked them if

19  they had specific questions about the property.

20  Q.   Did you conduct a tour with them of the home?

21  A.   My job was not to follow them around, no.  My job was stay

22  by the front door and welcome people to the property and get

23  their contact information.

24  Q.   So they were allowed to willy-nilly move through the house

25  at their desire?

1    A.    Yes.

2    Q.    Did Dr. Rattner complain about that?

3    A.    She was not comfortable with that.

4    Q.    So what did you do about that?

5    A.    We added another person to be there with me during the

6    open houses to kind of roam the property, to keep an eye on

7    people and check in on people.

8    Q.    Was Dr. Rattner actually upset with you for allowing that

9    to happen?

10   A.    I don't know if she was upset with me, me particularly, me

11   specifically.  She may have been upset with the process that

12   DeCaro had, but I don't know that it was me specifically that

13   she was upset with.

14   Q.    She never communicated any disappointment with you from

15   her?

16   A.    She did, I guess -- I don't know.  I don't know exactly

17   how to answer that question.  She was not -- she just wasn't

18   happy with the process.  I don't know if she specifically had

19   disappointment in me, but I don't think she liked the fact that

20   people could roam the property at their leisure.

21   Q.    And did she tell you why?

22   A.    She said she didn't like people potentially looking

23   through her drawers.

24   Q.    And using her computer?

25   A.    Using her -- I don't recall her saying using her computer,

C. Snyder - Cross                                              586

1   but...

2   Q.   Was she there at the first showing of the home?

3   A.   Again, I did not know that she was in the home, but I've

4   been later told that she potentially was hiding in a closet, a

5   locked closet that I didn't have access to.

6   Q.   Was she there at any other times during open houses?

7   A.   Again, I had no knowledge of her being present at the open

8   houses.  I didn't physically see her.  She did have us have --

9   she had one of her son's friends be present one day.  He sat in

10  a space and did his schoolwork, to my understanding.

11  Q.   How would she know the amount of traffic that went through

12  the homes on the open houses?

13  A.   We tallied it.  We kept a report of who came to the

14  property and how many people were in each group, and then every

15  week we would give her a report on the visitors.

16  Q.   And would that be on Monday?

17  A.   Typically on Monday.

18  Q.   Were you involved in that?

19  A.   I believe I was on all the phone calls, but I may not have

20  been on all of them.  Mr. DeCaro really conducted those.

21  Q.   Do you recall the weekend of the fire?

22  A.   In what fashion do I recall the weekend of the fire?

23  Q.   You were there, Chad Boykin was there?

24  A.   Yes.

25  Q.   Was there any report of the traffic on that next Monday?

1    A.    I don't know if we did a call because there was a little

2    bit of drama because the house just burned down.  I don't know.

3    I don't remember if there was a phone call that Monday.

4    Q.    But every other Monday there would be a report on traffic?

5    A.    Yes.  It was typically -- we always tried to have it

6    Monday.  Of course, if people's schedules didn't accommodate,

7    then we'd switch it to a Tuesday or something like that.  So it

8    should have occurred every Monday.

9    Q.    Now, with respect to the process, if you will, you were

10   not in charge of setting up the process?

11   A.    No.  I mean, the process was pretty standard.  We -- the

12   open houses that we did were all standard protocol, so -- but I

13   was not involved in the actual procuring of the property or the

14   agreement with Dr. Rattner.

15   Q.    On at least one occasion you came to the home and the

16   garage door was open?

17   A.    I believe it was the last day that I did an open house,

18   and I made Dr. Rattner aware that that garage door was open

19   when I arrived.

20   Q.    Was the rest of the house unsecured?

21   A.    The home all seemed secured when I got there.  I was not

22   concerned for my safety when I got to the house.  Everything

23   else seemed fine.  I just assumed that when she left, she left

24   her garage door open.

25   Q.    Was that on more than one occasion?

C. Snyder - Cross                                                          588

1   A.    Not to my recollection.

2   Q.    And as you exited the home, you went through what was

3   called the mud room?

4   A.    Yes.

5   Q.    And there was another room off that, a suite of some type?

6   A.    Off the mud room?

7   Q.    Yes.

8   A.    There was a bathroom and changing room, but there was not

9   a suite.  There was the garage.

10  Q.    So when you would leave, would you go out the mud room

11  through the garage?

12  A.    No.  The mud room door led to the outside.  There was a

13  door from the outside to the mud room that had a keypad.

14  Q.    Did you know where the motion sensors were in the home?

15  A.    No.

16  Q.    Do you know whether or not there were motion sensors?

17  A.    I only became aware of motions sensors when I was

18  interviewed by a fire detective or investigator or whatever it

19  might be.

20  Q.    And was Paddy Murphy the other realtor that was involved

21  in the sale of the home?

22  A.    Yes.  Paddy Murphy was Dr. Rattner's real estate agent.

23  Q.    Do you know how she was compensated?

24  A.    I do not know anything about the details of her agreement

25  with Dr. Rattner.

C. Snyder - Cross                                                    589

1    Q.   Was she there at all of the open houses?

2    A.   She was not.

3    Q.   Do you know how the price of the home was determined for

4    the auction?

5    A.   No.

6    Q.   And you said some homes sell for more, some sell for less?

7    A.   Correct.

8    Q.   When did you talk to Dr. Rattner?

9    A.   Regarding what?

10   Q.   Anything.

11   A.   Most of my communication with Dr. Rattner was via text or

12   e-mail.

13   Q.   Did you ever talk to her?

14   A.   I don't recall phone conversations, but I talked to her in

15   person when I met her at her home.

16   Q.   And that was the only time you directly spoke to her?

17   A.   I don't recall.  I mean, I don't recall having real phone

18   conversations with Dr. Rattner.  Most of my communication with

19   her was via text and e-mail.

20   Q.   Was the house loaded with furniture when you first went to

21   the home?

22        MR. FREED:  Objection.

23        THE COURT:  What's the reason?

24        MR. FREED:  The term "loaded" is very -- rather

25   imprecise.

1              THE COURT:  Rephrase the question.

2              MR. HANES:  I will rephrase the question.

3    BY MR. HANES:

4    Q.   During your attempts to sell this home, was furniture

5    moved in and out of the home?

6    A.   I don't recall any furniture being moved in and out of the

7    home.

8    Q.   Was any art removed from the home?

9    A.   I don't recall any art being moved in or out of the home.

10   Q.   Were there boxes in the home that were asked to be

11   removed?

12   A.   I don't recall that occurring either.

13   Q.   So you were just there on these weekends.  How many

14   weekends were you there?

15   A.   I was there for three weekends.

16   Q.   And the house burned down before the auction?

17   A.   Correct.

18             MR. HANES:  That's all I have, Your Honor.

19             THE COURT:  All right.  Any redirect?

20             MR. FREED:  Just briefly, if I may, Your Honor.

21        REDIRECT EXAMINATION

22   BY MR. FREED:

23   Q.   Ms. Snyder, you said that if someone wanted to inspect the

24   property, they had to do it before the auction?

25   A.   Correct.

C. Snyder - Redirect                                                    591

1   Q.    And would you be made aware that someone was making that

2   request?

3   A.    Yes.

4   Q.    Did anybody ask to inspect the property prior to the fire?

5   A.    No, but that is pretty common.  It wasn't a very common

6   occurrence for there to be inspections prior to an auction.

7   Q.    In your standard protocol, what, if anything, did you tell

8   the sellers about putting away or securing valuable items?

9   A.    It was pretty standard protocol for us to tell the seller

10  to secure any small items or valuable items, to put them away,

11  not leave them just sitting out.

12  Q.    And was the protocol -- didn't the protocol include as

13  part of it this idea that the potential bidders were not

14  accompanied through the house?

15  A.    That was our standard protocol.

16  Q.    And what was the logic or the reasoning for that?

17  A.    So the reasoning for that is an auction is very different

18  from a standard sale, and so an auction open house is also

19  different, very different from a standard sale open house.  We

20  are really selling the opportunity now, and we're not selling

21  the house as much any longer.  And our focus is really to

22  engage buyers to want to participate in the auction and not

23  sell them on, you know, that this cabinet was made by whatever

24  cabinet maker.  I mean, we 're really selling the opportunity.

25  It's a very different prospective or --

C. Snyder - Redirect                                                  592

1  Q.   Is it accurate to say it's looking at the house more as a

2  commodity than as a unique residence in the typical way that a

3  realtor would try to market it?

4  A.   Very much so.

5  Q.   What was the financial consequence to you of Dr. Rattner's

6  house burning down?

7  A.   I made no money.

8           MR. FREED:  No further questions.

9           MR. HANES:  No recross.

10          THE COURT:  Thank you, Ms. Snyder.  You're released

11 as a witness.  You can stay and watch the proceeding, although

12 we're about to stop for tonight.  But if you come back

13 tomorrow, you're not to discuss your testimony or anything you

14 see in court with any witness who has not yet testified.  Thank

15 you.

16          NOTE:  The witness stood down.

17          THE COURT:  All right.  Ladies and gentlemen, it's

18 been a long day, and I know parts of the testimony were a bit

19 tedious today.  So I'm going to let you go home a few minutes

20 early.

21          And tomorrow, as I said, I've got other matters

22 unrelated to this case on my docket.  So we cannot start before

23 11 o'clock.  I will ask you to be here at 11:00 tomorrow

24 morning, and we won't have a morning break.  We'll just have

25 our normal lunch break at 1 o'clock.  So for planning purposes,

1  all right.

2      Please remember my cautions.  Leave your notebooks

3  here.  Do not communicate about the case.  Do not conduct any

4  investigation.  And we'll see you back here, and I am going to

5  get you out by 5 o'clock tomorrow.  So again, just a slightly

6  shorter day.

7      All right, thank you.  We're going to stay in

8  session.

9      NOTE:  At this point the jury leaves the courtroom;

10 whereupon the case continues as follows:

11 JURY OUT

12     THE COURT:  All right.  You all have a seat for a

13 second.

14     I assume there's nothing to report, but should

15 anything need to be reported -- or is there something to be

16 reported?

17     MR. O'HARA:  May we approach, Your Honor?

18     THE COURT:  Approach the bench?  Yes.

19     NOTE:  A side-bar discussion is had between the Court

20 and counsel as follows:

21 AT SIDE BAR

22     MR. O'HARA:  Your Honor, because of the -- and I

23 would have brought it to the attention of counsel so that he

24 knew what I was going to ask the Court.  Because of the nature

25 of the claim, as you recall in testimony, there was a call by

1   Mr. Rattner to Evan Greenberg, who then got a gentleman by the

2   name of Paul Krump involved in some of the aspects of this

3   case.  Paul Krump is listed as the last witness that Chubb will

4   call in this case.  He is on our list.  And he has also been

5   the subject of a request by the plaintiff as part of pretrial

6   exchanges.

7          As we brought to your Court's staff's attention

8   during the lunch break, there has now been what I would

9   describe as a reasonable opening settlement offer for which I

10  have communicated with the chief claims officer of Chubb, Frank

11  Lattal.

12         In order to make the determination as to how the

13  company is going to proceed, Mr. Lattal would like to speak to

14  Mr. Krump, who is the president of Chubb National, who has been

15  involved in all of the dialog.

16         But I did not want to violate the witness rule.  I

17  gave Mr. Lattal specific instruction that subject to counsel

18  being comfortable, that he could speak to Mr. Krump without

19  talking about anything relating to the testimony that has

20  occurred in the case.

21         THE COURT:  Is there any problem?

22         MR. HANES:  I appreciate counsel doing that.  I have

23  no problem with doing that whatever.

24         THE COURT:  Terrific.

25         MR. O'HARA:  If the Court is comfortable with that.

1          THE COURT:  And I can tell you that Judge Anderson

2     would also make himself available if that would assist you in

3     resolving this case.

4          So that's going to go on this evening?

5          MR. O'HARA:  My phone, because it's not permitted in

6     the courthouse, is in the Westin across the street.  Mr. Lattal

7     is out of country.  I spoke with him during the break, during

8     the afternoon, the last hours of the afternoon.  I can reach

9     him tonight.  And when I give him permission, as I understand

10    it, he will speak to Mr. Krump tonight.  He was going to e-mail

11    Mr. Krump and tell him that he needed to speak with him in

12    anticipation of him being permitted to do so.

13         THE COURT:  That's fine.  I think it would be very

14    wise.  And anything we can do to assist in that process, that

15    would be fine.

16         If you don't get -- if you do get it resolved, a

17    couple of things.  First off, you have to get all your stuff

18    off counsel table because we have criminal matters in here

19    tomorrow morning, and I am going to be on the bench from 9 to

20    11.

21         If you know you have reached a settlement before

22    9 o'clock in the morning, we would like an e-mail to that

23    effect or a phone call, there is somebody in my chambers about

24    7:30 in the morning, so we will know what the day looks like.

25    But the jurors are going to come back.  So at 11 o'clock I

1   still want you here.

2            MR. O'HARA:  Yes, ma'am.

3            THE COURT:  If you have settled, you can even put it

4   on the record if you want to do that.  All right.

5            MR. O'HARA:  Thank you, Your Honor.

6            THE COURT:  All right.  Well, good luck.  Hopefully

7   you can work it out.

8            MR. O'HARA:  Thank you, Your Honor.

9            MR. FREED:  Thank you, Your Honor.

10           NOTE:  The side-bar discussion is concluded;

11  whereupon the case continues before the jury as follows:

12  BEFORE THE JURY

13           THE COURT:  All right.  As we indicated, counsel,

14  we're going to close it down for tonight.  You need to make

15  sure that you've gotten your exhibits and any equipment off of

16  your counsel table.  Mr. van Roekel will work with you on where

17  to put your things.

18           I do -- if the case goes forward tomorrow, I do want

19  a list of witnesses and the order the defense plans to call

20  them.  I think that helps the plaintiffs in knowing how the

21  cross is to be organized.  All right.

22           And I did, just for the record, want to find out one

23  thing.  Mr. Magnuson's slide presentation was completed when?

24           MR. FLUHR:  The final version, Your Honor, was not

25  completed because it incorporated some of the Enterprise rental

1   car location, which was only discovered on Tuesday.  It was not

2   completed until yesterday.

3            THE COURT:  That explains why it was a late

4   production, and then I'm not going to chastise you.  But,

5   again, we do require that there be -- you probably should have

6   served notice earlier.

7            MR. FLUHR:  Absolutely, Your Honor.  We had a draft

8   of it sooner, and I should have served it, and I regret that.

9            THE COURT:  All right.  But it is not as bad as I

10  thought.  If it had been around for a couple weeks, I was

11  really going to let you know that is not proper.

12           If there is nothing further, then we will recess

13  court then for tonight.

14           NOTE:  The October 12, 2017 portion of the case is

15  concluded.

16       --------------------------------------------------

17

18               We certify that the foregoing is a true and

19       accurate transcription of our stenographic notes.

20

        /s/  Norman B. Linnell

21      Norman B. Linnell, RPR, CM, VCE, FCRR

22

23      /s/  Anneliese J. Thomson

        Anneliese J. Thomson, RDR, CRR

24

25